**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **MARTINA PENA, individually, and** | § | |
| **As next best friend of A.P., and** | § | |
| **ARISTEDES PENA, individually, and** | § | |
| **On behalf of the Estate of** | § | |
| **ALBERTO PENA,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 7:22-cv-276** |
| | § | |
| **STARR COUNTY, TEXAS,** | § | |
| **EVELARIO GARZA, and** | § | |
| **UBALDO SUAREZ,** | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, MARTINA PENA, individually, and as next best friend of A.P., and ARISTEDES PENA, individually, and on behalf of the Estate of ALBERTO PENA, Plaintiffs, complaining of STARR COUNTY, TEXAS, EVELARIO GARZA, and UBALDO SUAREZ, and for causes of action will respectfully show unto the Court as follows:

> "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help."

*Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979).

> "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'"

*Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993).

## SUMMARY

On August 13, 2020, Alberto Pena was arrested and held in the Starr County Jail. After being placed into restraints, he began yelling that he could not breathe and needed help. Alberto's cousin, Edgar, was also an inmate in the Starr County Jail and could hear Alberto yelling for help. Guards Evelario Garza and Ubaldo Suarez took Edgar down to Alberto's cell to try to help calm him down. Alberto was turning purple, complaining he could not breathe, and begging for help. Edgar pleaded with Garza to help Alberto by at least loosening the restraints. Garza refused. Both Garza and Suarez heard Alberto begging for help and complaining he couldn't breathe. Both Garza and Suarez saw Alberto was turning purple. Instead of getting Alberto medical care, both Garza and Suarez left Alberto alone in the cell without providing any type of medical attention. The guards did not monitor Alberto through the video camera in his cell or by doing cell checks according to the Texas Commission on Jail Standards. Alberto died that day after pleading for help and receiving none.

This was not the first time a person has died in the Starr County Jail due to guards failing to monitor an inmate in a solitary cell. Sheriff Rene Fuentes was on notice that the practices of not monitoring these inmates would lead to serious injury or death, as the Starr County Jail was found non-compliant with cell checks in 2018 as part of a special inspection when Marco Munoz committed suicide while guards failed to monitor the video of his cell or conduct cell checks according to the Texas Commission on Jail Standards – the same failures which resulted in Alberto's death in this case.

Plaintiffs now file this lawsuit against Starr County, Texas, Evelario Garza, and Ubaldo Suarez for the wrongful death of their son and father and for violating Alberto's constitutional rights under the Fourteenth Amendment to the United States Constitution to receive adequate medical care as a pre-trial detainee.

2

# I.
## Parties

1.      Plaintiff Martina Pena is Alberto Pena's mother and is an individual residing in Starr County, Texas.

2.      Plaintiff Aristedes Pena is Alberto Pena's father and is an individual residing in Starr County, Texas.

3.      Defendant Starr County, Texas is a political subdivision of the State of Texas located in the Southern District of Texas. Defendant Starr County, Texas can be served through its County Judge, Eloy Vera, at 100 N. FM 3167 Rio Grande City, Texas 78582, or wherever he may be found.

4.      Defendant Evelario Garza is an individual residing in Starr County, Texas, and at all times relevant to this lawsuit was a jailer with the Starr County Sheriff's Office working in the Starr County Jail and may be served at his residence, or wherever he may be found. Defendant Garza is being sued in his individual capacity.

5.      Defendant Ubaldo Suarez is an individual residing in Starr County, Texas, and at all times relevant to this lawsuit was a jailer with the Starr County Sheriff's Office working in the Starr County Jail and may be served at his place of employment at the Starr County Sheriff's Office located at 102 E 6th St, Rio Grande City, TX 78582, or wherever he may be found. Defendant Suarez is being sued in his individual capacity.

# II.
## Jurisdiction and Venue

6.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983.

3

7.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Southern District of Texas, and all or a substantial part of the cause of action accrued in the Southern District of Texas.

## III.
## Facts and Allegations

8.     Alberto Pena, (hereinafter referred to as "Alberto") was a thirty-year-old father who died on August 13, 2020, in the Starr County Jail after pleading with Defendant Evelario Garza to help him because he could not breathe.

9.     Defendant Ubaldo Suarez stood near Defendant Garza as Alberto pleaded for help and turned purple while complaining he couldn't breathe, yet Defendant Suarez also refused to provide Alberto with any kind of medical attention.

10.     Defendants Garza and Suarez, both jailers with the Starr County Sheriff's Office, refused to provide Alberto with medical care, choosing instead to keep Alberto restrained in a solitary cell where no one else would render him aid prior to his death.

11.     Not only did Defendant Garza refuse to provide Alberto with medical care, but Defendant Garza failed to properly supervise the other jailers who not only failed to monitor Alberto through the video footage of Alberto's cell or face-to-face according to the Texas Commission on Jail Standards, but also failed to provide Alberto with any type of medical care.

12.     Below is a copy of the Texas Commission on Jail Standards Inspection Report of the Starr County Jail performed on September 25, 2020, which states that face-to-face observations were not conducted within 15 minutes as required at the time Inmate Alberto Pena was found unresponsive in the WRAP restraint system.

4

**TEXAS COMMISSION ON JAIL STANDARDS**
**JAIL INSPECTION REPORT**

Facility Name: Starr County Jail                    Date:        September 25, 2020

| Item | Section | Paragraph | Comments |
|------|---------|-----------|----------|
| 1 | 273 | .6(3) | A documented observation of the inmate shall be conducted every 15 minutes, at a minimum. The observations should include an assessment of the security of the restraints and the circulation to the extremities. |

**Face-to-face observations were not conducted within 15 minutes as required at the time Inmate Alberto Pena was found unresponsive in the WRAP restraint system.**

TCJS Inspector, Jennifer Shumake

## Prior Death Due to Starr County Jail Practice of Failing to Monitor Inmates in Solitary Cells

13.     Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty,* 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (2003).

14.     In 2018 and 2020, Rene Fuentes was the Sheriff of Starr County, Texas.

15.     Accordingly, Rene Fuentes is the final policymaker in the area of law enforcement for the purpose of holding Starr County liable under § 1983. *James,* 577 F.3d at 617; citing *Williams*, 352 F.3d at 1013.

