# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

| | | |
|---|---|---|
| MARTINA PENA, Individually and § <br> As Next Best Friend of A.P., and § <br> ARISTEDES PENA, Individually and § <br> On Behalf of the Estate of § <br> ALBERTO PENA § <br> § <br> *Plaintiffs*, § <br> § <br> VS § <br> § <br> STARR COUNTY, TEXAS, et al. § <br> *Defendants*, § | | C.A. NO. 7:22-cv-00276 |

## PLAINTIFFS' MOTION TO STRIKE TESTIMONY OF DEFENSE EXPERT THOMAS FOWLKES

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

**COMES NOW,** Plaintiffs Martina Pena, individually, and as next best friend of A.P., and Aristedes Pena, individually, and on behalf of the Estate of Alberto Pena, by and through their counsel of record, and hereby files this file this Motion to Strike Testimony of Defense Expert Thomas Fowlkes. In support, Plaintiffs would show the following:

## INTRODUCTION

On August 13, 2020, Alberto Pena was arrested by Starr County Sheriff's Deputies Chester Cervantes, Erasmo Rios, and Daniel Garcia for the Class B Misdemeanor offense of Criminal Mischief for causing damage to property. After being placed into the back of Deputy Cervantes' patrol car, Deputies Rios and Garcia noticed Mr. Pena banging his head on the window of the rear passenger door. When the deputies opened the doors, they found Mr. Pena lying on his side unconscious. Deputy Rios simply pushed Mr. Pena back into the vehicle and closed the door. Then, the deputies heard a loud thud on the door and opened it to find Mr. Pena had fallen back onto his side again. Mr. Pena was not responding, and the deputies attempted to get a reaction by hollering

at him and tapping his face. After Mr. Pena woke in response, he asked the deputies what had happened and Deputy Rios replied, "you knocked yourself out, you go to quit doing that shit." Mr. Pena began to cry and stated that nobody cared for him. This interaction was documented in the arrest report. No medical care was provided to Mr. Pena despite the fact that he knocked himself unconscious by striking his head against the window.

After Deputy Cervantes left the location with Mr. Pena in the backseat of his patrol vehicle, Deputy Cervantes contacted Deputies Rios and Garcia by radio and stated that Mr. Pena was again hitting his head on the passenger door window. Deputy Cervantes told Deputies Rios and Garcia that he was going to pull the car over to the side of the road so that they could secure Mr. Pena. Deputy Rios made the decision to ride in the backseat of Deputy Cervantes' patrol car with Mr. Pena to keep him from striking his head against the window any further. No medical care was provided to Mr. Pena despite the fact that he continued to strike his head against the window hard enough to cause Deputy Cervantes to pull over and Deputy Rios to ride in the backseat with Mr. Pena.

When Deputies Cervantes, Rios, and Garcia got Mr. Pena to the Starr County Jail, they did not inform the jailers that Mr. Pena had struck his head against the window in the patrol car numerous times, that he had knocked himself unconscious by doing so, or that he had not received any medical attention to ensure he was alright. Instead, the deputies simply told jail staff that Mr. Pena was being "rowdy." As a result, Mr. Pena was not provided medical care at the jail for the head injury he had caused himself in the patrol car.

Mr. Pena was placed in the detox cell in the Starr County Jail prior to being booked in while the jailers finished booking other inmates. While in the detox cell, Mr. Pena banged his head against the plexiglass window in the door to his cell hard enough to get the attention of the inmate

in the holding cell nearby and the officers in the front picket down the hall. Mr. Pena struck himself hard enough to daze himself where he fell into the wall. Roughly thirty-fives seconds later, Mr. Pena again struck his head against the plexiglass window causing Sergeant Hector Lopez and Deputies Javier Gonzalez and Joel Garza to go to the cell to check on him. While these three were standing in front of his cell looking at him through the plexiglass window, Mr. Pena once again banged his head against the window. Lopez, Gonzalez, and Garza entered the cell, sat Mr. Pena down, and began talking to him. However, Mr. Pena was not provide medical care for the head injury he just caused himself when he struck his head three separate times against the plexiglass window of his cell door causing Lopez, Gonzalez, and Garza to come check on him.

