# Thomas D. Fowlkes, M.D.

Re: Jarvis v. Wellpath, 20-cv-2028

Mr. Sargent,

You asked me to review documents pertaining to the lawsuit brought by Mr. Jarvis against Wellpath and individual health care providers as well as the Mesa County Sheriff. You asked me to review the case materials related to the above referenced action and give my opinion regarding the appropriateness of the care and treatment provided to Mr. Jarvis during his incarceration at the Mesa County Detention Center (MCDC) in July 2018. You requested that I provide opinions in response to the allegations of deliberate indifference and negligence against Correct Care Solutions, LLC (CCS), n/k/a Wellpath, the facility's contract medical provider, Kurtis Holmes, and individual health care employees of CCS/Wellpath including Alyssa Embree-Nicholson RN, Renee Workman RN, Heather Martinez RN, Heather Stanford RN, Shawna Christensen LPN, Nickole Croomes LPN, Denise McAllister LPN, and Katelyn Stults Medical Assistant. You also asked that I provide opinions regarding the adequacy of relevant CCS policies, training, staffing, and supervision of its employees. You also asked that I specifically opine on the actions of CCS/Wellpath and the individual health care providers and how their actions or inactions were factors, if at all, in Mr. Jarvis' stroke or outcome. This report sets forth such relevant conclusions and opinions as well as the rationale of the expressed opinions. I reserve the right to review additional information, including any deposition transcripts, medical records, jail records, or reports by experts hired by any of the other parties and reserve the right then to provide any different or additional opinions.

I am board-certified in emergency medicine and addiction medicine. I am also a certified Correctional Health Care–Physician. Since 1998 I have been the Medical Director at Lafayette County Detention Facility responsible for the provision of all medical, nursing, medication, and lab services at the facility. As a result, I am familiar with the standards of care for physicians, nurse practitioners, registered nurses, licensed practical nurses, and other health care providers in the Jail setting as well as the policies and procedures that are typically present in such facilities. I am familiar with medical negligence cases as well as cases under section 1983 requiring an inmate to show deliberate indifference to a serious medical condition. Please see the attached CV for additional information regarding my qualifications and other attached Rule 26 disclosures.

I base my opinions in this case on my education, training, and experience and my review of the documents and records specific this case including:

- First Amended Complaint and Jury Demand;
- Medical records from St. Mary's (001 – 303), MCDC (043 – 370), Colorado West Otolaryngologists (001 – 047), Colorado Canyons adult rehabilitation (001 – 193), primary care partners (001 – 752), MCDC (001 – 042), medical records – Mesa defendants (Jarvis) (0031 – 0074);
- Inmate activity log 2019 (001 – 010, 013-016, 017-021),
- Mesa County Detention Center Policies and Procedures (1044 – 1375), nursing document pathways (0490 – 0557),
- Depositions of James Jarvis, Robin Finkle, Captain Arthur Smith, Deputy Barry Hernandez, Deputy Nathaniel told, Deputy William Barbee, Heather Martinez RN, Denise McAllister LPN, Renee Workman RN, Alyssa Embree – Nicholson RN,

> Nickole Croomes, Shawna Christensen LPN, Katelyn Stults MA, Heather Stanford RN, and Lori Coleman both as the HSA and as a Wellpath corporate representative;
- Video recordings showing the Pod lunchroom and medical lobby;
- Job descriptions for Registered Nurse, Director of Nursing, Health Services Administrator, Nurse Practitioner, Licensed Technical Nurse, Physician.

Mr. Jarvis was incarcerated at the Mesa County detention facility on July 12, 2018. Mr. Jarvis reported on the receiving screening that he had hypertension and took an unknown blood pressure medication, which later turned out to be lisinopril, brought to the facility by his wife the following day, July 13, 2018. The records indicate that administration of the lisinopril was then ordered to start on July 15, 2018 during the morning med pass. The records further indicate that Mr. Jarvis refused his lisinopril on July 15 and on subsequent days. Mr. Jarvis did not report that he had been taking aspirin during the receiving screening and there is no record that he subsequently questioned or asked medical providers why he was not receiving his aspirin.

