

**Judy Melinek, M.D.**

3739 Balboa Street #102
San Francisco, CA 94121

E  drjudymelinek@pathologyexpert.com
T  415/850/7056
W  *www.pathologyexpert.com*

December 8, 2023

James P. Roberts
Civil Rights Attorney
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
www.scottpalmerlaw.com
E james@scottpalmerlaw.com
M 254-709-7443
T 214-987-4100
F 214-922-9900

RE: Martina Peña v Starr County, TX (Civil Action No. 7:22-cv-00276)

Dear Mr. Roberts,

I have reviewed the following material you have sent me regarding the above case:

1. Autopsy report for Alberto Peña A-20-20 and NMS Labs toxicology report
2. Autopsy photos (49 JPG files and one PDF)
3. Police reports: Officer Angel Sosa's Offense Report, Officer Daniel Garcia's Offense report, Officer Miguel Cervantes' Offense Report
4. Photos of clothing (PDF file with 10 photos)
5. Jail phone calls (3 audio files) and document called Pena-Jail phone calls - DA #10.docx
6. Videos from police and Starr County Jail (5 files)
7. Video interviews of Joel Garza, Javier Gonzalez, Hector Lopez III, Cesar A. Juarez Jr., Anna C. Gracia, Ubaldo Suarez III, Evelario I. Garza, Emilio Garza, Ana C. Gonzalez, Jesus Barrera Jr.
8. Defendant responses to discovery: Pena Discovery Video Notes, DA investigative file (11 folders and 1 file - including the deputy body cameras and 911 call),

Defendant's Documents from detention center file (3 folders, 10 files), Defendant Starr County Exhibits to RFP (4 folders, 10 files including #13 Medical records for Alberto Peña from St. Catherine Hospital), Docs from Sheriff's Office (6 folders, 4 files including arrest report and associated photographs (13 files), incident report, photographs from the scene and hospital taken by Investigator Juan Guerra, body camera footage from Angel Sosa and M. Cervantes, and 911 call audio)

9.  Translated 911 call transcript
10. Plaintiff responses to discovery: 3 folders including amended responses, documents produced and supplemental disclosures; and 5 files including initial disclosures and amended responses
11. Texas Rangers Report
12. Medical and billing records from Starr County Emergency Medical Services and Starr County Memorial Hospital
13. Depositions of Daniel Garcia, Miguel Cervantes, Aristedes Peña, Martina Peña, and Ubaldo Suarez III

I am a forensic pathologist who works as an independent consultant in both criminal and civil matters. My education is notable for my undergraduate degree from Harvard University (magna cum laude), a medical degree with honors from the University of California Los Angeles School of Medicine, and pathology residency at UCLA Medical Center. I trained in forensic pathology at the Office of the Chief Medical Examiner in New York City from 2001-2003. During that time it was part of my duties to identify the human remains from the World Trade Center terrorist attacks of 9/11/2001. I was an Assistant Medical Examiner at the Office of the Chief Medical Examiner in San Francisco for nine years. I worked as a contract pathologist for the Alameda County Sheriff Coroner's Office from May 2013 until June 2020, and for three months operated as interim chief forensic pathologist in response to the emergence of SARS-CoV2 and the COVID-19 pandemic. I am currently practicing forensic pathology and performing coronial and forensic autopsies in Wellington, New Zealand, where I instruct medical students as a Clinical Senior Lecturer in the Department of Pathology and Molecular Medicine at Otago University School of Medicine. I am the sole forensic pathologist for a jurisdiction of approximately half a million people.

# PathologyExpert, Inc.

I have published in the medical literature on the topics of pathology, forensic pathology, surgical complications, transplantation surgery, toxicology, and immunology. I have been qualified as an expert witness in the fields of pathology, forensic pathology, post-mortem toxicology interpretation, trauma interpretation, neuropathology, and cause of death determination over 200 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, and Texas. I am currently licensed to practice medicine in California and am vocationally registered to practice forensic pathology in New Zealand. I am board certified by the American Board of Pathology in anatomic, clinical, and forensic pathology, and I routinely interpret autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death, and to evaluate the contributory effects of natural disease or intoxicants.

I have investigated many in-custody deaths in my career, and I have been qualified in court to opine on mechanism of injury and manner of death based on my own and others' autopsy reports, photographs, and scene reports. I have taught forensic pathology to undergraduates, medical students, and resident doctors at New York University, Stanford University, the University of California San Francisco Medical Center, and the University of Otago, and have been an invited lecturer at the University of California San Francisco College of the Law, the University of California Davis, and at Barts & The London School of Medicine.

After reviewing the above-referenced sources in this case, it is my opinion that Alberto Peña died from complications of acute alcohol and cocaine intoxication in the context of restraint and blunt force trauma of the head. Bipolar disorder, hypertensive arteriosclerotic cardiovascular disease, and chronic substance abuse would be considered significant contributing conditions. Sudden death following agitation, combativeness, and prolonged struggle against restraints in an acutely intoxicated individual is compatible with what had been previously referred to in the medical literature as "excited delirium." Although this term is no longer recommended, the pathophysiology of cardiorespiratory arrest caused by metabolic acidosis in intoxicated

individuals who struggle against restraints is relevant in this case, since Mr. Peña was agitated, acutely intoxicated, sweating, and was witnessed to struggle for hours preceding his cardiac arrest.

This death could have been averted by giving Mr. Peña prompt medical attention for his agitation, cooling him, monitoring him, correcting electrolyte imbalances caused by exhaustion, dehydration, rhabdomyolysis, and metabolic acidosis; and ventilating him for emerging aspiration pneumonia. Prolonged restraint in the restraint chair led to Mr. Peña's death because it allowed him to continue struggling in his agitated state until he reached the point of physical exhaustion and dehydration. His behavior leading up to his arrest combined with his behavior in custody (agitation, aggression, unsteady gait, thrashing, self-injury, sweating, blood-shot eyes) made it clear to police that he was in emotional distress, under the influence of controlled substances, and should have prompted a recognition that he was in need of medical attention. The presence of extensive subgaleal hemorrhages in the context of repeated head impacts and witnessed unconsciousness following one of those impacts, with cerebral edema and vascular injury on microscopic sections, indicate that concussive head injury also played a significant role in this death. The pain from scalp injury and confusion caused by concussive injury would have further increased Mr. Peña's agitation and distress. Had Mr. Peña been evaluated for head trauma following the impacts that led him to fall over in the patrol vehicle (per Lieutenant Rios), or fall down and "go unconscious" (per Officer Joel Garza) or "knock himself out" (per Officer Javier Gonzalez) in the jail cell, he would have been sedated for agitation, and his death could have been averted.

The unprofessional packaging for shipment of the microscopic slides from the autopsy, which caused their destruction, and the destruction of the wax-embedded tissue blocks, is a violation of standard forensic practice and constitutes spoliation of evidence. As a result of this disregard for the evidence, I cannot assess whether the pathologist was correct in his assessment of tissues contained in slides 1, 2, 4 and 5. Since slide 5 contained samples from the lungs, liver, and gallbladder, I cannot make an independent assessment of the histopathologic derangement of these tissues. I cannot confirm the presence of a bronchopneumonia as was seen on the chest X-ray

and supported by the elevation in white cells but not confirmed by the pathologist, who reported that he only saw hemorrhage. The foam seen in the decedent's mouth was possibly from pulmonary edema, but this too cannot be confirmed histopathologically due to the destruction of the tissue slide evidence. Slide A8 only contains three small pieces of brain tissue, insufficient for a thorough workup for acute and chronic traumatic brain injury (encephalopathy). Furthermore, the absence of vitreous fluid collection or testing makes it impossible to assess post-mortem electrolyte levels. While these egregious errors indicate a disregard for the standards of forensic practice or the court's orders, they do not impact my ability to determine the cause or manner of death within reasonable medical certainty. They do, however, hinder potential peer review, criminal prosecution (which requires a higher standard of proof), and elucidation of the degree of traumatic brain injury Mr. Peña suffered.