16.     At all times relevant to the subject matter of this litigation, both Defendants Garza and Suarez were employees of Starr County, working in the Starr County Jail, and who were following the County's policies, practices, customs, *de facto* policies, and training put in place by Sheriff Rene Fuentes, which are outlined in this lawsuit.

17.     On August 13, 2020, the date of Alberto's death, Sheriff Fuentes was on notice that his jail's practice of failing to monitor inmates in solitary cells, including the detox/padded cell,

would lead to serious bodily injury or death as his jail had been previously found non-compliant in monitoring an inmate who committed suicide during the period of non-compliant monitoring.

18.     On May 13, 2018, Marco Munoz died by suicide in the Starr County Jail when he was placed into a solitary cell – the same cell Alberto died in – and not monitored either through video surveillance that was available in the cell or by way of cell checks that were supposed to take place every 30 minutes according to a Texas Commission on Jail Standards Inspection Report.

19.     Below is a copy of the Texas Commission on Jail Standards Inspection Report of the Starr County Jail performed on May 30, 2018, pertaining to Marco Munoz's death, which states the 30-minute face-to-face observations of inmates in areas where inmates are known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were not conducted in accordance with Minimum Jail Standards.

### TEXAS COMMISSION ON JAIL STANDARDS
### SPECIAL INSPECTION REPORT

**Facility Name:** Starr County Jail                                    **Date:**        May 30, 2018

| Item | Section | Paragraph | Comments |
|---|---|---|---|
| 1 | 275 | .1 | Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined. |

After reviewing video evidence provided by Starr Co. officials, it was determined that the 30 minute face-to-face observations of inmates in areas where inmates are known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were not conducted in accordance with Minimum Jail Standards.

**Wendy Wisneski -TCJS Inspector**

20.     Accordingly, Starr County, by way of its final policymaker, Sheriff Rene Fuentes, was on notice on May 30, 2018, that the practice of Starr County jailers failing to monitor inmates in solitary cells would lead to serious bodily injury or death as a result of this May 30, 2018 Inspection Report and the investigation into the death of Marco Munoz.

6

21.     Mr. Munoz was able to tie clothing around a steel grate in the floor, tie the clothing into a loop, lie on the ground next to the grate, wrap the clothing around his neck, and turn over repeatedly until the clothing tightened around his neck, asphyxiating him.

22.     Mr. Munoz was able to do all of this in a solitary cell with a camera pointed at him making video available for monitoring.

23.     However, the video of Mr. Munoz's cell was not monitored, resulting in no guard stopping his suicide.

24.     Additionally, the face-to-face checks were not done according to the minimum standards required, resulting in no guard walking by to see what he was doing in preparation for his suicide or to stop his suicide from occurring.

25.     As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse v. City of Kemah, Texas*, 961 F.3d 771, 777 (5th Cir. 2020).

26.     While Mr. Munoz died by suicide and Alberto died due to some other cause, both could have and should have been prevented by adequately monitoring their cells and providing appropriate aid – both of which were areas Sheriff Fuentes refused to implement remedial policy changes following the death of Mr. Munoz.

27.     Further, it does not make sense that multiple suicides are not required to occur before officials are required to take preventative measures, but multiple deaths by other causes are required for the same type of preventative measures to be implemented.

28.     Sheriff Fuentes was on notice of this following the tragic death of Mr. Munoz in May of 2018; however, the practice in his jail of guards failing to monitor the video feeds in

solitary cells as well as failing to perform cell checks in compliance with minimum jail standards continued, ultimately resulting in Alberto's death.

29.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993).

30.    Following Mr. Munoz's death, Starr County, through its final policymaker Sheriff Rene Fuentes, failed to adopt policies to ensure inmates in the detox/padded/solitary cells would be monitored despite it being obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights after learning the facts and the non-compliance with minimum jail standards in Mr. Munoz's case.

31.    The policies that Starr County failed to adopt despite knowing the obvious consequences of not adopting policies would be a deprivation of civil rights were the following:

    a.  Failure to monitor inmates in the detox/padded cells and other solitary cells with face-to-face checks in compliance with the minimum jail standards articulated by the Texas Commission on Jail Standards.

    b.  Failure to monitor inmates in the detox/padded cells and other solitary cells through use of video monitoring which was accessible and available in the detox/padded cells.

    c.  Failure to provide medical care or attention to inmates complaining of an inability to breathe and who are actually showing signs of failing to breathe such as turning purple;

    d.  Upon information and belief, failing to train at all its employees who were charged with watching, observing, and/or interacting with inmates in its jail who were

8

highly intoxicated on drugs and/or alcohol and/or who had mental health issues regarding such issues;

e. Upon information and belief, allowing officers to turn audio down in the dispatch area, thus muting inmate requests and verbalization of pain or difficulty breathing;

f. Upon information and belief, requiring communications personnel (dispatchers) to fulfill duties of supervision and care of prisoners, when they could not do so while fulfilling duties in the dispatch area; and

g. Upon information and belief, the Starr County Jail was understaffed as it did not have enough guards available to monitor the cell videos or to adequately complete cell checks in compliance with minimum jail standards while also completing their other guard duties.

32. Additional evidence that these policies, practices, and/or customs pre-existed Alberto's incarceration is that, upon information and belief, Defendant Garza, Defendant Suarez, nor any other jailers suffered any adverse employment decision or reprimand as a result of Alberto's suffering and death or as a result of Mr. Munoz's suffering and death.

33. As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is consistent testimony of jail employees, *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016) ("Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices."), or **the policy maker knows about a misconduct yet fails to take remedial action**, *Sanchez*, 956 F.3d at 793–94; *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies

or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

### Defendant Garza's and Defendant Suarez's Deliberate Indifference Toward Alberto's Health and Safety Caused His Death

34.    At all times relevant to this lawsuit, Defendant Garza and Defendant Suarez were acting pursuant to the practices, policies, customs, and *de facto* policies at the Starr County Jail, which are outlined in this lawsuit.

35.    On August 13, 2020, at 3:31 PM, Starr County Sheriff's Deputies took Alberto Pena into the Starr County Jail for the offense of Criminal Mischief for causing damage to property at his parents' house.