After being booked into the jail, Mr. Pena was again housed in the detox cell. At 5:38 PM, Mr. Pena struck his head against the plexiglass window of his cell door FOURTEEN times. Mr. Pena struck his head so hard that it rattled the windows of the front picket down the hall where the jailers were stationed. When Mr. Pena struck his head against the window fourteen times, he knocked himself unconscious on the floor of his cell. Mr. Pena struck his head so hard that Gonzales heard the banging all the way in the front of the jail where he was helping a medical officer with other inmates. Lopez can be seen in the surveillance video footage laughing as he walked over to Mr. Pena's cell. Garza and Gonzalez joined Lopez in the detox cell to check on Mr. Pena. Shockingly, Mr. Pena is not provided medical attention for the head injury he caused himself when he struck his head fourteen times against the window of his cell knocking him unconscious. Mr. Pena was not provided medical care despite there being a medical officer and a doctor at the jail at this time.

Eventually, Lopez orders that Mr. Pena be placed into a restraint system known as the WRAP to prevent him from further self-harm. After being placed into restraints, he began yelling

that he could not breathe and needed help. Alberto's cousin, Edgar, was also an inmate in the Starr County Jail and could hear Alberto yelling for help. Guards Emilio Garza, Jesus Barrera, Cesar Juarez, and Ubaldo Suarez took Edgar down to Alberto's cell to try to help calm him down. Alberto was turning purple, complaining he could not breathe, and begging for help. Edgar pleaded for the guards to help Alberto by at least loosening the restraints. The guards refused. Each of the guards heard Alberto begging for help and complaining he couldn't breathe. Each of the guards saw Alberto was turning purple. Instead of getting Alberto medical care, the guards left Alberto alone in the cell without providing any type of medical attention. The guards did not monitor Alberto through the video camera in his cell or by doing cell checks according to the Texas Commission on Jail Standards. Alberto died that day after pleading for help and receiving none – including no medical care or attention by any medical personnel.

## EXPERT ISSUES

Issues in this case include the cause of Mr. Pena's death and whether the arresting deputies and detention officers acted reasonably in refusing to summon medical care for Mr. Pena despite his continued self-harm. Plaintiffs retained multiple experts to discuss (1) cause of death (Dr. Judy Melinek – a forensic pathologist), (2) accepted standards in a correctional setting (Tim Gravette – former correctional officer and associate warden), and (3) accepted police practices and standards (Natasha Powers – retired police sergeant). Defendants have attempted to hire Dr. Thomas Fowlkes as a "one-stop-shop" to testify regarding all of the issues in this case. However, he is not qualified to opine on any of them. Further, the one area where Dr. Fowlkes may be qualified to opine – correctional healthcare[1] – is irrelevant in this case as no medical personnel were involved in providing any medical

---

[1] According to Dr. Fowlkes' CV, his certification as a Certified Correctional Healthcare Professional – Clinical Provider (CCHP-CP) lapsed in June of 2024. Exhibit B, Dr. Fowlkes' Report, p. 1.

care to Mr. Pena while he was in the custody of the Starr County Jail. The issue in this case is whether the jailers should have had medical personnel provide care to Mr. Pena, not whether that care was insufficient – as it never occurred.

Dr. Fowlkes is a physician who is board certified in addiction and emergency medicine to opine on (1) the standard of care for healthcare workers in a jail, (2) the cause of Plaintiff's death, which involved blunt force trauma to the head and struggle under prolonged restraint, (3) the reasonableness of the actions by the patrol deputies at the scene of the arrest, and (4) the reasonableness of the conduct of the detention officers in the Starr County Jail. Dr. Fowlkes is not a forensic pathologist – or even a pathologist. Nonetheless, he plans to testify at trial on causation of death by <u>adopting and repeating the opinions of the medical examiner, Dr. Frank Salinas, as if they are his own</u>.