On July 25, 2018, Mr. Jarvis apparently made a request to a medication assistant during the morning medication pass that he wanted to see a doctor and was told to put in a medical request form. The process of putting in a medical request form is a process that is explained to the inmate during the intake process and is important so that the inmate gets put into the system and his complaints can then be triaged to determine the urgency with which he needs to be seen. Mr. Jarvis did not put in a medical request form until later in the day after he was told a second time to put in a medical request form. At that time, he reported vomiting, dizziness, stumbling when he tried to walk, can't hold anything down. Later, on July 27, 2018 nurse Martinez requested nurse McAllister to perform further triage of Mr. Jarvis in his cell. The attorneys for Mr. Jarvis claim that this evaluation was in response to a call from a Deputy, however, there is no supporting documentation in the inmate activity log. Regardless of the reason nurse McAllister evaluated Mr. Jarvis in his cell, the record supports that Mr. Jarvis was still experiencing the signs and symptoms reported on his medical request form from two days earlier and that his condition remained stable.

Mr. Jarvis was seen each day during the morning medication passes. The videos and inmate activity logs indicate that Mr. Jarvis was being assisted as he walked through the pod by one or two inmates beginning the afternoon of July 27 at approximately 1:00 PM. There does not seem to be any notification of this fact to the medical unit after 1:00 PM. At 9:50 PM on 7/30 there is an entry in the inmate activity log that a Deputy called down to medical and talked to nurse Workman who told him to continue efforts to contact another nurse. Another nurse did arrive in the pod 20 minutes later and evaluated Mr. Jarvis and found his blood pressure to the within normal limits. Presumably this was on the evening of 7/29. The following morning, 7/30, Mr. Jarvis was seen in medical by nurse Christensen who referred Mr. Jarvis to then be seen by the nurse practitioner the following morning. Mr. Jarvis was seen the following morning, 7/31 by the nurse practitioner who suspected that Mr. Jarvis had had a stroke (or cerebrovascular accident/CVA) and transferred him to the hospital.

At St. Mary's Hospital, Mr. Jarvis reported that for the last week he had slight binocular blurry vision without any visual field deficits, complained of some very mild nonspecific non-vertiginous lightheadedness and then at midnight, 7/30, he had a syncopal episode. He stated that all day the previous day, 7/30, he was otherwise fine with the exception of these symptoms of mild dizziness and blurry vision. He reported that the symptoms came on fairly rapidly last night, 7/30.

He reported that the last known well time was around 11:00 PM, 7/30, to 12:00 AM, 7/31. Mr. Jarvis was ultimately found to have had a CVA with atypical presentation. He was found to have an obstruction in the posterior inferior cerebral artery, often referred to as lateral medullary syndrome or Wallenberg syndrome. Wallenberg syndrome affects the back portion of the brain and involves the balance/coordination areas of the brain. Signs and symptoms are non-specific, often making the diagnosis difficult because the signs and symptoms are consistent with many other benign medical conditions or illnesses, especially illnesses often found in the jail setting like dehydration, stomach illness, gastrointestinal upset, etc. Because of the uncertainty of the last time he was known to be normal and with reported symptoms dating back at least 9 ½ hours before presentation, a thrombolytic or "clot buster" drug, such as tPA, was not indicated and was not given.

Mr. Jarvis alleges that CCS/Wellpath and the individual health care providers listed above violated his Civil Rights under the 8th and 14th amendments of the U.S. Constitution. Furthermore, Mr. Jarvis claims that these Medical Defendants were negligent in the care they provided.