The pertinent facts of the case that lead me to these conclusions are:

1. The autopsy report authored by Dr. Frank Salinas M.D. indicates that according to information received, the victim was a 30 year old male who was reported to be intoxicated and under the influence of drugs, with heavy slurred speech and an unsteady gait, who had caused damage to the walls and door of his house. He was arrested and placed in a police car. In the car he "began to be rowdy" and was hitting the interior of the car with his head. He was also aggressive in his cell, butting his head against the wall. He was placed in a WRAP restraint chair and was later found unresponsive with foam in his mouth. Cardiopulmonary resuscitation (CPR) was begun, and he was taken to Starr County Memorial Hospital where he was pronounced dead. At autopsy decedent weighed 265 pounds at 74 inches. Injuries included a contusion at the right abdomen, handcuff abrasions at the wrists, and both abrasions and contusions of the upper and lower extremities. On internal examination "there is extensive scattered scalp hematoma throughout the frontal and bilateral parietal areas." The brain weighed 1,135 grams and was reportedly "unremarkable." The lungs showed "extensive congestion and pulmonary hemorrhage." The heart was 525 grams and had biventricular hypertrophy (left ventricle 2.4 cm, right ventricle 0.9 cm). The coronary arteries showed minimal atherosclerosis. The liver showed "fatty like degenerative changes." Microscopic

descriptions from the autopsy report indicate that the coronary arteries (slide A1) showed moderate atherosclerotic disease. The heart showed "old scarring", hypertrophied myocytes, and an increase in inflammatory cells in vessels with interstitial edema. The liver was significant for fatty dysplasia and portal tracts with mild inflammation. The brain (slide A8) showed mild cerebral edema and congested blood vessels. Vitreous glucose and electrolytes were not reported and there is no documentation to indicate it was collected or retained.

2. NMS Labs report indicates that cardiac blood ethanol concentration was 161 mg/dl ( 0.161 BAC in g/100 ml). Cocaethylene was 25 ng/ml and benzoylecgonine (a metabolite of cocaine) was at 710 ng/ml. Delta-9 THC was at 2.2 ng/ml and the inactive metabolite delta-9-carboxyhemoglobin THC was at 8/7 ng/ml.

3. Microscopic slides from the heart (slide 3) show chatter artifact, hypertrophic myocytes with enlarged nuclei, and focal subendocardial interstitial fibrosis without necrosis or inflammation. A single coronary arteriole has intimal and medial thickening. Slide 6 was of the spleen and kidneys. Sections of the thyroid, stomach and intestines on Slide 7 show autolysis but are otherwise unremarkable for any pathologic changes. Slide 8 of the brain shows perivascular hemorrhages consistent with diffuse vascular injury and areas with vacuolation of the neuropil consistent with edema. There are also focally extravasated red cells in the subarachnoid space.

4. Photos from your office reveal that the slides were packaged in plastic slide containers which were not sealed shut or wrapped in cushioning material such as bubble wrap. Slides 1, 2, 4 and 5 were broken, and there were shards of glass inside the envelope. This creates a workplace biohazard for your staff and means that the slides cannot be used for diagnostic purposes. The tissues preserved in those slides have been ruined as evidence.

5. Autopsy photos of the body of Alberto Peña show contusions on the shoulders, back, upper arms and both legs consistent with restraint-related injuries; abrasions at the wrists consistent with handcuffing injuries; and diffuse subgaleal contusions over the calvarium indicating multiple planes of injury. The brain in situ appears small and there is a significant gap between the frontal lobes and calvarium which I estimate at 1 cm (without a ruler). The gyri and sulci appear normal sized and not

swollen. The dura mater is incompletely removed and there is no visible skull fracture apart from postmortem artifact at the sella turcica caused by removal of the pituitary, and a left temporal saw mark. The neck dissection is not photographed. The base of the brain or serial sections of the brain are not photographed.

6. Officer Miguel Cervantes' body camera shows Alberto Peña sitting on a couch when the officers comes in. Peña gets up and partially takes off his shirt and spins around. He says "take me to the border." The officers cuff his hands behind his back. Peña shakes his head and speaks incoherently. He resists with the officers when they are searching him and trying to get him in the back seat of the patrol vehicle as his shorts partially fall down. Peña's father speaks to Cervantes outside in Spanish. Cervantes walks back to the car. Then he speaks to Peña's parents, and they show him inside the house where the damage was. Cervantes goes back out to the patrol vehicle and retrieves a phone camera to take photos of the damage. Meanwhile, Alberto Peña has been in the back seat of the patrol vehicle and it is very sunny out. The windows are up.

7. Videos from the detox cell and holding area document Alberto Peña's behavior in the holding cell, agitation, self-injury (including multiple head impacts), handling by officers including being maced prior to being restrained, prolonged restraint in the WRAP restraint and subsequent struggle against the restraints, dousing of water by the guards on his face, and terminal events leading to his cardiorespiratory arrest and attempted resuscitation.

8. Pena Discovery Video Notes, a translated transcript of the audio, indicate that on Officer Miguel Cervantes' body camera video, Alberto Peña's father tells the officer, "He went in my home, broke the door, made holes in the wall and doesn't even know where he's at. I want you to arrest him." Peña's mother is in the background stating, "You need to see a psychiatrist, you are not good in the head. He's been like this 1-2 years." The father says "about 2-3 weeks ago he got that drunk again and I also called the cops on him." Officer Cervantes pulls Peña's father away from the other officers and asks him what happened. Peña's father tells the officers, "He's hung over and on drugs. I have no idea what he's even talking about of saying." Officer Cervantes tells Peña's father, "If he's bipolar we can't arrest him because that is not a place for bipolar people. Also, if he is on drugs, from my



experience he isn't bipolar it's just the drugs." Officer Cervantes states, "From my experience, it's a cause of drug usage, it's not bipolar disorder. I have a friend who they said was bipolar but he stopped using the drugs and became a paramedic." In translation, Peña's mother states, "So then in Chicago they did an error when they checked him out?" Officer Cervantes states, "I don't know but that happens." Alberto Peña's father states he has "three illnesses" and "once he tried to light himself on fire."

9. Pena Discovery Video Notes indicate that on Officer Angel Sosa's body camera video, an officer explains to Officer Sosa, "When we came in, we went inside there to loosen up his cuffs and give him some water. He said he was hot so we went ahead and sprinkled some water on his face." Officer Ubaldo Suarez states to Officer Sosa, "When I came in, he was already in the wrap… He was talking to us telling us he wanted water. We gave him water and poured water on his face. We left him in the wrap, and I told him to chill out man in 15-20min or hour we will get you out of the wrap. He calmed down a little and in those 10 min he started hitting again and again. His cousin wanted to talk to him and could not get through to him, so he started yelling and yelling. Before Garza found him, I was the last one who saw him. I thought he was asleep." Officer Cesar Juarez Jr. reported to Officer Angel Sosa that "When he (Alberto Peña) was talking to his cousin, his eyes were very swell, and pupils dilated." Officer Emilio Garza reported that "Day shift had said he banged his head, so he collapsed so that's why they restrained him."

10. Pena Discovery Video Notes documents that Alberto Peña hits the door with his head at 21:20 (3:34 PM) and again at 21:55 (3:35 PM). At 3:33:57-3:37:27 (6:50PM-6:52PM) four officers go into the jail cell, take Peña out, throw him on the floor, and wrap him. Officers then put him in a chair and roll him into the jail cell.