36.    Alberto was placed in the Starr County jail detox holding cell alone.

37.    This was the same cell Marco Munoz was placed in, unmonitored, until his death.

38.    Alberto's behavior was bizarre, violent, and uncooperative with jail staff.

39.    At one point while a jail supervisor was present, Alberto began striking the cell door with his own forehead.

40.    In response to Alberto attempting to injure himself by striking his own head against the door, the shift Sergeant and other jailers entered the cell in an attempt to calm him down.

41.    At 6:53 PM, Alberto again became aggressive and in response the shift Sergeant in view of the camera placed Alberto in the Wrap Restraint System, placing Alberto in the roll cart for the Wrap.

42.    The roll cart, which Alberto was placed into, was placed inside the detox cell where Alberto was housed alone.

43.    The roll cart, which Alberto was placed into, was placed directly in front of the cell camera.

44.     At 8:00 PM, a shift change occurred, and the next crew showed up for duty under the supervision of the shift Sergeant.

45.     Defendant Garza was the shift Sergeant in charge of supervising the other jailers during his shift.

46.     Defendant Suarez was a jailer on this shift working under the supervision of Defendant Garza.

47.     While Alberto was being held in the Wrap Restraint System in front of a camera in a solitary cell in the intake area, Alberto's cousin, Edgar Pena, was in a jail cell near the intake area.

48.     From his cell about 50 feet away from Alberto's, Edgar could hear a person yelling and screaming asking for his daddy and mommy and stating loudly that he could not breathe.

49.     This occurred around 8:30 PM.

50.     Edgar was able to discern that the person screaming for help was his cousin, Alberto.

51.     Edgar was aware that Alberto had some mental health issues and had helped calm Alberto down in the past.

52.     Edgar began banging on his cell door to get a guard's attention.

53.     Defendant Garza went to Edgar's cell to see why he was banging on his door.

54.     Edgar explained to Defendant Garza that Alberto was his cousin and that he thought he would be able to calm Alberto down.

55.     Edgar was placed into handcuffs and escorted by Defendant Garza, Defendant Suarez, and other guards to Alberto's cell to see if Edgar could help calm Alberto down.

56.     This occurred around 8:40 PM.

57.     Defendant Garza stood next to Edgar the entire time he was with Alberto.

58.     Defendant Suarez stood directly behind Edgar the entire time he was with Alberto.

59.     Both Defendants Garza and Suarez could hear and see both Alberto and Edgar as they were standing within a foot of Edgar.

60.     When Edgar got to Alberto's cell, Edgar saw that Alberto was strapped to the rolling cart by his arms and legs and had a heavy strap across his chest.

61.     Edgar saw that Alberto's face was purple.

62.     Despite not having medical training, Edgar immediately knew that Alberto's face was purple because he was having trouble breathing.

63.     Defendant Garza would have seen that Alberto's face was purple as well, as it was obvious and Defendant Garza was standing by Edgar and looking at Alberto.

64.     Defendant Suarez would have seen that Alberto's face was purple as well, as it was obvious and Defendant Suarez was standing behind Edgar and looking at Alberto.

65.     The other jailers that escorted Edgar over to Alberto's cell would have seen that Alberto's face was purple as well, as it was obvious and these jailers were standing around Edgar and looking at Alberto.

66.     Edgar heard Alberto continuing to cry out "I can't breathe, Momma, Daddy, Help me!"

67.     Defendant Garza would have heard Alberto's crying out "I can't breathe, Momma, Daddy, Help me!" as well, since Alberto was saying it loudly and Defendant Garza was standing by Edgar and looking at Alberto.

68.     Defendant Suarez would have heard Alberto's crying out "I can't breathe, Momma, Daddy, Help me!" as well, since Alberto was saying it loudly and Defendant Suarez was standing behind Edgar and looking at Alberto.

69.     The other jailers who escorted Edgar to Alberto's cell would have heard Alberto's crying out "I can't breathe, Momma, Daddy, Help me!" as well, since Alberto was saying it loudly and these jailers were standing around Edgar and looking at Alberto.

70.     When Alberto saw Edgar, Alberto told Edgar he could not breathe and asked Edgar to "help him" and to "let him up."

71.     Defendant Garza would have heard Alberto continuing to say he could not breathe and asking for help as Defendant Garza was standing by Edgar and Alberto was speaking loudly enough for all of them to hear.

72.     Defendant Suarez would have heard Alberto continuing to say he could not breathe and asking for help as Defendant Suarez was standing behind Edgar and Alberto was speaking loudly enough for all of them to hear.

73.     The other jailers who escorted Edgar to Alberto's cell would have heard Alberto continuing to say he could not breathe and asking for help as these jailers were standing around Edgar and Alberto was speaking loudly enough for all of them to hear.

74.     Edgar asked Defendant Garza to at least loosen the straps around Alberto's chest.

75.     Edgar pointed out to Defendant Garza that Alberto was turning purple.

76.     However, Defendant Garza responded to Edgar that, "there is no way those straps are cutting of his circulation. I am going to leave him there for at least another 15 minutes until he calms down and then I will untie him."

77.    Defendant Suarez would have heard this interaction between Edgar and Defendant Garza as Defendant Suarez was standing behind Edgar and Edgar and Garza were speaking loudly enough for Defendant Suarez to hear.

78.    The other jailers who escorted Edgar to Alberto's cell would have heard this interaction between Edgar and Defendant Garza as these jailers were standing around Edgar and Edgar and Garza were speaking loudly enough for everyone to hear.

79.    The fact that Defendant Garza commented on Alberto's circulation being cut off demonstrates that Defendant Garza was aware that Alberto was complaining about having trouble breathing and acknowledged that Edgar pointed out that Alberto was turning purple in his face.

80.    Defendants Garza and Suarez were aware that not being able to breathe could lead to serious bodily injury or death, as this is common knowledge by almost all human adults – especially jailers who possess a duty to protect and provide medical care for inmates in their watch.

81.    The other jailers who escorted Edgar to Alberto's cell were aware that not being able to breathe could lead to serious bodily injury or death, as this is common knowledge by almost all human adults – especially jailers who possess a duty to protect and provide medical care for inmates in their watch.