His opinions on causation of death should be excluded at trial, as he provides no analysis supporting his *ipse dixit* conclusions and simply parrots Dr. Salinas – likely due lacking any experience in the areas at issue. His opinions on the reasonableness of the patrol deputies and the jailers should be stricken as he has <u>zero experience as a patrol deputy or jailer</u>; thus, his opinions in these areas are completely unreliable. Finally, his opinions regarding the standards of care for providing medical care in a correctional setting should be stricken as <u>no medical personnel are involved in this case</u> and his healthcare standards of care do not apply to patrol deputies or detention officers.

Dr. Fowlkes has had his testimony stricken in another case where he parroted the conclusions of another expert and was not qualified to give opinions on causation. *Jarvis v. McLauglin*, No. 1:20-CV-02028-CNS-GPG, ECF 179 (D. Colo. Oct. 20, 2022).

The following is an excerpt from the hearing in *Jarvis*, where the Court struck Dr. Fowlkes'

opinions due to not being qualified to render opinions in causation. Exhibit A, *Jarvis v. McLauglin*, No. 1:20-CV-02028-CNS-GPG, Reporter's Transcript of Pretrial Conference, October 10, 2022.

```
23          THE COURT:  Got it.  All right.  Before we go through
24    the proposed pretrial order, I did want to turn to the one
25    pending motion, which is Plaintiff's Motion To Strike Portions
```

                                                                    3

```
 1    Of The Expert Report of Thomas... I'm not sure how to say his
 2    name.  Fowlkes?  Is that close enough?  That's ECF Number 127.
 3    Largely, for the reasons set forth in plaintiff's brief, the
 4    Court is granting that motion, as detailed in plaintiff's
 5    motion on pages 13 through 15.  The following opinions will be
 6    excluded.  Opinions on cause of the initial stroke on 7-25-18,
 7    and opinions on defendant's conduct between 7-25 and 7-31, with
 8    respect to whether or not that conduct caused the injuries to
 9    the plaintiff.
10          The Court finds that Dr. Fowlkes appears to be a
11    standard-of-care expert, has no particular expertise in
12    neurology or strokes, causation of strokes, treatment of
13    strokes, et cetera, and therefore, the Court is granting that
14    motion.
```

## ARGUMENTS AND AUTHORITIES

Rule 702 of the Federal Rules of Evidence authorizes a 'witness qualified as an expert by knowledge, skill, experience, training, or education" to give opinion testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Under Rule 702 of the Federal Rules of Evidence, a witness who is qualified by knowledge, skill, experience, training, or education may offer a relevant opinion if: (a) the expert's knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case; e.g., *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007). Consistent with the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Rule 702 requires trial courts to act as gatekeepers, admitting only expert testimony that is both reliable and relevant. 509 U.S. 579, 589 (1993). First, a court must determine if the expert's proffered testimony has "a reliable basis in the knowledge and experience of his [or her] discipline." *Id.* at 592. Second, a court must consider whether the proposed testimony is sufficiently relevant to the task at hand. *Id*. The objective of *Daubert's* gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In this case, the court must determine whether the proposed expert witness, Dr. Fowlkes, has training or experience to offer opinions that are relevant for the expert's testimony to assist the trier of fact. *Primrose Operating* Co. *v. Nat'/ Am. Ins.* Co., 382 F.3d 546, 562-63 (5thCir. 2004). The court also must assess whether the "reasoning or methodology underlying the testimony is

valid and determine whether the reasoning or methodology can be applied to the facts at issue." *Skidmore v. Precision Printing & Packaging, Inc.,* 188 F.3d 606,617 (5th Cir. 1999); see *Daubert,* 509 U.S. at 592-93. Here, the relevant field to offer opinions regarding the cause of death from untreated blunt force trauma to the head and sustained struggle while under prolonged restraints is forensic pathology with experience with these specific issues. Dr. Fowlkes is an expert in addiction medicine who simply does not have the experience necessary to opine on the issues of this case.

1. <u>Opinions on cause of death, blunt force head trauma, and consequences of sustained struggle against prolonged restraint.</u>

Both the Plaintiffs and the Defendants retained experts to opine on the cause of Mr. Pena's death, and whether the denial of medical care following his repeated self-inflicted head injuries along with the sustained struggle in the WRAP restraint chair caused his death. Plaintiff's expert, Dr. Judy Melinek, is board certified in forensic pathology who has previously been qualified as an expert witness in trauma interpretation. Exhibit D, Dr. Judy Melinek Expert Report, p. 3. She has taught, presented, researched, and published in peer reviewed journals extensively on causes of death. Exhibit E, Dr. Judy Melinek CV, generally.