The organizational structure and roles of the various healthcare personnel as described in the various records and depositions is common, typical, and appropriate in correctional facilities and other facilities such as hospitals, surgery centers, nursing homes, assisted living facilities, etc. It is common in correctional facilities, as did this facility, to use some form of medication assistant, here a QMAP, to assist with administering medication during med pass, having inmates submit kites, triage those kites by LPNs or RNs, having LPNs see inmates as part of further triage and evaluation, involving RNs if indicated, having the RNs see or evaluate the patient further if indicated, and ultimately referring the patient to a nurse practitioner or a physician if indicated. The use of QMAPs, LPNs, and RNs as they were being used in this case is not only reasonable and appropriate but also consistent with how QMAPs, LPNs, and RNs are used in correctional facilities and also in hospitals, nursing homes, assisted living facilities, etc.

Mr. Jarvis was appropriately screened during the intake screening by nurse Embree-Nicholson and appropriate orders were then entered based on the information he provided during the intake process. Mr. Jarvis did not report taking aspirin and therefore it was appropriate not to prescribe or continue aspirin as part of his daily medications. Mr. Jarvis did report an unknown blood pressure medication and it was appropriate for nurse Embree-Nicholson to suggest that Mr. Jarvis have his wife bring in his prescription, which she did the following day on July 13. In this situation it was most expeditious to have Mr. Jarvis' wife bring in the medication to identify and verify the medication. The order was then entered the following day, 7/14, for the lisinopril to start the following morning on July 15, all of which is reasonable and appropriate for lisinopril and was not an unreasonable delay for this type of medication. In any event, patients with high blood pressure who are on antihypertensive medications like lisinopril, often forget to take lisinopril for a few days in a row, perhaps if they forget to take it with them on a weekend vacation, and those patients do not suffer heart attacks or strokes because they missed a few days of lisinopril. There is no "rebound hypertension" from missing a few days of lisinopril like there can be with other antihypertensive medications like Clonidine. Accordingly, not taking lisinopril on the morning of 7/13 or 7/14, did not result in Mr. Jarvis having a stroke or other complications from high blood pressure over two weeks later. The records further indicate that Mr. Jarvis refused his lisinopril on the morning of July 15, but again even missing his dose of lisinopril for three days in a row did not result in Mr. Jarvis' stroke over two weeks later. Additionally, Mr. Jarvis' stroke was an

occlusion or ischemic stroke rather than a hemorrhagic stroke. Occlusive or ischemic strokes do not typically result from missing anti-hypertensive medication. Acute hypertension from missing doses of anti-hypertensive medication would more likely be associated with a hemorrhagic stroke which was not the case here.

Mr. Jarvis was then seen each morning for med pass. It was appropriate for Katelyn Stults on the morning of 7/25 to instruct Mr. Jarvis to send in a medical request form if he wanted to see a physician. This instruction from Ms. Stults is not, as Plaintiff has suggested, putting the medical decision making into the hands of a medication assistant. Clearly, if Mr. Jarvis was having a serious medical event or suffering from a serious medical condition at that time, any lay person, the medication assistant, or even the deputy who receives training on responding to medical emergencies and who was standing right next to Ms. Stults during med pass would have been able to recognize that medical emergency and call for help. In addition, it is in the best interest of Mr. Jarvis to put in the appropriate paperwork so that he is placed into the system to be evaluated. Ms. Stults also appropriately then reported to one of the nurses back in the medical unit that Mr. Jarvis had requested to see a physician when she returned to the medical unit after med pass. Ms. Stults' conduct was reasonable and appropriate for a medication assistant under those circumstances.

Mr. Jarvis did not put in a medical request form at that time but it was only after a second nurse, nurse Christensen, saw him later that day and she also suggested that he put in a medical request form if he wanted to see a doctor. It is important to note here that nurse Christianson went down on 7/25 because the medical staff received information from Mr. Jarvis' wife that Mr. Jarvis was prediabetic, a medical condition that he had not disclosed to nurse Embree-Nicholson during the medical intake screening 13 days earlier. It was reasonable and appropriate for nurse Christensen to go down and take a blood sugar to see what Mr. Jarvis' blood sugar was at that time on 7/25. She did not observe any signs, symptoms, or medical condition of Mr. Jarvis at that time that caused her to think that Mr. Jarvis needed to be seen in the medical unit emergently or urgently and it was reasonable for her to again suggest that Mr. Jarvis put in a medical request form.