11. The Starr County Sheriff's Office arrest report indicates that on Thursday, August 13, 2020 at approximately 2:34 PM, Officer Miguel Cervantes was dispatched to 48 Fresno Circle regarding an "unwanted subject." Aristedes Peña reported that his son was "highly intoxicated and under the influence of drugs." Officer Cervantes saw the subject sitting on the couch and noted that he appeared intoxicated and smelled of alcohol. The subject was uncooperative. Aristedes Peña reported that his son, Alberto Peña, had been up all night and had not slept. He had been

causing damage to the interior of the residence. He had broken sheetrock drywall and had caused damage to a door. While the officer was gathering this information, Alberto Peña "became rowdy and began to hit the interior of the patrol unit with his head." Officer Daniel Garcia and Lieutenant Erasmo Rios assisted Officer Cervantes with Alberto Peña and he was transported to Starr County Jail where he was charged with Criminal Mischief.

12. Police incident reports from Starr County Sheriff's Office states that on Thursday, August 13, 2020 at approximately 7:30 PM, Sergeant Hector Lopez and "his crew" had placed a male subject named Alberto Pena (sic) in a WRAP chair because he was "being aggressive and started to hit his head on the wall." Peña was placed inside the detox cell. Peña was later discovered unresponsive with foam on his mouth. He had a low pulse and was cold to the touch. He was taken out of the chair and placed on the ground and CPR was started. Starr County Paramedics transported him to Starr County Memorial Hospital.

13. Joel Garza reported in his video interview that he was at the jail when they had a report of "rowdy inmate" coming in. He described the inmate as "very calm" but "drunk," that you could "smell it on his breath," and that he was "really intoxicated." Garza stripped the inmate and put him in the detox cell and booked him in. As Garza was booking him in, the inmate was okay but "crying" and "very intoxicated." The inmate was in detox for the rest of the day but Garza didn't remember the time. When Garza was coming back to medical, he heard really loud banging. He was told that the inmate was banging his head on the door. They checked in on the inmate and the inmate said that he wanted to call his son. Garza said that the inmate, Alberto Peña, had made a threat to an officer and was very aggressive. Peña had fallen and was hurting himself by banging his head against the floor. Javier Gonzalez maced the inmate and then they restrained him and put him back in the detox cell where they could see him. They did their checks, but the inmate was "just sitting there… screaming" and Garza said, "I guess he was just really intoxicated." Garza said that he left at eight, and by then Alberto Peña was out of the chair and uncomfortable, and they fixed him to make him more comfortable. Garza said he was "pouring water on his face" and giving him water. The inmate came in around 2 or 3 PM. Garza remembers that the first time Peña banged his

head, "he did it to the point where he literally fell to the ground." They restrained him to prevent him from hurting himself. Alberto Peña was in the detox cell by himself. He didn't really comply. He got pepper sprayed (OC) by Javier Gonzalez. It didn't appear to affect him. Peña was resisting, and they put him in a WRAP to restrain him. Garza describes the WRAP as being "comfortable" and said that they put Peña in the "rolling chair." They were concerned that he was going to hurt himself because "he really banged his head to the point that he fell to the floor and he looked like he was unconscious" (13:21). Garza said he was across the jail and he could "literally hear the bangs." He said that after using OC spray on an inmate they are supposed to shower him, but instead they wrapped Alberto Peña and Garza poured water on his face and it "felt better for him." Garza gave Peña water in his mouth and poured it on his face about three times. When Garza left the jail at 8 PM, Alberto Peña was still responsive. Peña appeared to him to be "just another drunk guy" when he was booked in. Garza reported that Javier Gonzalez, Hector Lopez (his supervisor), and another officer, Jesse Barrera, were also present in the cell with him when they came in to see Peña.

14. Javier Gonzalez reported in his video interview that his shift was to work at the jail from 8 AM to 5 PM. He was doing checks every 18 minutes based on a timer that goes off. One of the guys "in the front," Max, started hitting the door around 9:30, 9:35 in the morning. The inmate Max wasn't listening or following commands and continued hitting the door. The inmate said he wasn't going to stop. Sergeant Hector Lopez gave the command and they put Max in the WRAP. They placed Max in the WRAP at about 9:15 or 9:30 AM for around 3 hours, and he was "pretty calm." Around 12:30 they unwrapped Max and put him in the cell. He was okay. The day went by, and then around 2 or 2:30 PM they had to go work at the court, and the medical officer asked Gonzalez if he could have help. Gonzalez had not seen the individual who came in that day. Around 3:30–3:45 PM they got back from getting a package at the airport. When they got back, Gonzalez had seen the individual (Alberto Peña) with the deputy when he came in. Peña was booked in at around 4:15 or 4:20 and "wasn't rowdy or anything." Gonzalez was outside medical, waiting, when he heard over "10 loud banging," and he got a radio call from Sergeant Lopez. Gonzalez rushed to the front and saw Sergeant Lopez and Officer


Garza with Alberto Peña in the detox cell. The officers were lifting Peña up. Sergeant Lopez said "this guy, he started hitting himself, and he knocked himself out real bad." Sergeant Lopez started talking to Peña and Peña kept saying he wanted to go home with his kids. They kept asking him to stop hitting himself. Peña was "really, really very intoxicated" with "blood-shot eyes" and Gonzalez could see that he was "dripping and sweating." They said he was in "no good stable condition" to be released. He was complying and listening, but he "kept on mumbling his words" and "stuttering." Peña was looking all over the place and not making eye contact. Sergeant Lopez confirmed that Peña had "knocked himself out." Around 5:45 PM Peña started hitting himself again and saying that he wanted to get out. He was walking around in the detox cell and kept on hitting the wall and kept on hitting himself in the head real bad again. They walked back in the cell around 5:50 PM and Peña went straight to the corner. Gonzalez kept explaining to Peña how he was acting. Peña kept apologizing but saying that he just wanted to go home and see his kids. He calmed down for a bit. Gonzalez warned Peña that if he kept hitting himself they would have to wrap him up for his own safety. They stepped out of the cell at 5:56 PM, and Gonzalez went back to the front to tell Sergeant Lopez that he was going to head out. He was walking out and Sergeant Lopez was behind him when they heard the Unicom. An officer told him that the man in detox was threatening the officer's life. So Gonzalez walked back inside and pulled up the restraint chair and got the WRAP and the bottle of Mace. As soon as they walked in the detox cell, he told Alberto Peña that if he didn't turn to face the wall he was going to get Maced. Peña wasn't paying attention and was looking all over the place. Gonzalez sprayed Peña. The can was almost empty, so very little hit Peña, and Peña turned so the spray hit the left side of his body. Peña got on the ground and on his knees. They cuffed him and took him out. He didn't want to get up. They placed him in the WRAP. He was not cooperating and said "I don't want to go." They put Peña back in the detox cell, still in the restraint chair. They decided that if they were to put Peña unrestrained in the padded cell, could have hurt himself in there, too, because the door and window in that room were not padded. Gonzalez left around 7:20-7:30 PM. They check inmates in the WRAP every 15 minutes. Gonzalez said that Alberto Peña, the inmate, was "mumbling" and "he was



afraid." Gonzalez stated that "Honestly, he was really heavily intoxicated. I knew something was wrong as soon as the first time I saw him when I walked to the detox cell and when they picked him up I saw he was heavily sweating… and his eyes were real red… he was very anxious." Gonzalez said he knew that Peña was heavily intoxicated, but he didn't know from what source because Peña didn't smell of alcohol. (28:46 - 29:52) He didn't know what kind of drug, but he thought it was either cocaine or heroin because he didn't smell the alcohol. Alberto Peña was "sweating real bad. He was sweating a lot, from the minute he got there."