82.    In addition to Defendant Suarez, these other officers present heard this interaction between Alberto, Edgar, and Defendant Garza and saw that Alberto was turning purple.

83.    However, just like Defendant Garza and Defendant Suarez, none of the other guards provided medical attention for Alberto.

84.    When multiple employees act in the same unconstitutional manner, that is indicative of a *de facto* policy. *See Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 793 (5th Cir.), *cert. denied*, 141 S. Ct. 901, 208 L. Ed. 2d 455 (2020). (finding that evidence that the

14

county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees).

85.     Thus, the fact that all of the jailers present failed to help Alberto receive medical care is indicative of a *de facto* policy not to help inmates who are complaining that they cannot breathe and showing symptoms of the same.

86.     Edgar was then escorted back to his cell.

87.     After returning to his cell, Edgar could not hear Alberto continuing to make loud noises or screams for help, so Edgar decided to take a quick shower.

88.     When Edgar got out of the shower, he went to his cell door and heard loud sounds and people running.

89.     When Edgar looked through the window of his cell, he saw several officers who did not appear to be regular jailers enter the jail from the door across from his cell door and run down the hallway.

90.     Edgar began attempting to get a guard's attention to find out what was happening.

91.     Defendant Suarez came to his cell door.

92.     Edgar asked Defendant Suarez what happened, and Defendant Suarez told him that "oh your cousin is sick with Covid and we are going to take him to the hospital."

93.     It should be noted that Alberto was tested for COVID at the hospital and was negative.

94.     If the jailers truly believed that Alberto was suffering from COVID, the fact that Alberto was complaining of an inability to breathe and was turning purple should have alerted them that this was an extremely serious event (somehow more so than an otherwise healthy person

not being able to breathe and turning purple) and medical care should have been called for immediately.

95.     Later that night around 10:30 PM or 11:00 PM, Edgar stopped Defendant Suarez while he was walking by Edgar's cell.

96.     Edgar asked Defendant Suarez what happened with his cousin Alberto and Defendant Suarez told Edgar that Alberto had a drug overdose.

97.     It is unknown why Defendant Suarez changed his story from COVID to drug overdose, but either way if the jailers, including Defendant Garza and Defendant Suarez, believed Alberto was suffering from either COVID or a drug overdose, was turning purple, was complaining he couldn't breathe, and was begging for help – he should have been given immediate medical care, which he was not by any of the jailers in the Starr County jail.

98.     Interestingly, in the In Custody Death Report filed by Starr County, Starr County included the following sentence, "Alberto made no outcry or notified the jail staff that of any medical distress or trouble breathing."

99.     This statement is untrue as Edgar could hear Alberto screaming for help and that he could not breathe from 50 feet down the hall, which means jail staff in the intake area would have also heard the pleas for help and that Alberto could not breathe since Alberto's detox cell was located in the intake area.

100.    Additional evidence that this statement is not true would be that Defendants Garza and Suarez, as well as the other jailers who escorted Edgar to Alberto's cell, were present with Edgar when Alberto was continuing to ask for help and complain that he could not breathe all while his face was turning purple.

101.    Further evidence that this statement is not true would be that Alberto was restrained in a roll cart in a solitary cell with a camera pointed at him so that those viewing the camera footage would see and hear him begging for help, complaining he could not breathe, and turning purple.

102.    Pursuant to the In Custody Death Report, the last cell check was at 8:53p.m., which would have been just after Edgar's interaction with Defendant Garza and Alberto.

103.    None of Defendant Garza, Defendant Suarez, or the other jailers who escorted Edgar to Alberto's cell provided Alberto with medical care or attention in response to seeing Alberto's face turning purple, Alberto's pleas and cries for help, and Alberto's complaints that he could not breathe.

104.    Defendant Garza also did not ensure that Alberto was being sufficiently and adequately monitored despite having the authority to do so as the staff sergeant in charge during that shift, as Alberto was not monitored via the video camera in his cell or through cell checks that complied with the minimum jail standards.

105.    On August 13, 2020, it was the practice in the Starr County Jail not to monitor video footage in the solitary cells or to complete cell checks in compliance with the minimum jail standards, just as it was the same practice back on May 30, 2018, when Mr. Munoz died while not being monitored.

106.    This was a practice that Sheriff Fuentes did not change following the death of Mr. Munoz and the non-compliance report from the Texas Commission on Jail Standards.

107.    Defendant Garza was aware of these Starr County Jail practices as a sergeant in the jail and thus was aware that Alberto would not be adequately and sufficiently monitored despite turning purple, pleading for help, and complaining that he could not breathe.

108.    Knowing all of this, Defendant Garza, as the supervisor in the jail, did nothing to ensure that Alberto would receive medical attention or increased monitoring or supervision.

109.    According to the In Custody Death Report, the next cell check occurred at 9:12 PM.

110.    According to the In Custody Death Report, the jailer conducting cell checks saw that Alberto was not moving and went to the picket for backup.

111.    According to the In Custody Death Report, jail staff removed Alberto from the roll cart and the wrap and started emergency first aid CPR.

112.    This demonstrates that emergency first aid could have been provided to Alberto when he was turning purple, pleading for help, and complaining he could not breathe to Defendant Garza and in front of Defendant Suarez.

113.    According to the In Custody Death Report, EMS and Fire responded to the jail within minutes.

114.    According to the In Custody Death Report, after reviewing Alberto's cell video, Chief Molina and Texas Ranger Vela noticed that Alberto stopped moving at 9:01 PM.

115.    This means that Alberto was still moving and needing oxygen from 8:53 PM at the last cell check until 9:01 PM when he stops moving on the video.

116.    This means that eight minutes went by after Defendants Garza and Suarez saw Alberto turning purple, pleading for help, and complaining that he could not breathe before he stopped moving.

117.    Alberto was pronounced dead at the hospital.

118.    The unnecessary refusal to provide medical care by Defendant Garza, Defendant Suarez, and the jail staff at the Starr County Jail resulted in Alberto's undue suffering and preventable death.