Importantly, Dr. Melinek will testify that "The presence of extensive subgaleal hemorrhages in the context of repeated head impacts, and witnessed unconsciousness following one of those impacts, with cerebral edema and vascular injury on microscopic sections, indicate that concussive head injury also played a significant role in this death." Ex. D, p. 4. Dr. Melinek will also testify that "Prolonged restraint in the restraint chair led to his death because it allowed him to continue struggling in his agitated state until he reached the point of physical exhaustion and dehydration." *Id*. Dr. Melinek will testify that "Had Mr. Peña been evaluated for head trauma following the impact that caused him to fall down and "go unconscious" (per Officer Joel Garcia) or "knock himself out" (per Officer Javier Gonzalez), he would have been sedated for agitation,

and his death would have also been averted." *Id*. Further, Dr. Melinek will explain that "This death could have been averted by giving Mr. Peña prompt medical attention for his agitation, cooling him, monitoring him, correcting electrolyte imbalances caused by exhaustion, dehydration, rhabdomyolysis, and metabolic acidosis; and ventilating him for emerging aspiration pneumonia." *Id*. Dr. Melinek's actually used a methodology to reach her conclusions, which involved reviewing the microscopic slides from the autopsy of Mr. Pena and forming her own conclusions based off her experience and training. Ex. D, p. 6, para 3; p. 22.

Dr. Fowlkes is board certified in emergency medicine and addiction medicine. Ex B, p. 1. He has never performed a residency in forensic pathology or pathology and is not board certified in forensic pathology or pathology. Exhibit B, Dr. Fowlkes CV, generally. He has not presented at any conferences on blunt force head trauma, consequences of sustained struggle while restrained, or determining cause of death. *Id*. He has never published a peer-reviewed article on blunt force head trauma, consequences of sustained struggle while restrained, or determining cause of death. *Id*. The last time he worked as an urgent care physician was in 2009. Ex. B, pp. 1-2. He has never been a medical examiner, and the only experience he has even tangentially related to this field is acting as an <u>investigator</u> for the deputy medical examiner for Lafayette County, Mississippi after completing a <u>40-hour</u> death investigation certification class! Ex. B, p. 2.

Dr. Fowlkes is completely unqualified to offer opinions on cause of death regarding blunt force trauma to the head or struggle against prolonged restraint. Ex. B, generally. The one area that has any significance to this case where Dr. Fowlkes is likely qualified to opine is whether the drugs in Mr. Pena's blood caused his death; however, Dr. Fowlkes states in his report that none of the alcohol, cocaine metabolite, or marijuana found in Mr. Pena's blood were at levels high enough to cause Mr. Pena's death. Ex. C, Dr. Fowlkes' Report, pp. 17-19.

Not only is Dr. Fowlkes unqualified to opine on cause of death in this case, but his reasoning or methodology underlying the opinions is not valid or reliable – <u>because he used no reasoning or methodology</u> and simply made *ipse dixit* conclusions. *Skidmore*, 188 F.3d at 617; *see Daubert*, 509 U.S. at 592-93). Instead of employing a methodology – such as personally reviewing the microscopic slides from the autopsy of Mr. Pena like Dr. Melinek did in this case – Dr. Fowlkes simply parrots the findings of the medical examiner – Dr. Frank Salinas. Ex. C, p. 20, para. 7 ("I agree with Dr. Salinas' cause of death finding."). "[E]xpert testimony based solely or primarily on the opinions of other experts is inherently unreliable." *Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*, 725 F. Supp. 3d 644, 685 (E.D. Tex. 2024); quoting *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014). "It is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable." *Id.* Simply put, a testifying expert may not "act as a mere conduit" for another expert's opinion. *Equal Emp. Opportunity Comm'n*, 725 F. Supp. 3d at 685; quoting *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at *14 (W.D. Tex. Mar. 24, 2021). The "[l]ack of [Dr. Martin's] originality is not dispositive," but "[t]he crucial issue is whether [he] independently evaluated or verified the opinions upon which he relies." . *Equal Emp. Opportunity Comm'n*, 725 F. Supp. 3d at 685; quoting *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-CV-00366-JRG-RSP, 2019 WL 6896674, at *3 (E.D. Tex. Dec. 18, 2019) (quoting *Hunt*, 297 F.R.D. at 275). An expert cannot parrot the opinions and conclusions of other experts whose testimony is not subject to cross-examination. *Equal Emp. Opportunity Comm'n*, 725 F. Supp. 3d at 685; *Hunt*, 297 F.R.D. at 275.