The medical request form was responded to by nurse Martinez on 7/27 telling Mr. Jarvis that he had been placed on the list to be seen. It is not uncommon that medical request forms are not responded to within 24 hours, despite everyone's best efforts. Medical units in jails can become busy and triage of medical request forms and patients to be seen is necessary in order to make sure that the most urgent patients are attended to and given priority. Nevertheless, because it had been 48 hours rather than 24 hours, it was appropriate for nurse Martinez to ask nurse McAllister to go down to Mr. Jarvis' cell to provide further triage to see if the signs and symptoms reported on the medical request form persisted, had improved, or had worsened. When nurse McAllister returned, she appropriately reported to nurse Martinez, and based on the information provided by nurse McAllister, it was appropriate for nurse Martinez to put Mr. Jarvis in line to be seen in the medical unit and appropriate to tell Mr. Jarvis to take sips of a clear liquid in response to what she thought was, and what very well could have been, dehydration. Nurse Martinez' conduct on 7/27 was reasonable, appropriate, and consistent with the scope of her practice as a registered nurse.

I also understand that Mr. Jarvis claims that nurse McAllister went down to Mr. Jarvis' cell in response to a request from the deputies for medical assistance for Mr. Jarvis. There is no evidence in the inmate activities log that that was the reason nurse McAllister evaluated Mr. Jarvis in his cell on 7/27. Regardless of the reason why nurse McAllister went down to visit Mr. Jarvis on 7/27, it still represents an encounter with Mr. Jarvis where he was evaluated and nurse

McAllister's encounter with Mr. Jarvis was reasonable and appropriate. In fact, if nurse McAllister went down to see Mr. Jarvis in his cell at the request of a deputy for medical assistance for Mr. Jarvis, then nurse McAllister and the entire medical unit responded very promptly to the deputy's request and did not ignore, disregard, or otherwise dismiss Mr. Jarvis or his medical request. Nurse McAllister's explanation of the encounter and her evaluation as stated in her deposition were all reasonable, appropriate, and within accepted standards of practice. Nurse McAllister testified that she discussed the options with Mr. Jarvis of being taken to the medical unit for evaluation, waiting to be seen by the provider as the kite indicated had been scheduled, or sending him to the hospital at that time, all of which is reasonable, and Mr. Jarvis indicated that he was fine waiting for his scheduled appointment. It is also my opinion that nurse McAllister's indication on the medical request form that she had seen Mr. Jarvis in the pod as evidence of her visit was not unreasonable. As she explained in her deposition, because Mr. Jarvis' symptoms were stable and had not worsened, her signature on the medical request form confirmed that Mr. Jarvis was still reporting the same symptoms. She also reported the encounter to nurse Martinez when she arrived back in the medical unit and gave further report. Nurse McAllister's conduct on 7/27 with regard to her encounter with Mr. Jarvis was reasonable, appropriate, and within her scope of practice as a licensed practical nurse.

Mr. Jarvis continued to be seen during morning med pass and at no time did he report any problems or request further medical assistance. Significantly, Mr. Jarvis did not submit another medical request form reporting any medical problems or requesting to be seen in the medical unit throughout the entirety of his incarceration between 7/12 – 7/31 other than the one he submitted on 7/25. Mr. Jarvis at no time asked during medication pass nor did he submit a medical request form asking why he was not receiving aspirin.