15. Sergeant Hector Lopez III reported in his video interview that he was called that a "rowdy 95" was being brought in. Once they entered the jail's sally port he met the inmate (Alberto Peña). Sergeant Lopez said Peña wasn't rowdy. Once Peña had been strip-searched and Sergeant Lopez saw that Peña wasn't being aggressive, he went back to doing his work. He said Peña was highly intoxicated, and he could smell the alcohol from him. He didn't see any signs of excessive drug use and no red flags came up for him. They were having conversations and the subject was aware of what he was saying. They put Peña in the detox cell. He was booked in without any issues. It was about 5:15-5:30 PM that Peña started banging on the door and wall, demanding a phone call. He hit himself on the head like 15 times in a row and collapsed. Sergeant Lopez came in and asked for backup. He tried to get Peña to calm down, and checked him. Peña wasn't blacked out or unconscious from the head-banging. Sergeant Lopez said that if he had seen unconsciousness, he would have sent the inmate to the ER. Thirty minutes later Peña started again by head-banging and banging against the door. Every time Sergeant Lopez came in the cell, Peña would calm down. Officer Javier Gonzalez made Peña calm down and told him that he couldn't do the phone call. Between twenty and thirty minutes later, Sergeant Lopez was walking out with Officer Gonzalez when a guard said to them that the inmate had said he wanted to know the name of the officer who had been talking to him, so he could hurt him. That's when they decided to put Peña in the WRAP. They were concerned that the inmate had hit himself too many times in the head, and Sergeant Lopez was also concerned for officer safety. Peña wasn't complying, and they took him out of the cell into the hallway so they could put him in the WRAP. Peña didn't cooperate with the WRAP. At approximately 6:50 they put

him in the WRAP and in the restraint chair, and around 7:45 Sergeant Lopez was going to exit the jail and when he came out he saw that Peña was struggling and his feet were up in the air, so Sergeant Lopez called the guards and they accommodated the inmate and gave him water. Peña appeared highly intoxicated, but following orders and responding to him. The answers Peña was giving back were responsive to the questions he was being asked. Sergeant Lopez said that Peña was wearing a face mask. He had no suspicion of any drug use and thought that Peña was just drunk. After Peña had fallen down Sergeant Lopez did not see any injury to his head. He had no suspicion that Peña was at all acting "out of the ordinary." The inmate was in the WRAP since 6:45 or 6:50. Sergeant Lopez did not know the limit for how long he would have been in the WRAP. They didn't offer Peña an opportunity to eat, because it was after hours. Sergeant Lopez thought that Alberto Peña was in the WRAP for 2 hours 20 minutes. He thinks the maximum allowed is 4 hours but he wasn't sure.

16. Cesar A. Juarez Jr. reported in his video interview that he worked in the jail from 8 PM to 8 AM. As he walked in, he could hear Alberto Peña hitting the window and screaming. Juarez saw that Peña was on the floor leaning on the side. Juarez helped him sit up and they gave him water. Juarez said it was very hot. Peña was very sweaty. His body was "very hot." They put him back in the restraint chair. After two checks had passed, Emilio Garza reported that Peña had "foam." They went in and found foam on Peña's mouth. It was a "little bit purple." They put Peña on the floor, and two other other guards started doing CPR. Peña's face was purple when they got him off the chair, and while they did CPR the color came back to his face. Juarez put water on Peña's face. They kept doing compressions. Emergency Medical Services (EMS) took over. Peña was asking for water, and then 10 or 9 minutes later "he wasn't there anymore." The first time that Juarez checked on Peña he saw that he was no longer in the chair—he was on the floor, on his side, and that's when they went in to pick him up and give him water. Juarez put water on Peña's forehead because Peña was saying he was very hot. They saw the foam around 9:09 or 9:15. When the foam was in Peña's mouth, he was still in the chair but his head was to the left shoulder (Juarez demonstrates position at 09:34–09:41). Juarez said that Peña was "purple" at his face, and he thought it was from him not



breathing. When Juarez was lifting him up, Alberto Peña was asking him for water. All three officers—Cesar Juarez, Ubaldo Suarez, and Jesus Barrera—were doing the compressions.

17. Anna C. Gracia reported in her video interview that at around 2:30 there was a call saying that a rowdy inmate was coming. Alberto Peña came in at around 3:30, and Gracia thought he was drunk. He was sweating a lot but he was calm. Peña was booked. During the booking he was talking fine. He was pressing the intercom and asking for a phone call. At 5:00 Peña started to hit his head against the door, and the lieutenant told him to calm down. At 6:40 Peña started to scream and was sweating a lot. He kept saying he wanted a phone call. He wasn't listening, so Gracia went to the detox cell and spoke to him at the door and he sat down. He started hitting himself "like 10 times" and he "felt like a concussion" and "was in a bad state." At 6:50 Peña started screaming and saying a lot of stuff, and Sergeant Lopez and the other guards went to the cell. Officer Gonzalez and Sergeant Lopez were trying to calm him down. Peña calmed down for a little bit and then Officer Gonzalez and Sergeant Lopez left. Then Peña pressed the button and threatened to kill Officer Gonzalez when he gets out, and started to threaten everyone and to kick the door. Gracia went outside and told Officer Gonzalez and Sergeant Lopez what Peña had said, and that's when they put him in the WRAP. Gracia didn't see anything wrong with what they did. At 7:50 she asked Garza to give Peña water because he was sweating a lot. Gracia left at 8:00. Peña was saying that he wanted to murder the officers and wanted their names. He was screaming a "meow." Gracia thought he was intoxicated with alcohol. This wasn't different from what she saw with other guys. She never saw Peña fall out of the chair, just "slip a little bit." She wanted the officers to put water on his head because Peña was sweating a lot. At the end of Gracia's shift, Peña was calm and talking and they gave him the water and left. The way Alberto Peña looked at her, he was acting like he was in a "bad situation."

18. Ubaldo B. Suarez III reported in his video interview that he got into the jail at 8 PM and that he saw that inmate Alberto Peña was on the floor and "like out of the wrap." He and Sergeant Garza, Officer Emilio Garza, Cesar Juarez, and Jesus Barrera came in to the detox cell to put Peña back in the WRAP. He had managed

to get out of the restraint chair. Peña calmed down a little bit. They gave him water. Peña had been maced and said his face was burning. Officer Emilio Garza put water on Peña's face. A couple of minutes later, Peña got belligerent in the WRAP and started yelling. Garza made the decision to take Peña's cousin out to speak to him around 8:50, and the cousin said Peña was "all messed up." The next check, Garza went to the detox cell and said Peña didn't look right. They checked him out and that's when they saw that Peña had foamed at the mouth and his lips were blue and he was sweaty. The officers went to the cell, took the handcuffs off Peña, put him on the floor, and immediately started CPR. Fire department and EMS got there and they defibrillated him. Emilio Garza saw the foam in the mouth and so did Suarez and then Peña was cold to the touch. When they went in the second time Peña was sweaty. It was a cold sweat. Peña didn't sound okay. He kept saying that they were "burning him." Peña said he had a burning sensation in his back. Suarez could tell this was guy was high on something, but he couldn't tell what. Peña managed to unsnap the velcro in the back and wiggle his way out, making his way to the door.