119.    The Defendants were at all times acting under the color of law.

## IV.
## Causes of Action

### COUNT I

**DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Garza and Suarez**

120.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

121.    Pretrial Detainees must rely on jail authorities to treat their medical needs; therefore, the government has an obligation to provide medical care for those whom it is incarcerating.

122.    Alberto Pena had a constitutional right to medical care while incarcerated as a pretrial detainee under the 14th amendment.

123.    Episodic acts or omissions occur where the complained-of harm is a particular act or omission of one or more officials. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

124.    "The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).

125.    "A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs." *Est. of Bonilla by & through Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020).

126.    As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge…" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463–64 (5th Cir. 2015).

127.    <u>A serious medical condition or need</u> is "one for which treatment has been recommended or for which <u>the need is so apparent that even laymen would recognize that care is required</u>." (Emphasis added) *Carlucci v. Chapa*, 884 F.3d 534, 538-40 (5th Cir. 2018) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006))

128.    "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer*, 964 F.3d at 380 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)).

129.    "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

130.    "[T]he plaintiff must show that the officials refused to treat him, <u>ignored his complaints</u>, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs." *Domino*, 239 F.3d at 756.

131.    "A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

132.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

133.    Moreover, deliberate indifference cannot be inferred from "negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.,* 245 F.3d 447, 458-59 (5th Cir. 2001).

134.    The Fifth Circuit previously held that a defendant's failure to call an ambulance for almost two hours while plaintiff lay unconscious and vomiting rises to the level of deliberate indifference. *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003).

135.    Since *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Constitution. *Austin*, 328 F.3d at 210.

136.    Alberto Pena "had a clearly established right 'not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials.'" *Bonilla*, 982 F.3d at 307 (quoting *Dyer*, 964 F.3d at 380); see also *Thompson*, 245 F.3d at 457.

137.    At the time Defendants Garza and Suarez denied Alberto Pena medical care by ignoring his complaints, the law was clearly established that an inmate could demonstrate a constitutional violation by showing that a prison official "'refused to treat him, <u>ignored his complaints</u>, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

138.    The Fifth Circuit recently found the law was clearly established that officers violate an inmate's Constitutional rights when they know he is in distress after ingesting drugs, ignore his cries for help, and refused to seek medical assistance for him. *Sims v. Griffin*, 35 F.4th 945, 952

(5th Cir. 2022) ("[A] reasonable jury could conclude on the evidence at this stage that each officer knew Qualls had swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail. Further, a reasonable jury could conclude that no officer sought medical assistance for Qualls. In other words, a reasonable jury could find that the officers each refused to treat Qualls, ignored his cries for help, and overall evinced a wanton disregard for Qualls's serious medical needs.").

### Defendant Garza was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

139.   Defendant Garza was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Alberto was turning purple, complaining he could not breathe, begging for help, and was not capable of getting help for himself as he was relying exclusively on the Starr County Jail personnel to provide him with medical care.

140.   Thus, Defendant Garza was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Garza actually drew that inference.

141.   Defendant Garza actually drew this inference because he was physically present and saw that Alberto was turning purple while also hearing Alberto complain that he could not breathe and beg for help. Defendant Garza acknowledged that Edgar pointed out that Alberto was turning purple and could not breathe when Defendant Garza responded by explaining that the restraint strap could not be the issue.

142.    Further, Defendant Garza's actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Alberto was turning purple, complaining he could not breathe, begging for help, and Alberto was not capable of getting help for himself and was relying exclusively on the

22

Starr County Jail personnel to provide him with medical care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Garza actually drew the inference that a substantial risk of serious harm existed.

143.   Accordingly, Defendant Garza was deliberately indifferent to Alberto because Defendant Garza "refused to treat him, ignored his complaints … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" when he refused to get medical attention for Alberto despite knowing he was turning purple, complaining he could not breathe, was begging for help, was alone in a solitary cell where no other inmate would be able to help him, and that the Starr County Jail practices were to not monitor inmates in the solitary cells. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendant Suarez was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

144.   Defendant Suarez was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Alberto was turning purple, complaining he could not breathe, begging for help, and was not capable of getting help for himself as he was relying exclusively on the Starr County Jail personnel to provide him with medical care.

145.   Thus, Defendant Suarez was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Suarez actually drew that inference.**

146.   Defendant Suarez actually drew this inference because he was physically present and saw that Alberto was turning purple while also hearing Alberto complain that he could not breathe and beg for help. Defendant Suarez also heard the interaction between Edgar and Defendant Garza where Defendant Garza explained the issue was not the restraint strap.

147.    Further, Defendant Suarez's actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Alberto was turning purple, complaining he could not breathe, begging for help, and Alberto was not capable of getting help for himself and was relying exclusively on the Starr County Jail personnel to provide him with medical care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Suarez actually drew the inference that a substantial risk of serious harm existed.

148.    Accordingly, Defendant Suarez was deliberately indifferent to Alberto because Defendant Suarez "refused to treat him, ignored his complaints … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" when he refused to get medical attention for Alberto despite knowing he was turning purple, complaining he could not breathe, was begging for help, was alone in a solitary cell where no other inmate would be able to help him, and that the Starr County Jail practices were to not monitor inmates in the solitary cells. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendants Garza's and Suarez's Deliberate Indifference Caused Alberto's Injuries**

149.    As a direct result of Defendants Garza and Suarez ignoring Alberto's complaints and failing to provide him medical care and attention, he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died, for which Plaintiffs sue herein.

150.    These injuries were not caused by any other means.

151.    Defendants Garza and Suarez were at all times acting under the color of law.

## COUNT II

**FAILURE TO SUPERVISE**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendant Garza**

152.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

153.    In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

154.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Smith*, 158 F.3d at 912.).

155.    In this case, Defendant Garza failed to supervise Defendant Suarez and the rest of the Starr County jailers.

156.    First, it is clear that Defendant Garza was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and Defendant Garza actually drew the inference that a substantial risk of serious harm existed because Defendant Garza was aware that Alberto was turning purple, complaining he could not breathe, begging for help, was not capable of getting help for himself and was relying exclusively on the Starr County Jail personnel to provide him with medical care, was alone in a solitary cell where no other inmate would be able to help him, and that the Starr County Jail practices were to not monitor inmates in the solitary cells.