An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert. *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th

Cir.1993) (expert who adopted the projections of another expert did not reasonably rely on those projections when the record did not reveal what efforts the expert independently made to corroborate the projections). Rule 702 requires an expert's testimony to be "based upon sufficient facts or data" and to be "the product of reliable principles and methods" which have been "applied ... reliably to the facts of the case." *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir.1999) "Under *Daubert,* any step that renders the analysis unreliable renders the expert's testimony inadmissible. *Id.* "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). While an expert may review or even consider the reports of other experts, he must also independently analyze the material and apply his own knowledge and experience without wholesale adopting the opinion of another expert. *Sinclair Wyoming Ref. Co. v. A&B Builders, Ltd.,* No. 15-CV-91-ABJ, 2018 WL 4698781, at *11 (D. Wyo. Sept. 11, 2018). *See also Rodgers v. Beechcraft Corp.*, No. 15-CV-129-CVE-PJC, 2016 WL 7888002, at *9 (N.D. Okla. Oct. 27, 2016) (expert not permitted to testify to scientific or technical opinions which are not the product of his own analysis and technical methodology, and to extent he is merely parroting the opinions of other experts, his testimony does not pass the requirements of *Daubert*, and is duplicative of that offered by other expert witnesses).

Dr. Fowlkes makes repeated *ipse dixit* conclusions without any analysis, methodology, or reasoning supporting these claims – but instead simply parrot's the opinions and conclusions of Dr. Salinas. This is surely because he is not an expert in forensic pathology, has no experience or training in determining cause of death, and is completely unqualified to opine on whether Mr. Pena's blunt force head trauma or struggle against prolonged restraints caused his death. For these reasons, Dr. Fowlkes should be prohibited from testifying regarding the cause of death in this case,

and the following opinions in his report should be struck:

- "I see no evidence in this case that the WRAP restraint device played a role in Mr. Pena's death." Ex. C, p. 15, para 7.
    - This is just an *ipse dixit* conclusion with no analysis or support.
- "His symptoms and behavior were not consistent with a loss of consciousness due to a head injury." Ex. C, p. 13, para. 2.
    - This is just an *ipse dixit* conclusion with no analysis or support.
- "Nothing that the Defendants did or are alleged to have failed to do caused or contributed to Mr. Pena's unfortunate death." Ex. C, p. 16, para. 11.
    - This is just an *ipse dixit* conclusion with no analysis or support.
- "Mr. Pena's past medical history and autopsy findings influence my opinions as follows: 1. Mr. Pena did not have any significant trauma on autopsy. He did not even have any injuries which would have required medical care. Specifically: a. Mr. Pena did not have a significant closed head injury. He did not have a skull fracture, he did not have bleeding or bruising of his brain. Mr. Pena did not have a head injury which would cause his death or which required any treatment or intervention." Ex. C, pp 16-17, para. 1.
    - Dr. Fowlkes references the autopsy findings and then makes an *ipse dixit* conclusion about cause of death without providing any analysis. He does no more than copy the findings of Dr. Salinas in the autopsy report and then make a conclusion helpful to the Defendants in this case.
- "I agree with Dr. Salinas' cause of death finding." Ex. C, p. 20, para 7.
    - Dr. Fowlkes is literally just parroting Dr. Salinas.