Mr. Jarvis was again seen by nurse Christensen on the morning of 7/30 either as the scheduled appointment as referenced by nurse Martinez in response to the medical request form or at the request of a deputy. The records are unclear in this regard. However, here again, if Mr. Jarvis was seen in the medical unit on 7/30 in response to a request from a deputy that morning, then again it evidences the medical unit's prompt and appropriate response and that medical personnel were not ignoring or otherwise disregarding Mr. Jarvis or his medical condition. Nurse Christensen testified that she did evaluate Mr. Jarvis by observing him, taking his blood pressure, and taking a subjective history from him. Mr. Jarvis reported symptoms of blurry vision and his face feeling weird "rubbery" which were different than the symptoms he had reported on his previous medical request form. As is required of a licensed practical nurse, she reported these changes in his condition in the medical record and referred Mr. Jarvis to be seen by a nurse practitioner. In addition, as nurse Christensen testified, she also talked to Mr. Jarvis at the time about his options and Mr. Jarvis responded that he was okay waiting to be seen by the nurse practitioner the following morning. Nurse Christensen appropriately documented her encounter with Mr. Jarvis and reported the abnormal signs and symptoms Mr. Jarvis reported and the changes in his condition. In addition to what she does document, Nurse Christensen should have reported the encounter to the registered nurse on duty to allow the nurse to consider what, if any, further action needed to be taken at that time. The fact that she did not, however, did not cause or contribute to Plaintiff's claimed injuries. It is my opinion that Mr. Jarvis' medical course, treatment, and outcome would have been the same even if he had been taken to the hospital on 7/30 as opposed to 7/31. Further, she did testify that she talked to him about options during that

encounter and did refer him to a nurse practitioner for further follow-up and did not deliberately or intentionally ignore or disregard Mr. Jarvis or his medical condition.

It is interesting to note that later that same night when Mr. Jarvis had his syncopal episode and his cellmate asked Mr. Jarvis if he wanted him to notify the deputies, Mr. Jarvis also, at that time, responded that he was fine. In any event, even if nurse Christensen had Mr. Jarvis immediately evaluated by a provider or immediately sent him to the hospital, likely, to a reasonable degree of medical probability, it would not have changed the outcome in this case.

Mr. Jarvis was seen in the medical unit first thing the following morning, 7/31, and again it is unclear from the medical and jail records whether this was a scheduled appointment by the medical unit as referred to by nurse Christiansen or whether again this was at the request of the deputy. If Mr. Jarvis was seen in the medical unit as a result of a request by a deputy that morning, then again, the medical unit did not ignore or otherwise disregard Mr. Jarvis or his medical condition and responded promptly to the deputy's request in that regard. Mr. Jarvis was seen in the medical unit by nurse Stanford and by nurse practitioner RD Clare, both of whom provided reasonable and appropriate care within the standards of practice and within the scope of their respective licenses. After a brief examination, Mr. Jarvis was promptly sent to the hospital for a suspected CVA.

I have reviewed the St. Mary's medical records and the care and treatment Mr. Jarvis received at St. Mary's Hospital. I will testify regarding the information Mr. Jarvis provided at the time he was admitted and regarding Mr. Jarvis' condition as reflected in the records. I will comment on the results of the imaging studies done as well as other information contained in the medical records. I will testify that these types of strokes are difficult to diagnose or suspect because they present with nonspecific symptoms that can mimic many other conditions, diseases, and illnesses which are benign and are more typically seen in the correctional setting. Mr. Jarvis' complaints of dizziness, vomiting, loss of balance affecting his ability to walk, are all signs or symptoms that are frequently seen with inmates who are dehydrated as a result of not drinking enough fluids or eating appropriately which is seen on a daily basis in the correctional facilities. Likewise, nausea, vomiting and diarrhea are again common in correctional facilities due to gastrointestinal illnesses. Mr. Jarvis' complaints were consistent with these much more typical conditions seen in the correctional setting.