19. Evelario I. Garza reported in his video interview that his shift at the jail is from 8 PM to 8 AM. He was told by Sergeant Hector Lopez that they had a man in the detox cell who they had "wrapped up" during the day because he was aggressive and combative. You could hear the man yelling from outside the door. At 8 PM Garza entered the detox cell with Jesus Barrera and Ana Gonzalez. One of the other jail inmates (Edgar Peña) knew the guy in detox who was yelling, and was a relative of his. Evelario Garza agreed to let him talk to the man who was yelling in the detox cell. They spoke through the side and then Edgar Peña was returned to his cell. While Evelario Garza was in the restroom, he put the radio down and heard scuffling outside. He walked over to the detox cell and saw them taking Alberto Peña out of the WRAP. Then they initiated CPR. During this time Evelario Garza held Peña's head. The fire department took over, and a few minutes after that EMS arrived and took over CPR. Prior to Edgar Peña speaking to him, Alberto Peña had fallen out of the restraint chair, and they had to put him back. He was still being combative but he was asking to be taken out of the WRAP. He wanted some water, and so the guard got water. They let him drink and they also drizzled some on his forehead.



Alberto Peña thanked them for how they were treating him, but he seemed scared. He kept saying "stay here Sergeant." A couple of minutes after they left, his cousin Edgar Peña came to speak with him. Albert Peña's speech was excited and energetic, almost yelling. According to Evelario Garza, "you could tell he was intoxicated," but Garza didn't know what he was intoxicated with. Alberto Peña had bloodshot eyes, slurred speech, a lot of snot/drool going down his face, and his eyes were "super big." It didn't appear that he was drunk because he could still compose sentences. After his cousin Edgar spoke to him, it seemed like Alberto had calmed down. It was only a couple of minutes, though. Evelario Garza was in the restroom when Alberto Peña was found unresponsive.

20. Emilio Garza reported in his video interview that he helped restrain Alberto Peña in the WRAP and that Peña was asking for water. When it was his turn to check on Peña, Emilio Garza looked for breathing, but he went back because he wasn't sure, and that's when he saw foam coming out of Peña's mouth. They saw Peña was pale, so they took him out of the WRAP and started compressions. There was no pulse when they first started compressions, but after a while Emilio Garza felt a low pulse. EMS showed up and they put the defibrillator pads on, and Peña was transferred to a gurney. Emilio Garza was working 8 PM to 8 AM. When he was talking to Peña for the first time, Peña was screaming and incoherent. They got one of the supervisors to get Peña's cousin to speak to him. His cousin said "he's really out of it." They had gone in the cell because Peña was moving around a lot and had fallen off the restraint chair. Peña was telling them to let him go, but had made threats against day shift. They were checking on him every 18 minutes. The first time Emilio Garza went back to check on Peña, he double-checked because he wasn't sure Peña was breathing, and that's when he saw the foam. He called Ubaldo Suarez for backup. Peña had been maced, so he asked that they put water on his face and complained that his ass was burning. His speech was slurred and disoriented. Alberto Peña had a dislocated shoulder before, and he had been cleared by medical before he was placed in the cell.

21. Ana C. Gonzalez reported in her video interview that she entered at 8:00 PM and one of the guards had stated that the inmate was foaming at the mouth. She described the ambulance coming. Gonzalez's job was to open the doors and



answer the phones. She saw that the inmate was wrapped and that he was yelling. This inmate's cousin came to speak to him. A few minutes later the guard came in and stated that the inmate was foaming at the mouth.

22. Jesus (Jesse) Barrera Jr. reported in his video interview that his first contact with Alberto Peña was around 5 PM. The inmate was in the detox cell and he didn't know why he was there. When Barrera did the cell check at around 6 o'clock, Peña was getting rowdy. Barrera didn't witness the incident where Peña hit his head against the plastic glass, but he heard it. Barrera was at the end of the group that went in, and Peña got angry but then calmed down. Then something happened that they had to put Peña into the restraint chair. Berrera was holding Peña's head so that he wouldn't hurt himself when they put him in the chair. Later he came back in because Peña had wiggled out of the chair. The inmate was asking for water and Berrera said he would go out and bring him water. There was a shift change at 8 PM, and this shift had to readjust Peña. They loosened up his restraints because they were too tight. The sergeant asked Peña to prove himself in order to allow him to get out of the WRAP. You could hear Peña screaming. They got Peña's cousin from down the hall to tell him to settle down. The guy was just there screaming. When they readjusted his restraints, he said "Thank you and God bless you." On the way back to his cell, the cousin said that the family was having a lot of trouble with Alberto Peña. He had told his cousin to lay off the drugs. One of the guards found Peña unresponsive, and there was foam and a lot of mucus at his mouth. They took off the restraints and started doing CPR. With CPR Berrera saw a change of color in Peña's face. He said Peña was still warm and may have emitted a gasp. Fire department showed up and took over the compressions, and then EMS showed up and Barrera went in the ambulance. At one time Peña got completely off the restraint chair, and another time he got his head through the chair and they had to get him back. Alberto Peña wasn't tied or secured to the restraint chair. He was wrapped and placed on the chair. He was upright so he could breathe. The mucus and foam at his mouth appeared purple in color.

23. Medical records from St. Catherine Hospital indicate that Alberto Peña had an assault with bilateral nasal fractures on 12/14/2008, requiring a CT scan. He had a colonoscopy with biopsies on 2/6/2013 for rectal bleeding and abdominal pain



resulting in a diagnosis of internal hemorrhoids, anal fissure, and colon foreign body. He had an anal fissurectomy/fistulectomy on 8/2/2013. The admission history mentions "occasional alcohol use." From 8/27 to 8/29 in 2017 Peña was admitted for a suicide attempt after ingesting 2 bottles of Tylenol and one bottle of Aleve. Records state that the patient has a past history of bipolar disorder (p.0173). His admission drug screen was positive for cocaine, but this was unconfirmed (p.0169). He was also noted to be acutely intoxicated with alcohol (265 mg/dL, p.0167). From 6/6-6/7/2018, Peña was admitted following a suicide attempt. He admitted to pouring gasoline over his body with plans of lighting himself on fire. Admission Emergency Department Notes indicate that Peña had a history of substance abuse, depression, and a prior suicide attempt (p.0053). He also had a history of hypertension and was supposed to be on medications for that condition, but did not take them. His admission blood alcohol was 264 mg/dL (p.0047) and urine toxicology screen was positive for amphetamines—unconfirmed. On 4/7/2019 Alberto Peña was seen in the emergency department for rib fractures and an L1 compression fracture after he fell down the stairs. No apparent head injury. He had a history of smoking 0.5 packs of cigarettes per day for 4 years, and consumed 12 cans of beer per week (p.0004).

24. According to the Starr County Memorial Hospital EMS Prehospital Care Report, a call was received on 08/13/2020 at 21:18:00. Paramedics were at the patient's side at 21:31:00. The patient was Alberto Peña. The past medical history listed diabetes mellitus type II. Mental status was unconscious and unresponsive. There were abrasions noted to both wrists. The patient was apneic and cyanotic, and his body temperature was cool. At 21:34:00, his Glascow Coma Scale was 3, and the patient was intubated. Electrocardiogram reading was asystole. The report mentions that the unresponsive male was in cardiac arrest with a down time of about 20 minutes prior to Emergency Medical Services arrival. As per Starr County Sheriff's Office deputies, the patient had taken an unknown amount of pills and had been drinking an unknown amount of alcohol. They stated that when he was in the jail cell, patient got aggressive and hit his head several times on the glass window. Starr County Sheriff's Office report a possible near syncope episode, and after that patient went

to sit on a bench. Patient passed out and became unresponsive with foaming to his mouth.