157.    However, despite this information, Defendant Garza permitted Defendant Suarez and the other Starr County jailers not to provide Alberto with medical care or attention and not to monitor him according to the minimum jail standards either through video monitoring or face-to-face cell checks.

158.    As a result, Defendant Garza was deliberately indifferent in failing to supervise Defendant Suarez and the other Starr County Jail staff.

159.    As a result, his failure to supervise Defendant Suarez and the other Starr County Jail staff amounted to deliberate indifference.

160.    Finally, there existed a causal link between Defendant Garza's failure to supervise and the violation of the plaintiffs' rights because the failure to monitor or provide medical care and attention is what caused Plaintiff to suffer harm and die in this case. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

161.    Had Defendant Garza taken steps to ensure Defendant Suarez or the other Starr County Jail staff had provided Alberto with medical care and sufficient monitoring instead of simply ignoring him as he turned purple, complained he couldn't breathe, and begged for help, Alberto would not have continued to suffer and ultimately die.

162.    As a result, (1) Defendant Garza failed to supervise Defendant Suarez and the other Starr County Jail staff; (2) a causal link exists between the failure to supervise and the violation of Alberto's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 911–12).

163.    Defendant Garza was at all times acting under the color of law.

## COUNT III

### PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE
### *Monell v. New York City Department of Social Services*
### Violation of the Fourteenth Amendment
### Pursuant to 42 U.S.C § 1983
### Defendant Starr County, Texas

164.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

165.    Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Bonilla*, 982 F.3d at 308.

166.    Municipalities are, however, responsible only for "their own legal acts." *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). They cannot be held liable on a *respondeat superior* theory solely because they employ a constitutional tortfeasor. *Monell*, 436 U.S. at 691–92.

167.    Plaintiffs invoke two alternative theories of liability against Starr County for the death of Alberto: the "episodic acts and omissions" of County jailers, and the unconstitutional "conditions of confinement" at the County jail. *See Flores v. Cnty of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir 1997).

168.    Plaintiffs' episodic acts and omissions theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs" and—notably— that this conduct is attributable to the enforcement of a municipal policy, practice, or custom. *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017).

169.    Plaintiffs' conditions of confinement theory, in contrast, does not rest on the fault of individual jailers. *Id*. Rather, it challenges the conditions, practices, rules or restrictions of

27

pretrial confinement imposed by Defendant Starr County that, together, "impose[] what amounts to punishment in advance of trial." *Id.*

170.    Under both theories, Plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez*, 956 F.3d at 791 (quoting *Monell*, 436 U.S. at 694).

### Episodic Acts or Omissions Claim Against Defendant Starr County

171.    In an episodic acts or omissions claim against a municipality, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

172.    To hold a municipal entity liable under this standard, the plaintiff must establish: "(1) a governmental employee acted with subjective deliberate indifference; and (2) the employee's act resulted from a policy or custom adopted or maintained with objective deliberate indifference to the plaintiff's constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

173.    An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

174.    Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

175.    Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

176.    The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

177.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

178.    Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id.* at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020). For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

179.    As the Fifth Circuit stated, "[w]e have never held, and we will not now suggest, that multiple suicides must occur in the same cell before a jail official is required to take preventative measures." *Converse v. City of Kemah, Texas*, 961 F.3d 771, 777 (5th Cir. 2020).

180.    While Mr. Munoz died by suicide and Alberto died due to some other cause, both could have and should have been prevented by adequately monitoring their cells and providing appropriate aid.

181.    Further, it does not make sense that multiple suicides are not required to occur before officials are required to take preventative measures, but multiple deaths by other causes are required for the same type of preventative measures.

182.    In this case, Defendant Garza, Defendant Suarez, and the other jailers present when Edgar was speaking to Alberto, failed to provide medical care to Alberto even though they were aware that Alberto was turning purple, complaining he could not breathe, and begging for help.

183.    Defendant Garza, Defendant Suarez, and the other jailers present when Edgar was speaking to Alberto, failed to provide medical care to Alberto as a result of the *de facto* policies and practices in the Starr County Jail which Sheriff Rene Fuentes did not change following the death of Mr. Munoz in 2018 and notice that the practices he had in place in his jail were non-compliant with minimum jail standards due to receipt of the special inspection report.

184.    Defendant Garza failed to supervise Defendant Suarez and the other Starr County jailers by permitting Defendant Suarez and the other Starr County jailers not to provide Alberto with medical care or attention and not to monitor him according to the minimum jail standards either through video monitoring or face-to-face cell checks as a result of the Starr County Jail practices and *de facto* policies outlined in this lawsuit which did not require guards to monitor inmates in the solitary cells, and which Sheriff Fuentes did not alter after the death of Mr. Munoz.

185.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans*, 986 F.2d at 108.

## **Conditions of Confinement Claim Against Defendant Starr County**

186.    A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F.3d 633, 644–45 (5th Cir. 1996).

187.    The issue is whether the conditions "amount to punishment." *Bell*, 441 U.S. at 535.

188.    As has been explained, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

189.    If Defendant Starr County wishes to incarcerate pretrial detainees in its detox/padded cell, it has a constitutional responsibility to ensure that its conditions do not amount to "punishment" in advance of trial.

190.    To prove a conditions of confinement claim, the plaintiff must show (1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated [the detainee's] constitutional rights. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, 454–55 (5th Cir. 2009).

191.    In the Fifth Circuit, a conditions of confinement claim "requires no showing of specific intent on the part of the [municipality]." *Sanchez*, 866 F.3d at 279; *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 F. App'x 664, 669 (5th Cir. 2014) ("[U]nlike an episodic-act-or-omission claim, a plaintiff is not required to prove deliberate indifference.").

192.    Although an unlawful condition or practice is often explicit, a "formal, written policy is not required." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016); see *Shepherd*, 591 F.3d at 452.

193.    A condition may "reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645).

194.    As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is consistent testimony of jail employees, *Montano*, 842 F.3d at 875 ("Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices."), or **the policy maker knows about a misconduct yet fails to take remedial action**, *Sanchez*, 956 F.3d at 793–94.