- "there is no evidence that the restraint device played any causative role in his death." Ex. C, p. 22, para 1.
    - This is just an *ipse dixit* conclusion with no analysis or support.
- "The mild cerebral edema found only on microscopic examination likely has no causal connection to his death and is likely not causally connected to his banging on the doors and window earlier that day." Ex. C, p. 22, para 1.
    - Dr. Fowlkes simply speculates that his *ipse dixit* conclusion is "likely" without giving any reasoning, explanation, analysis, or methodology for that conclusion.
- "I disagree that medical evaluation or treatment was required for Mr. Pena's episodes of hitting his head or that this would have somehow prevented his sudden death several hours later." Ex. C, p. 23, para 1.
    - This is just an *ipse dixit* conclusion with no analysis or support.
- "I disagree that even had he been seen by a medical professional at the SCJ that it would have prevented his sudden death that evening." Ex. C, p. 29, para 8.
    - This is just an *ipse dixit* conclusion with no analysis or support.

2. <u>Opinions on the reasonableness of actions by the arresting officer defendants</u>

Dr. Fowlkes has zero experience as a police officer or sheriff's deputy making an arrest in the field or making contact with citizens during patrol. (Ex. B, generally). He does not list police practices or police work of any kind as an area of expertise in his CV. Ex. B, p. 1, Summary of Qualifications. He does not have any certifications associated with police work of any kind. Ex. B, p. 1. He does not have any experience with police work of any kind. Ex. B, pp. 2-3. He has not attended any police academies or undergone any police training. Ex. B, p. 3. He is not a member of any police organizations. Ex. B, p. 3. He has not published anything regarding police work of

any kind. Ex. B, p. 3. He has not presented on any topics regarding police work of any kind. Ex. B, pp. 4-5. He is board certified in emergency medicine and addiction medicine. Ex. B, p. 1. However, he simply has no expertise in police work. Ex. B, generally. Accordingly, he is not qualified to provide opinions on the reasonableness of the arresting deputies' conduct. F.R.C.P. 702; *Daubert,* 509 U.S. at 589.

Not only is Dr. Fowlkes unqualified to offer these opinions, but he also provides no analysis to ensure these opinions are reliable. This is surely because he is not an expert in police practices. For these reasons, Dr. Fowlkes should be prohibited from testifying regarding the actions of the arresting officers in this case, and the following opinions in his report should be struck:

- "The actions that the SCSO officers (Deputy Cervantes, Deputy Garcia, and Lt. Rios) took in restraining, calming, and transporting Mr. Pena were all reasonable and appropriate." Ex. B, p. 13, para. 2.

3. <u>Opinions on the reasonableness of actions by the detention officer defendants</u>

Dr. Fowlkes has zero experience as a detention officer or jailer overseeing the custody of arrested or convicted persons in any type of detention facility. Ex. B, generally. He does not list correctional standards related to detention officers or jailers as an area of expertise in his CV. Ex. B, p. 1, Summary of Qualifications. While he lists a certification by the Mississippi Board on Jail Officer Standards and Training on his CV, he maintains no certification by any Texas agency and does not have any experience actually working as a detention officer or jailer in any type of detention facility, jail, or prison. Ex. B, pp. 1-2. Outside of the one certification, he has not attended any other ongoing learning for detention officers or jailers. Ex. B, p. 3. He is not a member of any detention officer or jailer organizations. Ex. B, p. 3. He has not published anything regarding detention officer or jailer work of any kind. Ex. B, p. 3. He has not presented on any topics

regarding work done by a detention officer or jailers of any kind. Ex. B, pp. 4-5. He is board certified in emergency medicine and addiction medicine. Ex. B, p. 1. However, he simply has no expertise as a detention officer, correctional officer, or jailer. Ex. B, generally. At most he has experience working in the same building as detention officers or jailers, but this hardly makes him an expert in jailer standards and practices any more than undersigned counsel is an expert in Human Resources because there is a Human Resources department at his firm and undersigned counsel interacts with the Human Resources director. Thus, Dr. Fowlkes is not qualified to provide opinions on the reasonableness of the jailers' conduct. F.R.C.P. 702; *Daubert,* 509 U.S. at 589.