The care and treatment of the individual medical Defendants beginning with the intake evaluation by nurse Embree-Nicholson; nurse Embree-Nicholson's request that Mr. Jarvis have his wife bring in his medication to identify and verify the medication; the receipt and documentation of the medication by a nurse Croomes; Dr. Holmes ordering the lisinopril to be started on 7/15; Katelyn Stults telling Mr. Jarvis to put in a kite on the morning of 7/25; nurse Christensen going down again and seeing Mr. Jarvis on 7/25 to draw a blood sugar after being told, for the first time, by his wife that Mr. Jarvis was prediabetic and again instructing Mr. Jarvis to put in a kite; nurse Martinez' request that nurse McAllister go down to further triage Mr. Jarvis on 7/27, nurse McAllister's encounter with Mr. Jarvis on 7/27; nurse Workman's response to the deputy on the evening of 7/29 instructing him to continue his efforts to find a medical provider; nurse Christiansen's encounter with Mr. Jarvis on 7/30 (with the exception that she should have reported the encounter to the nurse on duty); and nurse Stanford's encounter and ultimate transfer of Mr. Jarvis to the hospital on 7/31, were all reasonable, appropriate, and within accepted

standards of care for their respective disciplines and were all within the scope of their respective licenses.

It is my opinion that the policies and procedures and nursing documentation pathways that CCS/Wellpath had in place and available as well as the training, educational materials, and supervision were reasonable and appropriate and complied with the standards of care. Based on my review, CCS/Wellpath had policies and procedures along with nursing documentation pathways in place to ensure adequate guidance, training, and supervision of their employees, and those policies and procedures and nursing documentation pathways were adequately and appropriately implemented. Dr. Holmes, as the Medical Director, appropriately supervised and oversaw the provision of clinical care in the medical unit and acted reasonably and appropriately as the Medical Director. There were appropriate policies and procedures and nursing documentation pathways in place and the provision of medical care in this case under Dr. Holmes' supervision was reasonable and appropriate as it pertained to Mr. Jarvis. Lori McLaughlin-Coleman, the Health Services Administrator also acted reasonably and appropriately in supervising and overseeing the medical unit. She provided adequate training as evidenced by the deposition testimony of the various individual health care providers and had the appropriate policies and procedures and nursing document limitation pathways available as a resource. Nurse Heather Martinez, as the Director of Nursing, acted reasonably and appropriately in her role as the Director of Nursing and overseeing and supervising the nurses in the medical unit and in the staffing of the medical unit together with Ms. McLaughlin-Coleman. There is also no evidence to indicate that the medical defendants knowingly engaged in a pattern and practice of providing inadequate care and treatment that was causally related to Mr. Jarvis' stroke or outcome.

In my opinion, the cumulative weight of the evidence indicates the medical defendants provided reasonable medical care to Mr. Jarvis and reasonably and appropriately managed Mr. Jarvis and his medical condition during his confinement at the Mesa County Jail in July 2018. Mr. Jarvis was seen independently, or his case evaluated by the individual medical defendants for different reasons from 7/12 when he was first incarcerated through 7/25 when Mr. Jarvis first put in the medical request form and again through 7/31 when he was transferred to the hospital. The medical records, deposition testimony, and other documentation that I have reviewed do not reveal that the medical defendants ignored, disregarded, or dismissed Mr. Jarvis or his medical condition. Mr. Jarvis was seen very frequently, at least every morning during med pass. The medical unit responded promptly at every occasion including, but not limited to, when Mr. Jarvis's wife reported that he was prediabetic and the medical staff responded by immediately going down to Mr. Jarvis and evaluating Mr. Jarvis' blood sugar, to immediately responding on 7/27, 7/30, and 7/31 to deputy requests that Mr. Jarvis be evaluated by the medical staff, if in fact that is why Mr. Jarvis was seen on those dates. Mr. Jarvis did not request any additional assistance during any of those encounters and never submitted another medical request form. In fact, according to the deposition testimony, Mr. Jarvis refused any additional assistance each time he was asked by nurse McAllister and nurse Christiansen, as he did what he was asked by his cellmate on the evening of 7/30. Further, given the number of the encounters with Mr. Jarvis during morning med pass, in his cell, and in the medical unit, it is evident, in my opinion, that the medical defendants did not deliberately or intentionally ignore Mr. Jarvis or his medical needs.