25. Starr County Memorial Hospital records indicate that Alberto Peña was brought to the emergency department and arrived with CPR in progress. He did not regain a pulse or begin breathing spontaneously. Social history was remarkable for alcohol and drug use. Laboratory tests taken at the hospital reveal an elevated glucose of 111.0 mg/dL (70.0 -110), elevated sodium (152.0 mmol/L, normal 136-145), potassium (5.8 mmol/L, normal 3.6-5.2), and chloride (112 mmol/L, normal 98-107). There were abnormalities in alkaline phosphatase (141 Iu/L, normal 50–136), AST and ALT. White blood cell count was elevated at 18.5 K/uL. Urine drug screen was positive for THC and cocaine. Myoglobin was elevated at 2290 ng/mL (normal 10-91) with normal troponin and CK-MB. Urine was trace positive for blood though no red cells were seen. Creatine phosphokinase (CPK)was elevated at 504 IU/L (normal 26-192) and there was lactic acid elevation at 15.3 mmol/L (normal 0.4-2.0). SARS-antigen fluorescent immunoassay (FIA)was negative. A chest X-ray was positive for mild patchy lung air-space densities in the left lung, compatible with pneumonia. The patient was pronounced dead at 22:12

26. According to the translated 911 call transcript Alberto Peña's mom stated "The son is acting supper aggressive I need you to send me an officer…He is all aggressive high and drunk."

27. In phone calls from the jail, Alberto Peña's cousin Edgar Peña states that his cousin is crazy drunk/drugged. Edgar states, "I mean I know I'm F** up but I never did that type of Sh**… he got mad at his parents and started F*** up the door(house)." "They tied up my cousin." And "he was creaming and screaming." "I asked them to let me talk to him and they let me talk to him. When I saw him, he was fucked up, he was too f***up." "He had his eyes rolled and had foam coming out of his mouth." Edgar spoke to his mother, and when she told him that Alberto had died, he said "all this happened because he was here. He fell asleep and then they tied him up because he was yelling. That's why it hit him, because of all the high blood pressure. He was very drugged up. This happened because of all the high blood pressure… He was yelling so much mom." "They tied him up. He was very crazy and had foam in his mouth."



28. Officer Daniel Garcia testified that Alberto Peña was arrested and placed in Officer Miguel Cervantes' vehicle. Cervantes went back into the house, so Garcia and Lieutenant Erasmo Rios stayed with the patrol vehicle. While they were waiting, Garcia noticed the shadow of Alberto Peña "where he is going swinging into the door and he's hitting himself" (p.28). He heard the thump "like, when someone is banging on a table." When they opened the door they saw the subject lying on his side. He was acting like he was unconscious—his eyes were closed and he was "mumbling and jumbling" (p.30). When they put Peña in the patrol car, he reeked of alcohol and was intoxicated. Garcia had heard two thumps, and when they opened the door they saw Peña, mumbling, on his side, with his eyes closed, so he and Lieutenant Rios attempted to get a reaction from him by tapping on his face and hollering at him, to which he immediately woke up and said "what happened?" (p.32). Lieutenant Rios said "You knocked yourself out." Garcia described Peña as appearing drunk because he was sleepy, disoriented, blabbering words, with his eyes "bloodshot red." (p.35). He thought Peña had passed out in the back seat because he was drunk (p.38). Peña began to cry. His face was wet and he had mucus over his nose. They made sure the air conditioning was running (p.55). Peña had a sweaty face, watery eyes, and it looked like he hadn't had sleep in a long time (p.56). Lieutenant Rios rode in the back seat with Peña "to control him" (p.58). Officer Garcia stated that he was not aware that Alberto Peña had a serious medical condition (p.73).

29. Officer Miguel Cervantes testified that he was called to a domestic disturbance and was approached by Alberto Peña's father, who said that his son was high and drunk and that he had been on a binge for a day or two (p.18).  Lieutenant Erasmo Rios and Officer Daniel Garcia arrived to assist him. They assisted him in placing Peña in the back seat of the patrol unit. There is banging heard on the audio of Officer Cervantes' body camera video, and he said that he later found out that that banging was Alberto Peña hitting the interior of the unit (p.23). Officer Garcia told Cervantes that Peña had been "knocked out" (p.24- 25). During transport of Peña to the jail, Cervantes heard thumping and banging, so he stopped and Lieutenant Rios, who was in the unit behind him, removed his handgun and rode in the back seat with Alberto Peña. Peña was "so intoxicated… he wasn't going listening to verbal

commands (sic)" (p.26). Peña was hitting the interior of the vehicle during the transport, and he "kicked my panel, he kept doing it with the shoulder" since he was handcuffed from behind (p.27). Officer Cervantes didn't see Alberto Peña because he was driving, but he presumed that "the only thing he could have used is his head," since Peña's hands were restrained and he was "too intoxicated to put his feet up" (p.27).

30. Aristedes Peña testified that his son Alberto Peña had bipolar disorder and attention deficit hyperactivity disorder (ADHD) (p.13). He said these were diagnosed conditions (p.21). Alberto drank and used drugs (p.26). He used cocaine and marijuana (p.26, 36). He had "extreme bipolarism" and when he would get drunk he would get very aggressive (p.30). On the day he was arrested, Alberto had drunk "the whole night" and was "destroying things" (p.42). It had been a year since Alberto was taking any medications for bipolar or ADHD (p.58-59). Alberto would drink one or two six-packs every day but he would not use drugs every day (p.59-60). Alberto attempted suicide two times (p.61). The first time was by pill ingestion and the second was by dousing himself with gasoline (p.63).

31. Martina Peña testified that her son Alberto Peña had bipolarism (p.16) and attempted suicide because he was very depressed (p.19). He would drink beer, an 18-pack or 20-pack of beer. She knew he had a problem with drugs (p.26). He was doing marijuana and pills (p.27). She stated he tried to die by suicide twice: once with Tylenol and once by dousing himself with gasoline (p.29). On the day Alberto was arrested, he was drinking with his friend all night outside (p.38). He did not sleep. On that day he was destroying things, breaking windows, and she was afraid he would harm himself (p.46).

32. Ubaldo Suarez testified that he was a detention officer at the Starr County Jail at the time of the incident (p.18). On the day of the incident, Suarez arrived a little bit before 8 PM and heard from Sergeant Lopez and Sergeant Garza about the things leading up to Alberto Peña's being in detox and in the WRAP (p.21). He heard that Peña hit his head against the glass door of the detox cell (p.22). Sergeant Lopez told Sergeant Garza that because Peña was exhibiting self harm, Sergeant Lopez had made the decision to put him in the WRAP. Sergeant Lopez said they did OC (pepper) spray Peña. Suarez heard that Peña had been banging his head. At a later

time, Suarez, Cesar Juarez, Jesse Barrera, and Sergeant Garza all went to the detox cell because they had seen Peña fall out of the WRAP. Peña had managed to break the Velcro in the back and "wiggle out" (p.24). He was kicking the door. They heard the door being kicked and went over. They readjusted Peña in the WRAP and readjusted his handcuffs. They also gave Peña some water. The next time Suarez saw Peña was when he did his rounds, and he observed Peña "still wiggling around, still fighting" (p.33). Suarez mentioned that cocaine would cause dilated pupils (p.37). He said they were trained to give proper medical attention when they recognized that someone was under the influence of drugs (p.37-38). He stated that he did not receive any training about when someone who has had head injury should receive medical care (p.45). Alberto Peña did not receive any medical care for a possible head injury after he had banged his head (p.47-48). Sergeant Garza allowed Alberto Peña's cousin Edgar Peña to speak to him to calm him down (p.50). Alberto Peña was fighting against the restraints and was yelling pretty loud, but Suarez did not smell any alcohol on him or see any signs of intoxication (p.51). Suarez believed Peña was just mad at being arrested. Suarez stated that Peña was showing signs of psychological distress because he was showing signs of agitation (p.63). When Emilio Garza found Alberto Peña unresponsive, Peña's lips were a bluish color (p.64). He had foam or saliva at the mouth (p.66).