195.    When multiple employees act in the same unconstitutional manner, that is indicative of a *de facto* policy. *See Sanchez*, 956 F.3d at 793 (finding that evidence that the county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees).

196.    "We do not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.' Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.'" *See Sanchez*, 956 F.3d at 791.

197.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

198.    A *de facto* policy can be found when none of the jailers face any reprimand after an inmate's death, or when a municipality fails to take any evident action to correct the jail's alleged deficiencies. *See Sanchez*, 956 F.3d at 793 (finding that "fail[ure] to take remedial action ... arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy.") (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)).

199.    The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

200.    "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

201.    A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

202.    To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy,

actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

203.    "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities…" *Hicks–Fields*, 860 F.3d at 808.

204.    The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

## POLICYMAKER

### Sheriff Rene Fuentes

205.    The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

206.    Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983. *James v. Harris Cty,* 577 F.3d 612, 617 (5th Cir. 2009); citing *Williams v. Kaufman County*, 352 F.3d 994, 1013 (2003).

207.    Accordingly, Sheriff Rene Fuentes is the policymaker for Starr County, Texas.

208.    Sheriff Fuentes was the sheriff and policymaker for Starr County with respect to the jail in 2018 when Marco Munoz died due to the jail's custom and practice of failing to monitor inmates in the padded cell.

209.    Sheriff Fuentes was the sheriff and policymaker for Starr County with respect to the jail in 2018 when a Special Inspection Report by the Texas Commission on Jail Standards finding Starr County officials did not conduct face-to-face observations of inmates in the padded cell where Marco Munoz died in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes.

210.     Subsequently, Sheriff Fuentes continued to be the sheriff and policymaker for Starr County with respect to the jail in 2020 when Alberto Pena died due to the jail's custom and practice of failing to monitor inmates in the padded cell.

211.     Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Fuentes promulgated, adopted, approved, and/or ratified the policies and practices discussed in this lawsuit after reviewing the policies, practices, and following the death of Marco Munoz on May 13, 2018 in the Starr County Jail, which lead to a Special Inspection Report by the Texas Commission on Jail Standards finding Starr County officials did not conduct face-to-face observations of inmates in the padded cell in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes.

212.     Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Fuentes had constructive knowledge of the customs, practices, and *de facto* policies outlined in this lawsuit, as he would have known of the violations if he would have properly exercised his responsibilities…" following the death of Marco Munoz on May 13, 2018 in the Starr County Jail, which lead to a Special Inspection Report by the Texas Commission on Jail Standards finding Starr County officials did not conduct face-to-face observations of inmates in the padded cell in accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes. *Hicks–Fields*, 860 F.3d at 808.

213.     Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Fuentes failed to implement corrective or remedial customs, practices, and policies following the death of Marco Munoz on May 13, 2018 in the Starr County Jail, which lead to a Special Inspection Report by the Texas Commission on Jail Standards finding Starr County officials did not conduct face-to-face observations of inmates in the padded cell in

accordance with the Minimum Jail Standards which required observations to be made at least every 30 minutes.

214.    Upon information and belief, discovery into information within the knowledge of the County will show that Sheriff Fuentes failed to implement corrective or remedial customs, practices, and policies following the death of Alberto in the Starr County Jail in this case, which lead to a Special Inspection Report by the Texas Commission on Jail Standards finding Starr County officials did not conduct face-to-face observations within 15 minutes as required at the time Inmate Alberto Pena was found unresponsive in the WRAP restraint system, <u>as another inmate – Edgar Garza – committed suicide on October 19, 2020 despite performing acts which if monitored would have alerted guards to his intentions and that intervention was necessary</u>. This demonstrates the practices and *de facto* policies were not changed or remedied following Alberto's death.

### Policy, Custom, and Practice
### Which was Moving Force of Constitutional Violations

215.    The § 1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); *See Piotrowski*, 237 F.3d at 580.

216.    The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

217.    The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City*, 471 U.S. at 823.

218.    The policymaker for Starr County consciously chose each of the policies outlined in this lawsuit over various available alternatives.

**Policy, Custom, Practice, and Culture of**
**Failing to Monitor Inmates in the Detox/Padded Cell Who Require Additional Attention**

219.    "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans*, 986 F.2d at 108.

220.    The County's policies caused people incarcerated at the Starr County Jail to suffer in agony without receiving medical attention until passed the point where medical intervention could save them.

221.    Plaintiff has pleaded detailed facts above, relevant to inadequate medical care, which are incorporated as if set-out fully herein which support:

a.  Official policies, longstanding practices and/or customs existed at the Starr County Jail which were implemented by the final policymaking official for the County, Sheriff Fuentes.

b.  The policymaker for the County, Sheriff Fuentes, knew or should have known about the policies and/or practices and customs which created *de facto* policies at the Starr County Jail;

c.  The policymaker for the County, Sheriff Fuentes, was deliberately indifferent in promulgating these policies and/or permitting these *de facto* policies to persist; and

d.  The County's policies and/or customs were the moving force leading to the constitutional violation of failing to provide adequate medical care for Alberto causing his injuries and ultimately his death.

222.    Plaintiff has pleaded facts to support that the County was deliberately indifferent because they disregarded known or obvious consequence of their policies and practices. The County clearly knew of the policies and knew that these policies were likely to cause constitutional violations by way of the obvious nature of not monitoring persons in their custody and control as well as the deaths outlined above which were caused by these very issues.

223.    The County's policies and practices include each policy listed in this lawsuit, which include, but are not limited to:

a.  Failure to monitor inmates in the detox/padded cells and other solitary cells with face-to-face checks in compliance with the minimum jail standards articulated by the Texas Commission on Jail Standards.

b.  Failure to monitor inmates in the detox/padded cells and other solitary cells through use of video monitoring which was accessible and available in the detox/padded cells.

c.  Failure to provide medical care or attention to inmates complaining of an inability to breathe and who are actually showing signs of failing to breathe such as turning purple;

d.  Upon information and belief, failing to train at all its employees who were charged with watching, observing, and/or interacting with inmates in its jail who were highly intoxicated on drugs and/or alcohol and/or who had mental health issues regarding such issues;

e.  Upon information and belief, allowing officers to turn audio down in the dispatch area, thus muting inmate requests and verbalization of pain or difficulty breathing;

f.  Upon information and belief, requiring communications personnel (dispatchers) to fulfill duties of supervision and care of prisoners, when they could not do so while fulfilling duties in the dispatch area; and

g.  Upon information and belief, the Starr County Jail was understaffed as it did not have enough guards available to monitor the cell videos or to adequately complete cell checks in compliance with minimum jail standards while also completing their other guard duties.