Not only is Dr. Fowlkes unqualified to offer these opinions, but he also provides no analysis to ensure these opinions are reliable. This is surely because he is not an expert in jailer standards or practices in any way. For these reasons, Dr. Fowlkes should be prohibited from testifying regarding the actions of the jailers in this case – including jailer observations, documentation of observation logs, and use of the WRAP restraint system – and the following opinions in his report should be struck:

- "At the SCJ the correctional officers performed appropriate receiving screenings (CO Joel Garza). They took appropriate actions in placing Mr. Pena in a single-man cell near the booking area where he could be under close observation and video monitoring until he sobered up and the booking process was complete. There were no serious medical conditions identified or suspected which should have led reasonable correctional officers to refuse acceptance into the facility or should have prompted them to send him to a hospital." Report, p. 13, para. 3.
- "When Mr. Pena began banging on the door/windows of his cell with his head and other parts of his body, the SCJ security staff appropriately tried verbal interventions to get him

to stop. When this failed and Mr. Pena threatened the officers, they appropriately escalated the use of force to gain control of Mr. Pena. They then appropriately placed him in a restraint device to prevent him from harming himself and others." Report, p. 14, para. 5.

- "He did not have apparent injuries which should have led a reasonable correctional officer to send him to the hospital or take any actions aside from those taken (CO Gonzalez, Sgt. Lopez, and CO Joel Garza)." Report, p. 14, para. 6.

- "I am familiar with the WRAP restraint device and similar restraint devices used in jails. The information available in this case shows that the application of this device was appropriate and that appropriate medical checks and monitoring were used." Report, pp. 14-15, para. 7.

- "When Mr. Pena remained agitated in the WRAP restraint system, the SCJ correctional officers appropriately let a person Mr. Pena knew (his cousin) speak with him from outside his cell to attempt to help him calm down." Report, p. 15, para. 8.

- "The welfare checks of the holding cells and the restraint logs were kept appropriately and document an adequate number and timing of checks on Mr. Pena's well-being while he was in the detox cell and while he was in the WRAP restraint device. The checks documented while in the WRAP restraint device during the day shift were all within the TJCS standards of at least every 15 minutes. In the last hour, during the evening shift, several of the documentations are slightly longer than 15 minutes. However, during this time officers were in the immediate vicinity of Mr. Pena's cell and for at least part of that time there were placing Mr. Pena back in the WRAP device (starting at 8:05 p.m.) and they were having his cousin try to calm him down. Thus, despite that the documentation of the times of checks were slightly more than 15 minutes, the officers were clearly interacting

with Mr. Pena frequently during this time. Despite this being recorded at a discrete time these actions would necessarily take more than a single minute. I understand that the TJCS cited the SCJ for this policy violation but it is my opinion that the checks performed and the actions taken were appropriate to identify any medical problems Mr. Pena was having, was appropriate medical monitoring of an inmate in a WRAP device and were within the standard of care. Their actions were reasonable for a correctional officer with respect to medical monitoring of an inmate." Ex. B, pp. 15-16, para. 9.

- Mr. Pena was discovered to be having a medical emergency at approximately 9:12 p.m. The response to the medical emergency was prompt and completely appropriate (CO Emilio Garza, CO Juarez, CO Suarez, CO Barrera, Sgt. Garza). Ex. B, p. 16, para. 10.

## CONCLUSION

For these reasons, Plaintiffs object to the testimony and opinions of Dr. Thomas Fowlkes outlined in this motion and ask this Court to strike the same. Plaintiffs also ask for all other relief which this Court finds they are so entitled.

Respectfully submitted,

/s/*James P. Roberts*
SCOTT H. PALMER,
Texas Bar No. 00797196
JAMES P. ROBERTS
Texas Bar No.24105721

PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@palmerperlstein.com
scott@palmerperlstein.com

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been delivered to all counsel of record via ECF on December 12, 2024.

/s/ *James P. Roberts*
James P. Roberts

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 11, 2024, undersigned counsel reached out to Defense counsel Robert Drinkard via email regarding this motion. Mr. Drinkard responded that Defendants are opposed.

/s/ *James P. Roberts*
James P. Roberts