X _Thomas D. Fowlkes, M.D._

Thomas D. Fowlkes, M.D.
Date: 11/5/2021



# Thomas D. Fowlkes, M.D.

1203 Medical Park Drive<br>
P.O. Box 1955<br>
Oxford, MS 38655<br>
Cell: 662-801-7508<br>
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with more than 23 years of practice in Correctional Medicine.

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters.

Areas of expertise include:
- Correctional Healthcare
- Deaths in Custody
- Drug Abuse and Effects of Addiction
- Drug testing interpretation and effects of substances
- Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine) - July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Preventative Medicine) - Jan. 2021 - Dec. 2030 (previous board certification was through American Board of Addiction Medicine 2010-2020)

Certified Correctional Healthcare Professional - Physician (CCHP-P) - July 2017 - June 2022

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2022

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1998-Present | Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015 |
| 2011- Present | Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judges Andrew Howorth & Gray Tollison |
| 2007- Present | Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi |
| 2018- Present | Co-owner and Physician at Right Track Medical Group, an outpatient provider of mental health services in Mississippi & Alabama |

# Thomas D. Fowlkes, M.D.

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice |
| 1999-Present | Served as Deputy Medical Examiner Investigator for Lafayette County MS from 1999-2008 after completing 40-hour Death Investigation Certification Class. Since 2008 I have served as the medical consultant to the Lafayette County Coroner. |
| 2011-Present | Medical Director for A&D Services for Region IV Comm. Mental Health Center. 2011-2014 Detox Services at Tupelo CSU. 2017-Present at Corinth (Part-time) |
| 2019- 2020 | Medical Director of Express Care of Mississippi, LLC, an urgent care center in Cleveland, MS. |
| 2015- 2018 | Director of Professional & Medical Relations/Addiction Physician for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN |

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of Public Safety
Served as flight physician for STAT Med-evac helicopter program

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS/RECOGNITIONS

American College of Correctional Physicians
Fellow of the American Society of Addiction Medicine
Mississippi Society of Addiction Medicine
North Mississippi Medical Society/Mississippi State Medical Association/American Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight.* 3rd ed. Ed. Kuehl A. Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command*. 1st ed. Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services.* Vol. 23 (1990): 20-27. Print.

**PRESENTATIONS/TEACHING**

"Issues in Drug Use for Workers' Compensation and Safety Sensitive Positions" at *Mississippi Bar Association's Workers' Compensation Section CLE Seminar* February 7, 2020, Oxford, MS

Instructor for modules on "Health Care Issues," "Responding to Medical Emergencies," and "Responding to Special Needs Inmates" for the *Mississippi State Standards & Training- Corrections Officer Training Course,* September 18 & 19, 2019, at the DeSoto County Sheriff's Department in Hernando, MS

Videotape Presentation on "Reasonable Suspicion for Drug Testing" as part of *DOT Training for Supervisors,* Asmark Institute, Owensboro, KY, September 9, 2019

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* June 22, 2018, Pearl, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* April 13, 2018, Gulfport, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* March 9, 2018, Oxford, MS

"Case Studies in Controlled Substance Prescribing" at *MPHP Prescribers' Summit: Controlled Substance Update* October 13, 2017, Jackson, MS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation Prescribers' Summit* March 31, 2017, Oxford, MS
"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

"Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit* June 24, 2016, Gulfport, MS

"Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit* April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

## PRESENTATIONS/TEACHING (cont.)

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit*, November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit*, October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference*, August 22, 2013, Pickwick, TN

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS (AS OF 09/03/2021)**

Lee v. Jackson County MS et al.
Case # 1:13-CV-441
US District Court, Southern District MS

E/O Filichia v. Correct Care Solutions et al.
Case # 2:16-cv-296
US District Court, Southern District OH

Ajibade v. John Wilcher et al.
Case # 4:16-cv-82
US District Court, Southern District GA

E/O Clark v. Hamilton County, NaphCare et al.
Case # 1:15-cv-512
US District Court, Southern District OH

E/O Hays v. Prison Healthcare et al.
Case # 2:16-cv-384
US District Court, Northern District AL