These opinions are based on my experience and training, as well as my knowledge of the peer-reviewed forensic medical literature. I am relying on the information you have provided me at the present time; thus, my opinions may change if other information is offered to me for review. The forensic methodology employed in my work in this case is identical to the methodology I employ when I perform an autopsy or write a report as part of my job for the medical examiner or coroner's office, or in my work as a medico-legal expert in other cases involving agitation and restraint. It is also consistent with the standards of my profession. I review the referenced records and then I analyze that information in the context of the current peer-reviewed medical literature. The peer-reviewed medical literature is searched via an online search engine at the National Library of Medicine (http://www.ncbi.nlm.nih.gov/pubmed) for the relevant terminology. In this case it was searched for the terms: agitation, sudden death, cocaine

intoxication, excited delirium, concussive brain injury, diffuse axonal injury, acute, concussion, sudden death. Articles are selected, referenced and listed below based on the relevance to this specific case.

I am available to testify to these opinions in a mediation hearing, deposition, or trial, if necessary. Please feel free to contact me at the above address and phone number if you have any questions or need further clarification.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of December, 2023 in Wellington, New Zealand.

Sincerely,

Judy Melinek, M.D.

Selected References:

Textbooks:

1. Baselt RC. Disposition of Toxic Drugs and Chemicals in Man, Tenth Edition. 2014 Biomedical Publications, Foster City, CA
2. College of American Pathology Standards: https://www.dropbox.com/scl/fi/rcull2jw2vt22harjp31v/CAP-tissue-retention-standards-2016.pdf?rlkey=pe61y4rkbf2ufqts7gkbbwdnu&dl=0)
3. Collins KA. Autopsy Performance & Reporting, Third Edition. 2017 College of American Pathologists, Northfield, IL
4. Cummings PM, Trelka DP, Springer KM. Atlas of Forensic Histopathology. 2016 Cambridge University Press, Cambridge, UK
5. Dettmeyer RB. Forensic Histopathology: Fundamentals and Perspectives. 2011 Springer, London.
6. DiMaio TG and Di Maio VJM. Excited Delirium Syndrome: Cause of Death and Prevention. 2006 CRC Press, Boca Raton, FL

7.  DiMaio VJ and Dana SE. Handbook of Forensic Pathology. 2007 CRC Press, Boca Raton, FL

8.  DiMaio VJ and DiMaio D. Forensic Pathology Second Edition. 2000 CRC Press, Boca Raton, FL

9.  Dolinak D, Matshes E, Lew E. Forensic Pathology Principles and Practice. 2005 Elsevier Academic Press, Burlington, MA

10. Dolinak D, Matshes E. Medicolegal Neuropathology: A Color Atlas. 2002 CRC Press, Boca Raton, FL

11. Ellison D, Love S, et al. Neuropathology: A reference text of CNS pathology, Second edition. 2004 Mosby, Philadelphia, PA

12. Glick, R.L. Emergency Psychiatry. 2008 Lippincott Williams & Wilkins, Philadelphia, PA

13. Itabashi HH et al. Forensic Neuropathology: A Practical Review of the Fundamentals. 2007 Elsevier Academic Press, Burlington, MA

14. Kroll MW, Ho JD. TASER® Conducted Electrical Weapons: Physiology, Pathology, and Law. 2009 Springer, New York, NY

15. Ogata M. Early diagnosis of diffuse brain damage resulting from a blunt head injury. Leg Med (Tokyo). 2007 Mar;9(2):105-8.

16. Payne-James J, Beynon J, Vieira DN. Monitoring Detention, Custody, Torture and Ill-Treatment: A Practical Approach to Prevention and Documentation. 2018 CRC Press, Boca Raton, FL

17. Rose BD. Clinical Physiology of Acid-Base and Electrolyte Disorders. 1989 McGraw-Hill, Inc., New York, NY

18. Ross Dl and Chan TC. Sudden Deaths in Custody. 2006 Humana Press, Totowa, NJ

19. Schwartz GR et al. Principles and Practice of Emergency Medicine Fourth Edition. 1999 Williams & Wilkins, Baltimore, MD

20. Spitz WU. Spitz and Fisher's Medicolegal Investigation of Death, Fourth Edition. 2004 Charles C Thomas Publisher Ltd., Springfield, IL

21. Veevers AE, Lawler W, Rutty GN. Walk and die: an unusual presentation of head injury. J Forensic Sci. 2009 Nov;54(6):1466-9.

22. Wecht CH, Lee HC, Van Blaricom DP, Tucker M. Investigation and Prevention of Officer-Involved Deaths. 2011 CRC Press. Boca Raton, FL

23. Wetli CV, Mittleman RE, Rao VJ. An Atlas of Forensic Pathology. 1999 ASCP Press, Chicago, IL


Articles and Abstracts:

1. AMA Executive Summary, Report 6 of The Council on Science and Public Health (A-09) : Use Of Tasers® By Law Enforcement Agencies: www.AMA.org

2. Bell LV, On a form of disease resembling some advanced stages of mania and fever. American Journal of Insanity. 1849, 6:97-127

3. Bell MD et al. Positional Asphyxiation in Adults. *The American Journal of Forensic Medicine and Pathology*. 13;2 1992 pp.101-107

4. Breed D, Meyer LCR, Steyl JCA et al. Conserving wildlife in a changing world: Understanding capture myopathy—a malignant outcome of stress during capture and translocation, *Conservation Physiology*, Volume 7, Issue 1, 2020, coz027, https://doi.org/10.1093/conphys/coz027

5. Chan T et al. The Impact of the Taser Weapon on Respiratory and Ventilatory Function in Human Subjects? *Academic Emergency Medicine* 14:5 May 2007 Suppl. 1 pp. S191-192

6. Davceva N et al. Traumatic axonal injury, a clinical-pathological correlation *J Forensic Leg Med*. May:48:35-40, 2017

7. Gonin P, Beysard N, Yersin B, Carron PN. Excited delirium: a systematic review. Academic Emergency Medicine. 2018 May;25(5):552-65

8. Grant JR et al. Excited Delirium Deaths in Custody: Past and Present. *The American Journal of Forensic Medicine and Pathology.* 30:1 March 2009 pp.1-5

9. Hick, JL et al. Metabolic Acidosis in Restraint-associated cardiac arrest: a case series. *Academic Emergency Medicine* 6:3 March 1999 pp. 239-243

10. Ho JD et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Academic Emergency Medicine 2006 Jun;13(6):589-95

11. Ho JD et al. Effect of position and weight force on inferior vena cava diameter – Implications for arrest-related death. *Forensic Science International*. 2011, 212: 256-259

12. Ho JD et al. Lactate and pH evaluation in exhausted humans with prolonged TASER X26 exposure or continued exertion. Forensic Science International. 2009 Jun 16

13. Jauchem JR. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of Sus scrofa following repeated TASER1 exposures. *Forensic Science International* 161 (2006) 20–30

14. Kennedy HG et al. Acute excited states and sudden death. *British Medical Journal* 315: 1107-1108 November 1997; associated letter by Ponder, D. British Medical Journal 1998 316:1171-1173

15. Lawrence C et al. Investigator Protocol: Sudden In-Custody Death. *The Police Chief*, Vol. 71 No. 1 2004: 44-52

16. Lee BK et al. Relation of Taser (electrical stun gun) deployment to increase in in-custody sudden deaths. *American Journal of Cardiology.* 2009 March 15;103(6):877-80

17. Marder, SR A review of agitation in mental illness: Treatment guidelines and current therapy. *Journal of Clinical Psychiatry* 2006; 67 suppl. 10: 13-21