224.   It is clear that the harmful effects of all of the County's *de facto* policies and practices exacerbated the harmful effects of each other as they lead to a perfect storm of a failure to adequately monitor the detox/padded cell along with anyone who did monitor the cell failing to provide care upon seeing Alberto in obvious distress.

225.   This Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system which the County put together and how the harmful effects of many of the County's *de facto* policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

226.   None of the County's policies, practices, customs, or *de facto* policies outlined in this lawsuit are reasonably related to a legitimate governmental objective.

227.   Upon information and belief, discovery into information within the knowledge of the County will show that the County's policymaker consciously chose each of the policies, practices, customs, and *de facto* policies outlined in this lawsuit over various available alternatives, despite knowledge that constitutional violations including deaths would occur if not changed.

228.   Upon information and belief, discovery into information within the knowledge of the County will show that the County's policymaker consciously chose not to alter or remedy each of the policies, practices, customs, and *de facto* policies outlined in this lawsuit, despite knowledge that constitutional violations including deaths would occur if not changed.

229.   The County's deliberately indifferent policies, practices, customs, and *de facto* policies caused Defendants Garza and Suarez, as well as the other Starr County jailers, to show their subjective deliberate indifference toward Alberto's health and safety outlined above by each Defendant and Starr County jailer aware of Alberto's suffering, as each of these defendants and jailers were acting pursuant to these policies when they were subjectively deliberately indifferent toward Alberto's health and safety.

230.   As a result of these unconstitutional policies, practices, customs, and *de facto* policies, Alberto was denied adequate medical care in violation of his rights pursuant to the Fourteenth Amendment to the United States Constitution and he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died.

231.   These injuries were not caused by any other means.

### Count Four

### <u>WRONGFUL DEATH</u>
**Against All Defendants**

232.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

233.   Plaintiff Martina Pena is Alberto Pena's mother.

234.   Plaintiff Aristedes Pena is Alberto Pena's father.

235.   Plaintiff A.P. is Alberto Pena's minor son, born in December of 2016.

236.   By reason of Defendants Garza's and Suarez's wrongful conduct of failing to provide Alberto medical care despite his clear and obvious need for medical attention due to his signs and symptoms demonstrating an imminent threat of serious harm without said care, Defendants Garza and Suarez are liable for damages.

237.     By reason of Defendant Starr County's deliberately indifferent policies, practices, and customs, which caused Defendants Garza and Suarez, as well as the other Starr County jailers, to show deliberate indifference to Alberto's health and safety, Defendant Starr County is liable for damages.

238.     To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

239.     Defendants Garza's and Suarez's deliberate indifference shown toward Alberto's health and safety, as described herein, violated Alberto's constitutional rights under the Fourteenth Amendment to adequate medical care and caused his death.

240.     Defendants Garza's and Suarez's conduct that caused Alberto's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants Garza and Suarez are liable for their actions and inaction and infliction of emotional distress caused by the wrongful death of Alberto.

241.     Defendant Starr County's deliberate indifference, as described herein, caused the deliberate indifference shown toward Alberto, which violated Alberto Pena's constitutional rights under the Fourteenth Amendment to adequate medical care and caused his death.

242.     Defendant Starr County's conduct that caused Alberto's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant Starr County is liable for its actions and inactions and infliction of emotional distress caused by the wrongful death of Alberto.

243.     Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### Count Five

### SURVIVAL ACTION
**Against All Defendants**

244.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

245.     Plaintiff Aristedes Pena brings this claim as the prospective Personal Representative of the Estate of Alberto Pena.

246.     Alberto died because of the Defendants' wrongful conduct outlined in this lawsuit.

247.     Alberto would have been entitled to bring this action against the Defendants if he had lived.

248.     The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

249.     The Defendants are liable to the Estate of the deceased for the loss of Alberto's life, pain and suffering, and the violation of his constitutional rights.

250.     Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### V.
### PUNITIVE DAMAGES
**Against Defendants Garza and Suarez**

251.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

252.     When viewed objectively from the standpoint of Defendant Garza and Defendant Suarez, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

253.     As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendant Garza and Defendant Suarez, Plaintiffs are entitled to recover punitive damages against Defendant Garza and Defendant Suarez in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

254.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

255.     Plaintiffs' injuries were a foreseeable event.

256.     Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Alberto Pena and their unconstitutional policies and practices applied against Alberto Pena.

257.     As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend Defendant Garza's and Defendant Saurez's conduct constitutes malice, evil intent, or reckless or callous indifference to Alberto's constitutionally protected rights. Thus, Plaintiffs are entitled to punitive damages against Defendant Garza and Defendant Suarez.

258.     As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs have been forced to suffer:

    a.   Actual damages;

    b.   Loss of affection, consortium, comfort, financial assistance, protection, and care;

    c.   Pain and suffering and mental anguish suffered by Alberto prior to his death;

    d.   Mental anguish and emotional distress suffered by Plaintiffs;

    e.   Loss of quality of life;

    f.   Funeral and burial expenses;

    g.   Loss of service;

    h.   Loss of earnings and contributions to Plaintiffs;

    i.   Prejudgment interest; and

    j.   Post judgment interest.

259.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs seek to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

260.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

261.    Plaintiffs respectfully request a jury trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Attorney-in-charge
Texas Bar No. 24105721
Federal ID No. 3244213

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Of counsel
Texas Bar No. 00797196
Federal ID No. 1751291

*/s/ Breanta Boss*
BREANTA BOSS,
Of counsel
Texas Bar No. 24115768
Federal ID No. 3738118

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@scottpalmerlaw.com
scott@scottpalmerlaw.com
breanta@scottpalmerlaw.com

COUNSEL FOR PLAINTIFFS