Sparks v. Tooke et al.
Civil Action # 099912-A
District Court, 7th Judicial District, State of Wyoming

Brooks (E/O Mixon) v. Wilkinson County et al.
Case # 5:17-cv-00033
US District Court, Middle District GA

Benoit v. Lincoln County et al.
Cause # 12L6-CC00060
Circuit Court of Lincoln County, State of Missouri

E/O Gracia v. Orange County et al.
Case # 6:17-cv-01423
US District Court, Middle District FL

Parkes v. Jasper County et al.
Cause # 18AO-CC00016
Circuit Court of Jasper County, Missouri

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

E/O Leverett v. Correct Care Solutions et al.
Cause # 2017RCSC00672
State Court of Richmond County, Georgia

Ivey v. Audrain County et al.
Case # 2:17-cv-00082
US District Court, Eastern District MO

E/O Wesley v. Escambia County, et al.
Cause # 3:18-cv-1368
US District Court, Northern District FL

Harris (E/O Wood) v. Entergy of Arkansas Inc., et al.
Cause # cv-17-126-3
Circuit Court of Marion County, Arkansas Civil Division

Davis (E/O Stufflebean) et al v. Buchanan County, Missouri et al.
Case # 17-cv-06058
US District Court, Western District of Missouri

E/O Legros v. Choctaw County, Oklahoma, et al.
Case # 18-cv-261
US District Court, Eastern Division of Oklahoma

E/O Clifton v. Champaign County, Illinois, et al.
Case # 1-2070
US District Court, Central District of Illinois

Marziale v. Correct Care Solutions, et al.
Case # 5:18-cv-86
US District Court, Eastern District of Arkansas

E/O Warner v. Faulkner County, Arkansas, et al.
Case # 4:18-cv-468
US District Court, Eastern District of Arkansas

E/O Angerbauer v. LaSalle Correctional, LLC, et al.
Case # 4:16-cv-129
US District Court, Eastern District of Texas

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Pickle v. Central Montana Medical Center, et al.
Case # 6:18-cv-00029
US District Court, District of Montana

State of Mississippi v. Jimmy Ray Hester
Cause # LK19-273MISC
Circuit Court of Lafayette County, Mississippi

Wadman v. Southern Health Partners, Inc. et al.
Case # 2016 CV 567
Superior Court of Lowndes County, Georgia

Hancock v. Arnott, et al.
Cause # 6:18-cv 03170
United States District Court, Western District of Missouri

Love v. Franklin County, Kentucky et al.
Case # 3:18-cv-00023
United States District Court, Eastern District of Kentucky

Andrews (E/O Rusher) v. Sangamon Co. et al.
Case # 1:18-cv-1100
United States District Court, Central District of Illinois

E/O Burris v. Dodds, Logan County, et al.
Case # 2:19-cv-815
United States District Court, Southern District of Ohio

Brinson v Wexford Health Sources, et al.
Case # 17-cv-1659
United States District Court, Northern District of Illinois

Brenner v MEnD Correctional Care, PLLC, et al.
Case # 18-cv-02383
United States District Court, District of Minnesota

E/O Thibault v Centurion, et al.
Case # 5:20-cv-00032
United States District Court, Middle District of Florida

3

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Bost (E/O Neal) v Wexford Health Sources Inc., et al
Case # 1:15-cv-03278
United States District Court, District of Maryland

Smith v Cowlitz County, Washington, et al
Case # 19-2-00918-06
Superior Court of Clark County, Washington

Israel v USA, et al
Case # 5:18-CT-3332
United States District Court, Eastern District of North Carolina

E/O Freiwald v. Fatoki, et al.
Case # 18-cv-896
United States District Court, Eastern District of Wisconsin

Appendix C

Thomas D. Fowlkes, M.D.

**FEE SCHEDULE**

I am being paid $500 per hour for review, study & testimony in this case plus travel expenses.

Minimum charge for deposition testimony is 4 hours.

Minimum charge for trial testimony is 8 hours.