18. Marinetti, LJ and Antonides, HM. Analysis of Synthetic Cathinones Commonly Found in Bath Salts in Human Performance and Postmortem Toxicology: Method Development, Drug Distribution and Interpretation of Results. *Journal of Analytical Toxicology* 2013;37:135–146

19. Marzuk, PM et al. Ambient temperature and mortality from unintentional cocaine overdose. *JAMA* June 10, 1998 279:22 pp. 1795-1800

20. Milliken D. Death by restraint. *CMAJ* 1998;158:1611-12

21. Mitchell RA *et al.* National Association of Medical Examiners Position Paper: Recommendations for the Definition, Investigation, Postmortem Examination, and Reporting of Deaths in Custody. Acad. Forensic Pathol. 2017 7(4): 604-618

22. MacCall C, Callender J. Mirtazapine withdrawal causing hypomania. *Br J Psychiatry* 1999; 175:390

23. Mash DC. Commentary on: Johnson MM, David JA, Michelhaugh SK, Schmidt CJ, Bannon MJ. Increased heat shock protein 70 gene expression in the brains of cocaine-related fatalities may be reflective of postdrug survival and intervention rather than excited delirium. *J Forensic Sci* 2012;57(6):1519-23. *J Forensic Sci*, March 2013, Vol. 58, No. 2 doi: 10.1111/1556-4029.12081

24. Mash DC, Pablo J, Ouyang Q, Hearn WL, and lzenwasser S. Dopamine transport function is elevated in cocaine users. *J Neurochem*, 81 :292-300, 2002

25. Mash DC, Duque L, Pablo J, Qin Y, Adi N, Hearn WL, Hyma BA, Karch SB, Druid H and Wetli, CV. Brain biomarkers for identifying excited delirium as a cause of sudden death. *Forensic Sci Int*, 190(1-3), 2009

26. Mash DC, Staley JK, Izenwasser S, Basile M, Ruttenber AJ. Serotonin transporters upregulate with chronic cocaine use. *J Chem Neuroanat.* 2000 Dec;20(3-4):271-80

27. Molina DK and DiMaio VJM. Head Trauma and Alcohol: A Lethal Combination. Am J Forensic Med Pathol Volume 36 (4): 290-292, 2015

28. Narayan V, Haddad PM. Antidepressant discontinuation manic states: a critical review of the literature and suggested diagnostic criteria. *J Psychopharmacol*. 2011 March; 25(3):306-313

29. NIJ Special Report "Study of Deaths Following Electro-Muscular Disruption." May 2011

30. O'Halloran, RL et al. Restraint Asphyxiation in Excited Delirium. *The American Journal of Forensic Medicine and Pathology* 14:4 1993; pp. 289-295

31. O'Halloran, RL et al. Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases. *The American Journal of Forensic Medicine and Pathology*. 21; 1 March 200 pp.39-52

32. Penders TM, Mash D., Lee J.C. Excited Delirium Following Use of Synthetic Cathinones. Poster Presented at American Academy of Forensic Sciences (AAFS), November 2012

33. Penders TM, Gestring, RE, Vilensky DA. Excited delirium following use of synthetic cathinones (bath salts). *General Hospital Psychiatry* 34 (2012) 647–650

34. Physicians for Human Rights Report "Excited Delirium and Deaths in Police Custody. The Deadly Impact of a Baseless Diagnosis" March 2022

35. Ross DL. Factors associated with excited delirium deaths in police custody. *Modern Pathology.* 1998 Nov 11 (11):1127-37

36. Samuel E et al. Excited Delirium: Consideration of selected medical and psychiatric issues. *Neuropsychiatric Disease and Treatment* 2009:5 pp.61-66

37. Scheinin L et al. Sudden death and sickle cell trait: medicolegal considerations and implications. *The American Journal of Forensic Medicine and Pathology.* 2009 Jun;30(2):204-8

38. Steinberg A. Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. *Med Sci Law.* 2021 Jul;61(3):215-226 and responses: Response to: Prone restraint cardiac arrest - A comprehensive review of the scientific literature and an explanation of the physiology. Vilke GM, Neuma T, Chan TC. *Med Sci Law.* 2022 Jan;62(1):77-78 and Response to: Response to: Prone restraint cardiac arrest: A comprehensive review of the scientific literature and an explanation of the physiology. Steinberg A. *Med Sci Law.* 2022 Jan;62(1):79-80

39. Stellpflug SJ, Menton TR, Corry JJ, Schneir AB There is more to the mechanism of unconsciousness from vascular neck restraint than simply carotid compression, International Journal of Neuroscience, 2020 130(1):103-106

40. Stone MP Understanding the dynamics. *PORAC Law Enforcement News* April 2004 pp.10-13

41. Stratton SJ et al. Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium. *American Journal of Emergency Medicine* 19, 9 May 2001 pp. 197-191

42. Stratton SJ et al. Sudden Death in Individuals in Hobble Restraints during Paramedic Transport. *Annals of Emergency Medicine* 25:5 May 1995 pp.710-712

43. Strömmer EMF et al. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. 22 Aug 2020 Forensic Science, Medicine and Pathology https://doi.org/10.1007/s12024-020-00291-8

44. Strote J et al. Taser use in restraint-related deaths. *Prehospital Emergency Care*. 2006 Oct-Dec;10(4):447-50

45. The Royal College of Emergency Medicine Best Practice Guideline: Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD). May, 2016 (https://www.rcem.ac.uk/docs/College%20Guidelines/5p. %20RCEM%20guidelines%20for%20management%20of%20Acute%20Behavioural%20Disturbance%20(May%202016).pdf)

46. Verma JK, Mohapatra S. Mirtazapine withdrawal-induced mania. *J Pharmacol Pharmacother*. 20 LS Oct-Dec; 6 (4): 214 - 215

47. Vilke GM et al. Physiologic Effects of the TASER on Human Subjects after Exercise. *Annals of Emergency Medicine* 50; 3 September 2007 S55

48. Vilke GM et al. Excited Delirium Syndrome (ExDS): Treatment Options and Considerations. *Journal of Forensic and Legal Medicine* 19 (2012); 117-121

49. Vilke GM et al. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. *Journal of Emergency Medicine* (2012) 43 (5): 897-905

50. Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozman WP. Excited Delirium Syndrome (ExDS): defining based on the review of the literature. *J Emer Med*, 2011; doi: 10.1 01 6/j.jemermed.2011.02.017

51. Weedn et al. Prone restraint cardiac arrest in in-custody and arrest-related deaths. *J Forensic Sci.* 2022 Sep;67(5):1899-1914 and Neuman T, Chan TC, Vilke GM. Commentary on: Prone restraint cardiac arrest in in-custody and arrest-related deaths. *J Forensic Sci.* 2022;67(5):1899-914.

52. Wetli CV et al. Cocaine-induced Psychosis and Sudden Death in Recreational Cocaine Users. Journal of Forensic Sciences 30:3 July 1985 pp.973-879

53. Wetli CV, Mash DC, and Karch S. Cocaine-associated agitated delirium and the neuroleptic malignant syndrome. *Amer J Emer Med* 14:425-428, 1996

54. Wolf, Dwayne A. Nontraumatic In-Custody Homicidal Deaths in Harris County, Texas (2015-2019). *Am J Forensic Med Pathol.* May 4, 2021 Published ahead of print

Others:

Reay, D.T. et al. Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise. The American Journal of Forensic Medicine and Pathology. 9; 1, 1988 pp.16-18

Reay, D.T. et al. Death in custody. Forensic Pathology, Part I. Clinics in Laboratory Medicine 18; 1 March 1998 pp.1-22

**PathologyExpert, Inc.**

Enclosures:

1. Dr. Melinek's curriculum vitae
2. Dr. Melinek's testimony in last 4 years
3. Dr. Melinek's contract and fee schedule