United States District Court
Southern District of Texas
**ENTERED**
August 01, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| MARTINA PENA, individually and as next best friend of A.P., and ARISTEDES PENA, individually, and on behalf of the estate of ALBERTO PENA, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 7:22-cv-00276 |
| STARR COUNTY, TEXAS, EVELARIO GARZA, UBALDO SUAREZ, CHESTER CERVANTES, ERASMO RIOS JR., DANIEL GARCIA, HECTOR LOPEZ III, JAVIER GONZALEZ, JOEL GARZA, EMILIO GARZA, JESUS BARRERA JR., CESAR JUAREZ JR., | § § § § § § § § § § | |
| Defendants. | § | |

## OPINION AND ORDER

The Court now considers "Plaintiffs' Motion to Strike Testimony of Defense Expert Thomas Fowlkes;"[1] "Defendants' Opposed Motion to Exclude or Limit Expert Opinions of Judy Melinek;"[2] "Defendants' Opposed Motion to Exclude or Limit Expert Opinions of Natasha Powers;"[3] and "Defendants' Opposed Motions to Exclude or Limit Expert Opinions of Tim Gravette."[4] The Court also considers the motions for summary judgment filed by each of the following Defendants: Miguel "Chester" Cervantes;[5] Evelario Garza;[6] Daniel Garcia;[7] Joel

---

[1] Dkt. No. 54.
[2] Dkt. No. 55.
[3] Dkt. No. 56.
[4] Dkt. No. 57.
[5] Dkt. No. 58.
[6] Dkt. No. 59.
[7] Dkt. No. 60.

Garza;[8] Cesar Juarez Jr.;[9] Hector Lopez III;[10] Ubaldo Suarez;[11] Starr County;[12] as well as "Defendant Erasmo Rios Jr.'s Motion to Dismiss Pursuant to Rule 12(b)(5);"[13] "Defendant Javier Gonzalez's Motion to Dismiss Pursuant to Rule 12(b)(5);"[14] and Plaintiffs' "Stipulation of Dismissal of Defendant Javier Gonzalez and Erasmos Rios in Exchange for Acceptanc [sic] of Trial Subpoenas Pursuant to Federal Rule of Civil Procedure 41."[15] The respective opposing party has filed a response to each opposed motion.

## I.    BRIEF BACKGROUND AND PROCEDURAL HISTORY

This case arises from a death in Starr County Jail. Plaintiffs allege the following sequence of events.[16] On August 13, 2020, Alberto Pena was arrested on a criminal mischief charge. Prior to and while being transported to the jail, he was witnessed by the officers hitting his head on the window of the patrol car. One of the officers believed Alberto had knocked himself out. After being transported to the jail, he was placed in a detox cell. While in the detox cell, Mr. Pena began banging his head against the plexiglass door, striking the wall with his hands and generally creating a ruckus. Ultimately County employees restrained Mr. Pena in a WRAP system roll cart made to prevent him from further self-harm.

After being placed in the WRAP system, Alberto began to scream that he could not breathe. His cries were heard by his cousin, Edgar Pena, who was also in Starr County's custody. Edgar was escorted by Defendants Emilio Garza, Jesus Barrera, Cesar Juarez and Ubaldo Suarez to Mr. Pena's cell to help calm him down. While there, Edgar saw that Alberto's face was purple, he

---

[8] Dkt. No. 61.
[9] Dkt. No. 62.
[10] Dkt. No. 63.
[11] Dkt. No. 64.
[12] Dkt. No. 65.
[13] Dkt. No. 85.
[14] Dkt. No. 86.
[15] Dkt. No. 90.
[16] Dkt. No. 33.

heard him complaining that he could not breathe and heard him begging for help. Edgar asked the guards to loosen the chest straps in the WRAP system, but the guards declined. Edgar was taken back to his cell. Shortly thereafter, Alberto died.

Plaintiffs, the family of Alberto, brought this suit on August 12, 2022. Their allegations include:

- Section 1983 claims based on deliberate indifference against Defendants Chester Cervantes, Erasmo Rios Jr., Daniel Garcia, Hector Lopez III, Javier Gonzalez, Joel Garza, Ubaldo Suarez, Emilio Garza, Jesus Barrera Jr., and Cesar Juarez Jr.[17]
- Section 1983 claims based on failure to supervise against Defendant Evelario Garza;
- Section 1983 claims based on *Monell* against Starr County;
- Wrongful death action against all Defendants; and
- Survival action against all Defendants.

Because the case is before the Court on summary judgment, the Court addresses the motions to exclude first.

## II. MOTIONS TO STRIKE/EXCLUDE/LIMIT EXPERT OPINIONS/TESTIMONY

### a. Legal Standard for Expert Opinion Admissibility

"[T]he Federal Rules of Evidence control the admission of expert testimony."[18] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

[17] *Id.* at 32.
[18] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).

(d) the expert has reliably applied the principles and methods to the facts of the case.[19]

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. Similarly, low probative value, or a total lack of it, will render proposed expert testimony unhelpful and, therefore, inadmissible under Federal Rule of Evidence 702."[20] The Court scrutinizes proposed expert testimony more searchingly than lay witness testimony for its pertinency and potential prejudice.[21]

Once testimony is deemed relevant, the reliability of the expert's methodology becomes the touchstone. The *Daubert* test is a flexible one,[22] and "under *Daubert,* any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."[23]

To test reliability, the Court assesses the intellectual rigor of the proposed expert testimony,[24] which must be validated by an independent and objective source beyond the expert's assurances,[25] and the Court "should ensure that the [expert] opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of [the] discipline."[26] However, an expert report or opinion need not be in lockstep

---

[19] FED. R. EVID. 702.

[20] 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 702.02[5] (Mark S. Brodin, ed., 2d ed. 1997) (cleaned up), *quoted in Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591 (1993).

[21] *Rule 702 of the Federal Rules of Evidence Is Sound; It Should not be Amended*, 138 F.R.D. 631, 632 (1991) (Weinstein, J.), *quoted in Daubert*, 509 U.S. at 595.

[22] *Daubert*, 509 U.S. at 594.

[23] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 n.11 (5th Cir. 1998) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (cleaned up).

[24] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[25] *Brown v. Ill. Cent. R.R.*, 705 F.3d 531, 536 (5th Cir. 2013) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)); *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (alteration and quotation omitted) ("But the existence of sufficient facts and a reliable methodology is in all instances mandatory. Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible.").

[26] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) (second alteration in original) (quotation omitted).

with the relevant discipline's prevailing view in order to be admissible.[27] "Certain more specific factors, such as testing, peer review, error rates, and 'acceptability' in the relevant scientific community . . . might prove helpful in determining the reliability of a particular scientific 'theory or technique.'"[28]

The Court's task at this stage is gatekeeping, not premature factfinding. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[29] Indeed, the Fifth Circuit has cautioned against transforming a motion to exclude an expert into a trial on the merits, because the factfinder may be entitled to accept or reject an expert's testimony *including* by judging whether the predicate facts on which an expert relied are accurate.[30] In short, experts may rely on disputed facts, but not unsubstantiated assertions. Cross-examination and presentation of competing evidence, rather than exclusion for inadmissibility, are the traditionally favored ways to challenge an expert opinion.[31] "It is the role of the adversarial system, not the court, to highlight weak evidence."[32]

---

[27] *Whitehouse Hotel LP v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010) (rejecting the argument that compliance with uniform published professional standards goes to admissibility rather than credibility); *see Daubert*, 509 U.S. at 588 ("Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility.").

[28] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 593–94).

[29] *United States v. 14.38 Acres of Land, more or less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

[30] *See Pipitone*, 288 F.3d at 250.

[31] *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015) (quoting *Daubert*, 509 U.S. at 596; *see 14.38 Acres of Land*, 80 F.3d at 1078 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.").

[32] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

As a preliminary matter, the Court notes that the principal issue in this case is the failure to enlist the aid of medical personnel, rather than the course of treatment. In this context, the Court addresses the motions to exclude.

**b. Analysis**

*1. Plaintiffs' Motion to Strike Testimony of Defense Expert Thomas Fowlkes[33]*

Defendants have designated Dr. Thomas Fowlkes to testify on "[t]he appropriateness of the care, medical screening, response to abnormal behavior, access to medical care and response to the medical emergency provided Mr. Alberto Pena . . . Mr. Pena's past medical history and autopsy finding" and to respond to the opinion of Plaintiffs' experts.[34]

Plaintiffs move to strike Dr. Fowlkes testimony contending that:

> Dr. Fowlkes is a physician who is board certified in addiction and emergency medicine to opine on (1) the standard of care for healthcare workers in a jail, (2) the cause of Plaintiff's death, which involved blunt force trauma to the head and struggle under prolonged restraint, (3) the reasonableness of the actions by the patrol deputies at the scene of the arrest, and (4) the reasonableness of the conduct of the detention officers in the Starr County Jail. Dr. Fowlkes is not a forensic pathologist – or even a pathologist. Nonetheless, he plans to testify at trial on causation of death by adopting and repeating the opinions of the medical examiner, Dr. Frank Salinas, as if they are his own.
>
> His opinions on causation of death should be excluded at trial, as he provides no analysis supporting his ipse dixit conclusions and simply parrots Dr. Salinas – likely due lacking any experience in the areas at issue. His opinions on the reasonableness of the patrol deputies and the jailers should be stricken as he has zero experience as a patrol deputy or jailer; thus, his opinions in these areas are completely unreliable. Finally, his opinions regarding the standards of care for providing medical care in a correctional setting should be stricken as no medical personnel are involved in this case and his healthcare standards of care do not apply to patrol deputies or detention officers.[35]

---

[33] Dkt. No. 54.
[34] Dkt. No. 73-1 at 7-8.
[35] Dkt. No. 54 at 5.

The record shows that Dr. Thomas Fowlkes is "a medical doctor who has approximately 25 years of experience in emergency and addiction medicine in a correctional setting."[36] Additionally, Dr. Fowlkes is certified in addiction medicine, as a medical review officer for drug/alcohol testing, as an adult detention officer, and until June 2024 was a certified correction healthcare professional.[37] As set out in his report, Defendants provide that Dr. Fowlkes reviewed existing medical history and autopsy findings in preparing his report.[38] "Unlike an ordinary witness, [] an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."[39] This "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."[40]

The fact that Dr. Fowlkes utilized existing medical information during his review of this case is of no concern to the Court. The Court has been presented with no evidence that the underlying medical information which may have assisted Dr. Fowlkes in the formation of his opinion is unreliable. The Court finds that Dr. Fowlkes' experience in emergency and addiction medicine in a correctional setting qualifies him to provide his opinion on the causation of death in this case. Therefore, the motion is hereby **DENIED**.

2.  *Defendants' Opposed Motion to Exclude or Limit Expert Opinions of Judy Melinek[41]*

Defendants move the Court to exclude or limit the expert opinions of Plaintiffs' expert, Dr. Judy Melinek.[42] Plaintiffs have designated Dr. Melinek to testify on the cause of Mr. Pena's death and what steps could have been taken to avoid that death. Defendants argue that Dr. Melinek, a

---

[36] Dkt. No. 73 at 5.
[37] Dkt. No. 73-1 at 41.
[38] Dkt. No. 73 at 6.
[39] *Daubert*, 509 U.S. at 592.
[40] *Id.*
[41] Dkt. No. 55.
[42] *Id.*

forensic pathologist, is unqualified to provide "expert testimony in this case related to: 1.) the

failure to provide medical treatment; 2.) what medical treatment could have or should have been

provided; and 3.) what medical treatment might have saved the decedent's life in this matter."[43]

To be specific, Defendants do not contest that

> [Dr. Melinek] is no doubt highly qualified to offer opinions as to forensic pathology
> and cause of death itself and as counsel noted in her deposition, do not intend to
> challenge her qualification to opine as a pathologist only. However, Dr. Melinek is
> not qualified, and never has been, to offer opinions regarding what kind of medical
> care or treatment would have or could have saved the decedent's life. In both her
> report, and her deposition testimony, Dr. Melinek strayed so far out of her limited
> expertise as to be borderline laughable.[44]

Defendants contend that "Dr. Melinek has zero experience or qualifications to be opining

on medical care that should have been provided to the decedent; much less that any such medical

care would in fact have resulted in a different outcome in decedent's life."[45] However, by

definition forensic pathology is "[t]he specific branch of medicine that establishes or interprets

evidence dealing with diseases and disorders of the body, esp. those that cause death."[46] Dr.

Melinek has an extensive background in forensic pathology and is certified by the American Board

of Pathology in anatomic, clinical, and forensic pathology.[47] The Court finds that providing expert

testimony in this case related to the cause of death, mechanism of injury and steps that could have

averted that is within Dr. Melinek's expertise as a forensic pathologist.

Thus, the Court finds that Dr. Melinek is qualified to provide her opinion in this matter. As

a reminder, cross-examination and presentation of competing evidence, rather than exclusion for

---

[43] *Id.* at 7.
[44] *Id.* at 5 (The Court frowns upon such a juvenile attack.).
[45] *Id.* at 6.
[46] Forensic Pathology Definition, Black's Law Dictionary (12th ed. 2024).
[47] Dkt. No. 76 at 5-7.

inadmissibility, are the traditionally favored ways to challenge an expert opinion.[48] The Court sees no reason to depart from that standard here. Accordingly, the motion is hereby **DENIED**.

### 3. *Defendants' Opposed Motion to Exclude or Limit Expert Opinions of Natasha Powers*[49]

Defendants move the Court to exclude the expert opinions of Plaintiffs' expert, Natasha Powers. Ms. Powers is a retired police officer retained to testify in police, security, and public safety practices."[50] Defendants argue that her opinions regarding use of force are irrelevant and prejudicial, she is unqualified to give opinions regarding provisions of medical attention, she is not qualified to give opinions on jail related matters, her opinions on WRAP application are unreliable, irrelevant and prejudicial, her opinions are unreliable as they are based on non-verified facts and are purely speculative, and finally she fails to provide support for her designation and regardless, a negligence standard does not apply to section 1983 claims.[51]

Ms. Powers' report details the five questions she was asked to address. The Court finds that Ms. Powers is qualified by education, training and experience to opine on these matters.

### a) Use of Force

While the Court agrees with Defendants that this is not a "use of force" case, the Court disagrees with Defendants' characterization of Ms. Powers testimony on this issue. Ms. Powers' opinion that certain Defendants "used excessive force when they restrained Pena"[52] is not irrelevant simply because a use of force claim is not pursued here. Nor is it unduly prejudicial.

---

[48] *See MM Steel, L.P.*, 806 F.3d at, 852 (5th Cir. 2015) (quoting *Daubert*, 509 U.S. at 596; *see 14.38 Acres of Land*, 80 F.3d at 1078 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.").
[49] Dkt. No. 56.
[50] Dkt. No. 56-3 at 1.
[51] Dkt. No 56.
[52] Dkt. No. 56-3 at 44.

### *b) Opinions Regarding Provisions of Medical Attention*

Defendants argue that Ms. Powers provided opinions that equate to medical opinion but that she does not have any medical training, medical education or medical experience of any kind. Defendants assert that

> In this regard, expert Powers attempts to offer opinions regarding "deliberate indifference" of the County and jailers in the Starr County jail as to a failure to provide medical attention. She opines several times in her report, discussed in Section C, that Pena was in "distress" or "medical distress." Further, she opines that Deputy Cervantes and Garcia ignored "Pena's medical and mental health emergency." She later opines that the arresting deputies failed to provide Pena with emergency mental health diagnosis and medical care. She opines that the involved Starr County Detention employees failed to provide Pena with mental health and emergency medical care.[53]

After reviewing Ms. Powers' expert report, it appears to the Court that Ms. Powers is not providing medical opinion but rather explaining, based on her experience, what medical signs that police professionals are trained to look for when using a restraint device such as the one that Mr. Pena was placed in. To be clear, Ms. Powers is not opining on what medical treatment should have been provided, but rather on whether medical treatment should have been sought. Thus, the Court does not find that Ms. Powers' opinions can be considered expert medical opinion.

### *c) Opinions on Jail Related Matters.*

Defendants also seek to exclude "Ms. Powers opinions, use of pictures, videos, documents, outside materials and even observations regarding what she believes took place in the Star County Jail . . . ."[54]

---

[53] Dkt. No. 56 at 5-6.
[54] Dkt. No. 56 at 7.

Defendants' basis for this argument is that "[i]t is clear from her report, summary of alleged professional qualifications, and attached resume that Ms. Powers has *zero* qualifications or even work experience with a jail, or even correctional facilities."[55]

Plaintiffs respond that they

do not intend to introduce opinions of Natasha Powers regarding jail related matters – as they have another expert, Tim Gravette, for that purpose. This case focuses on the deputies and jailers refusing to provide medical care for a man who they were aware had knocked himself unconscious after repeatedly slamming his head into hard surfaces.[56]

A review of Ms. Powers' report convinces the Court that the proposed testimony, even if it addresses matters occurring while Mr. Pena was in jail, is within Ms. Powers' expertise. One of the basic issues in this case is whether and when officers should have sought medical assessment/care for Alberto Pena. Ms. Powers is qualified to opine on this question.

*d) WRAP application*

Defendants argue that Ms. Powers' opinions on the WRAP application are irrelevant and prejudicial. However, as previously mentioned, the Court finds otherwise. Moreover, Plaintiffs argue that

[a]t this time, Plaintiffs do not intend to introduce opinions of Natasha Powers regarding application of the WRAP restraint system. This case focuses on the deputies and jailers refusing to provide medical care for a man who they were aware had knocked himself unconscious after repeatedly slamming his head into hard surfaces. Should the evidence at trial cause opinions on the application of the WRAP system to be relevant, Plaintiffs reserve the right to raise this issue with the Court before introducing these opinions.[57]

Thus, the Court declines to address this issue further.

---

[55] *Id.* at 6.
[56] Dkt. No. 77 at 7, ¶ 3.
[57] Dkt. No. 77 at 73.

*e) Non-Verified Facts*

Defendants also argue that Ms. Powers "makes a series of wholly unreliable speculative assertions and conclusory asserts to entirely non-verifiable inaccurate facts."[58] Defendants go on to state that Ms. Powers made-up that Mr. Pena was rendered unconscious, that he was yelling for help, that he was in distress, that it was improper for him to be left unattended, amongst other things. Whether Mr. Pena may have lost consciousness is clearly in dispute, however, the other allegedly "non-verifiable inaccurate facts" have some support in the record or are opinions. These are matters more properly addressed through cross examination.

As the Court has noted, the Court's task at this stage is gatekeeping, not premature factfinding. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[59]

*f) Negligence Standard*

Finally, Defendants seemingly argue that, without saying it, Ms. Powers has inappropriately written her opinion with a negligence standard in mind.[60] Based on a review of Ms. Powers' report, the Court finds otherwise. Nonetheless, the Court agrees that a negligence standard does not apply and will exclude any opinions based on that standard.

For the foregoing reasons, the motion is hereby **DENIED**.

---

[58] Dkt. No. 56 at 8.

[59] *United States v. 14.38 Acres of Land, more or less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

[60] Dkt. No. 56 at 10, ¶ F.

4. *Defendants' Opposed Motion to Exclude or limit Expert Opinions of Tim Gravette*[61]

Finally, Defendants move to exclude the expert opinions of Plaintiffs' expert, Tim Gravette. As background and qualifications, Mr. Gravette asserts that he is a twenty-year corrections veteran. Nine of those twenty years were served as an Associate Warden with the Federal Bureau of Prisons.[62] Defendants assert that Mr. Gravette is unqualified to give opinions regarding provision of medical attention; that his opinions on provision of medical attention are unreliable, irrelevant and prejudicial; that his numerous opinions regarding force used and observation checks should be excluded as they are irrelevant, speculative, unreliable, conclusory and prejudicial. Defendants also assert that Tim Gravette's report fails to provide support for his designation, that it is based on a negligence standard which does not apply to Section 1983 claims, and finally, that he is unqualified to give opinions as to policies and procedures for holding pre-trial detainees.[63]

a) *Qualification to Give Opinions Regarding Provisions of Medical Attention*

Defendants argue that Mr. Gravette does not have the medical training, medical education or medical experience to be qualified to opine on the deliberate indifference of the County jailers as to a failure to provide medical attention.[64]

Plaintiffs argue that

Mr. Gravette is a retired correctional officer and associate warden providing expert opinions on whether the detention officer defendants in this case conducted themselves in line with established correctional practices when they refused to provide medical care for a man who they were aware had knocked himself unconscious after repeatedly slamming his head into hard surfaces in the jail. Mr. Gravette provides no medical opinions – but instead simply opines on whether the jailers acted in concert with established police practices.[65]

---

[61] Dkt. No. 57.
[62] Dkt. No. 57-3 at 1.
[63] Dkt. No. 57.
[64] *Id.* at 5.
[65] Dkt. No. 78 at 5-6.

After reviewing Mr. Gravette's report, the Court agrees that Mr. Gravette is not providing medical opinions in his report. This entire case deals with the question of whether Defendant Starr County correctional employees can be found to have been deliberately indifferent to the alleged medical needs of Mr. Pena. Those Defendants are not medical professionals. Mr. Gravette's report speaks from his experience as a correctional employee trained for the same or similar circumstances. While those circumstances require some baseline assessment of individuals in custody who may be in medical distress, that opinion does not delve into medical treatment but instead asks the question of whether it was appropriate to seek the assistance of a medical professional. As previously ruled, with another of Plaintiffs' experts, this expert is not testifying about what medical treatment should have been provided, but on whether medical treatment should have been sought.

### b) Reliability, Relevance, and Prejudice of Opinions on Provision of Medical Attention

Defendants next argue that Mr. Gravette's opinions on the question of medical provisions are "purely speculative and would not only not help the fact-finder with respect to the deliberate indifference standard related to the constitutional requirement of medical attention, but in fact would be entirely prejudicial to Defendants, given their unreliability; their conclusory nature; their failure to be grounded in any actual scientific medical analysis; and their lack of relevancy to the proper standard."[66] Whether by design or inadvertence, Defendants simply misconstrue Mr. Gravette's report.

Mr. Gravette's report sets out the Texas Commission on Jail Standards and by using his own "knowledge, education, training, and years of experience working as a correctional

---

[66] Dkt. No. 57 at 6.

professional," applies those standards to the facts of this case.[67] Mr. Gravette is qualified to provide

his opinions and from the Court's review, the opinions do not appear to be unreliable considering

Mr. Gravette's background.

### c) Opinions Regarding Force Used and Observation Checks

Defendants next argue that Mr. Gravette's opinions regarding excessive use of force are

not relevant.[68] Plaintiffs state that they do not intend to introduce the opinions of Mr. Gravette

regarding force.[69] Thus the Court will revisit this issue if and when it is an issue.

Defendants also argue that Mr. Gravette's opinions on observation checks amount to

"random opinions" that are "speculative, conclusory and unreliable."[70] However, as previously

addressed, Mr. Gravette bases his opinions on the Texas Commission on Jail standards which the

Courts finds relevant to the facts in this case.

### d) Support for Designation and Negligence Standard

Defendants next argue that Mr. Gravette fails to provide support for his assertion that the

employees of Starr County were deliberately indifferent toward Mr. Pena.[71] Defendants'

objections here are a cut and paste version of their objections to Ms. Powers' proposed testimony.

As with Ms. Powers, Defendants' objections are without merit.

### e) Opinions as to Policies and Procedures for Holding Pre-Trial Detainees

Lastly, Defendants argue that although Mr. Gravette has many years of experience in a

correctional setting, he is not qualified to render opinion "with pre-trial detainees or specific issues

related to intaking or housing pre-trial detainees which would include applying Texas law to pre-

---

[67] Dkt. No. 57-3.
[68] Dkt. No. 57 at 8.
[69] Dkt. No. 78 at 12.
[70] Dkt. No. 57 at 9.
[71] Dkt. No. 57 at 11.

trial detention matters."[72] According to Defendants "[i]t is completely disingenuous for someone who has spent their entire career with federal correctional facilities to offer opinions as to what a county jail should be doing with respect to holding pre-trial detainees."[73]

The Court does not agree with this assertion. If anyone is being disingenuous, it is Defendants. Defendants fail to recognize that while the legal source of a pretrial detainee's claim may be distinct from that of a prisoner, the deliberate indifference standard is substantially similar.[74] Mr. Gravette clearly indicates he is considering the Texas Commission on Jail Standard. That Mr. Gravette has extensive experience in a federal correctional setting does not render his opinion unreliable. Rather, Mr. Gravette is fully qualified to render his expert opinion on the duties of a correctional officer based upon his training, experience and the correct standard.

Based on the foregoing, Defendants' motion to exclude or limit the expert opinions of Tim Gravette is hereby **DENIED**.[75]

## III.    MOTIONS FOR SUMMARY JUDGMENT

### a.    Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court has the ability to grant summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[76]

"A fact is 'material' if its resolution could affect the outcome of the action,"[77] while a "genuine" dispute is present "only if a reasonable jury could return a verdict for the non-movant."[78]

---

[72] *Id.* at 12.
[73] *Id.*
[74] *Hare v. City of Corinth, Miss.*, 74 F3d. 633, 648-49 (5th Cir. 1996).
[75] Dkt. No. 57.
[76] FED. R. CIV. P. 56(a); *see Bulko v. Morgan Stanley DW Inc.*, 450 F.3d 622, 624 (5th Cir. 2006).
[77] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007).
[78] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006); *see Bache v. Am. Tel. & Tel. Co.*, 840 F.2d 283, 287 (5th Cir. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) ("[T]o determine if an issue

As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[79] "Although this is an exacting standard, summary judgment is appropriate where the only issue before the court is a pure question of law."[80] The Court does not weigh the evidence or evaluate the credibility of witnesses and views all facts and inferences in the light most favorable to the nonmovant,[81] including "resolv[ing] factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[82]

In a Section 1983 case such as this, where Defendants seek summary judgment based on qualified immunity, the burden is then on Plaintiffs to establish a genuine factual dispute whether the allegedly wrongful conduct violated clearly established law.[83] Thus, the Court will be applying a modified summary judgment standard as it analyzes Defendants' qualified immunity defenses.

> The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation. A court may rely on either prong of the defense in its analysis.
>
> If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable in light of law which was clearly established at the time of the disputed action. Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact act have been illegal. An official's actions must be judged in light of the circumstances that confronted him, without benefit of

---

of material fact is genuine, we must then decide whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'").

[79] *Anderson,* 477 U.S. at 248.

[80] *Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir. 1991).

[81] *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996).

[82] *Boudreaux v. Swift Transp. Co*, 402 F.3d 536, 540 (5th Cir. 2005).

[83] *Brown v. Callahan*, 623 F.3d 249, 252-253 (5th Cir. 2010) (citations omitted).

hindsight. In essence, a plaintiff must allege facts sufficient that no reasonable officer could have believed his actions were proper.[84]

As to the first prong of the qualified immunity defense, pretrial detainees have a clearly established Fourteenth Amendment right not to be denied, by deliberate indifference, attention to serious medical needs.[85] To succeed on a deliberate-indifference claim, Plaintiffs must show that (1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) the official actually drew that inference.[86]

As for the second prong of the qualified immunity standard, "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[87] As the Fifth Circuit has held, "the salient question we ask at prong two is whether the state of law at the time of the incident gave the officers fair warning that their alleged treatment of [the plaintiff] was unconstitutional."[88]

### b. Factual Background

The following facts are undisputed, unless otherwise stated, and pertinent to Defendants' motions for summary judgment.

On August 13, 2020, Starr County Deputies were dispatched to the Pena home in response to a 911 call regarding Alberto Pena. Deputy Miguel "Chester" Cervantes, the first on the scene, was approached by Alberto's father who advised Deputy Cervantes that his son was highly intoxicated and under the influence of drugs. Upon encountering Alberto, Deputy Cervantes noticed Alberto had heavy slurred speech and unsteady balance with a strong odor of alcohol. Deputy Cervantes handcuffed Alberto without incident. Lt. Erasmo Rios and Deputy Daniel

---

[84] *Id.* at 25 (internal quotation marks and citations omitted).
[85] *Id.* (citing *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir. 1996)).
[86] *Dyer v. Houston*, 964 F.3d at 374 (2020) (internal quotation marks and citations omitted).
[87] *Id.*at 383 (internal quotation marks and citations omitted).
[88] *Id.* (internal quotation marks and citations omitted).

Garcia, who had then arrived on the scene, placed Alberto in the back of Deputy Cervantes' patrol unit.

While in the patrol unit, before departing the scene, Alberto became rowdy and hit the interior of the patrol unit with his head twice. Whether Alberto lost consciousness is a disputed fact issue. Alberto again hit himself on the interior of the vehicle during his transportation to the Starr County Jail. To prevent further injury, the vehicle stopped and Lt. Rios got in the back of the seat with Alberto to monitor him for the remainder of the ride to the jail.

Defendant Cervantes arrived at the county jail with Alberto at approximately 3:16 p.m. Defendant Cervantes completed an arrest complaint which notes Albert was under the influence of drugs and alcohol.[89] Alberto was then placed in the detox holding cell. While in the detox cell at approximately 3:34 p.m., Alberto intentionally struck his forehead on the cell's metal door polycarbonate ballistic glass three times. Within a minute Sgt. Hector Lopez, Officer Jesus Gonzalez, and Sgt. Chris Galvan entered the detox holding cell to talk with Alberto about hitting his head on the cell window to get him to stop and calm down.

As he had not yet been booked, at approximately 4:29 p.m., Alberto was escorted out of the detox holding cell and taken to the booking area. Alberto was booked without incident and then escorted back to the detox holding cell by Detention officer Joel Garza.

At approximately 5:38 p.m., Alberto again intentionally struck his head 14 times on the cell's metal door polycarbonate ballistic glass. Again, within a minute, Sgt. Hector Lopez and Detention Officers Joel Garza and Javier Gonzalez entered the detox holding cell to talk to Alberto. Alberto was able to stand and walk and interact with the officers. Alberto was then escorted out of the detox holding cell by Sgt. Hector Lopez and Detention Officers Joel Garza and Javier

---

[89] Dkt. No. 66-4 at 5.

Gonzalez. At approximately 5:41, Alberto was escorted back into the detox holding cell. Alberto was walking and conscious.

From 5:41 until 6:39 p.m. Alberto was conscious and alternatively sitting, walking, talking, pacing, tapping on windows, talking into the intercom, and holding up a piece of paper for jailers to see. At approximately 6:27 p.m., Alberto continued with his aggressive behavior and struck the cell's metal door polycarbonate ballistic glass five times with his right fist. At approximately 6:33 p.m., Alberto struck his right shoulder against the cell's metal door. At approximately 6:38 p.m., Alberto struck the cell's metal door four times with his right hand and then the cell wall once with his hand.

In response, Detention Officers Lopez, Gonzalez, Joel Garza and Barrera entered the detox holding cell at 6:39 p.m. and continued to talk to Alberto. The Detention officers did not notice any problems with his breathing, or his ability to stand or ability to communicate other than his continued intoxication.

At approximately 6:48 p.m., Alberto intentionally struck the cell's metal door with his left foot. During this time, Officers were advised that Alberto was voicing threats to harm Officer Gonzalez. Due to those perceived threats and Alberto's previous incidents of hitting his head and punching the cell with his fists, Sgt. Lopez made the decision to place Alberto in the WRAP restraint to prevent any further harm to himself or the officers.

At approximately 6:50 p.m. Sgt. Lopez and Detention Officers Gonzalez, Garza and Barrera approached Alberto's cell. Officer Gonzalez gave commands for Alberto to turn against the wall with his hands behind his back. Alberto did not immediately comply, so Officer Gonzalez deployed pepper spray. Alberto then kneeled and was handcuffed and escorted out of the detox

holding cell. At approximately 6:53 p.m., the same detention officers escorted Alberto back into the detox holding cell in a WRAP Restraint System rolling cart.

At approximately 7:48 p.m., due to his squirming, Albert ended up laying down almost entirely flat on the rolling cart. Detention Officers Joel Garza and Barrera entered the detox holding cell and re-positioned Alberto in an upright position on the rolling cart and provided him water.

Night shift came on duty at 8 p.m. At 8:05 p.m. Alberto continued to squirm, broke loose from the rolling cart and fell onto the ground, still handcuffed behind his back. Alberto was rolling around on the cell floor and attempting to get up. At approximately 8:11 p.m., Detention Officers observed and heard Alberto out of the WRAP rolling cart, on the floor and kicking the cell door. Supervisor Sgt. Evelario Garza and Officers Suarez, Juarez, Emilio Gaza and Barrera entered the detox holding cell. The officers removed Alberto from the wrap restraint chair and kept him upright while they adjusted the straps on the chair. The officers also adjusted Alberto's handcuffs and poured water over his head.

At approximately 8:51 p.m., Officer Suarez escorted Alberto's cousin, Edgar Pena, who was an inmate down the hall, to the detox holding cell's metal door window with the idea of having Edgar calm Alberto down. Edgar was escorted away from Alberto's cell after a few minutes' conversation.

At approximately 9:01 p.m., Alberto stopped moving while restrained to the WRAP rolling cart system and he appeared to stop breathing. At approximately 9:12 p.m., Detention Officer Emilio Garza did an observation check on Alberto and observed foam on Alberto's mouth. At approximately 9:13 p.m., Detention Officers entered the detox holding cell and attended to Alberto. Alberto was removed from the WRAP rolling cart, and Detention Officers began Cardiopulmonary Resuscitation (CPR) First Aid.

At approximately 9:25 p.m., the Rio Grande City Fire Department arrived at the jail to assist and at approximately 9:28 p.m. Emergency Medical Services Paramedics arrived. Alberto was then placed on a stretcher and transported to Starr County Memorial Hospital in Rio Grande City. Alberto was pronounced dead at approximately 10:12 p.m.

A toxicology analysis showed that at the time of his death, Alberto had Ethanol (alcohol), Benzoylecgonine (Cocaine Degradation Product), Cocaethylene (Cocaine/Ethanol By-Product), Delta-9 Carboxy THC (Inactive Metabolite, and Delta-9 THC (Active Ingredient of Marijuana) in his system. The autopsy report listed Alberto's cause of death as "Cardiorespiratory Arrest While Under the Influence of Mixed Drugs" and the manner of death as "Accidental."

### c. Analysis

#### 1. Miguel "Chester" Cervantes[90] and Daniel Garcia[91]

Defendants Miguel "Chester" Cervantes and Daniel Garcia were two of the three arresting officers of Alberto Pena for the Class B Misdemeanor offense of Criminal Mischief for causing damage to property.

Defendant Cervantes was the first to arrive at the Pena home having received the call from dispatch at approximately 2:34 p.m. The undisputed summary judgment evidence establishes that Defendant Cervantes was advised that Alberto was intoxicated, using drugs and causing property damage.[92] Defendant Cervantes placed Alberto in handcuffs and escorted him out of the house. Defendant Daniel Garcia, who had then arrived, also recognized that Alberto was highly intoxicated. Defendant Garcia assisted in placing Alberto in the patrol unit. Defendant Cervantes returned to the home to talk with Alberto's father. While in front of the home, Defendant Cervantes

---

[90] Dkt. No. 58.
[91] Dkt. No. 60.
[92] Dkt. No. 66-4 at 5

"heard a bang and was notified by Deputy Garcia that Mr. Pena banged his head on the police vehicle window."[93] Defendant Garcia also "noticed Mr. Pena hitting his head on the window of the rear passenger door and heard the thump." Alberto was found on his side and was "pushed back into the vehicle." Soon after, Defendant Daniel Garcia heard another thud and again found Alberto "on his side with his eyes closed [] mumbling like a typical drunk person." Defendant Garcia and his partner "immediately attempted to get a reaction from [Alberto] by hollering at him [] and tapping his face." Defendant Garcia "believed [Alberto] was intoxicated and [that] this was a normal action with drunks."[94]

While Defendant Cervantes was transporting Alberto to the county jail, Alberto again "begin to hit himself on the interior of the vehicle." Defendant Cervantes stopped the vehicle and Lt. Rios, who was also assisting, entered the back seat to ride with Alberto for the remainder of the trip. Defendant Cervantes arrived at the jail with Alberto at approximately 3:16 p.m. After delivering Alberto to jail, neither Defendant Cervantes nor Defendant Garcia had further interaction with Alberto.

These are the undisputed facts most favorable to the Plaintiffs. Plaintiffs do allege that Alberto lost consciousness because of the head banging in the vehicle prior to transport. The summary judgment evidence does indicate Lt. Rios stated to Alberto that "you knocked yourself out" but this is not definitive evidence that Alberto lost consciousness. There is no other summary judgment evidence that Alberto lost consciousness during this time period. Furthermore, there is no summary judgment evidence that Alberto suffered head trauma, or that he died due to head trauma. Nonetheless, relying on their claim that Alberto lost consciousness, Plaintiffs allege that Defendants acted with deliberate indifference in ignoring Alberto's medical needs. The Court will

---

[93] Dkt. No. 66-10 at 2.
[94] Dkt. No. 66-12 at 2.

assume, for purposes of this analysis that Alberto passed out for a brief period while in the police unit.

Given these facts, the Court finds that Plaintiffs cannot meet their burden of showing that these Defendants acted with deliberate indifference. The Plaintiffs fail to show Defendants Cervantes and Garcia were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. Even if Alberto lost consciousness, he recovered quickly, did not show visible signs of injury, responded to intervention, was alert during transport and was able to walk upon arrival at the jail. No inference arises from these facts that a substantial risk of harm existed. Nor can Plaintiffs show that these Defendants actually drew that inference.

Even if Plaintiffs could meet the deliberate indifference standard, Plaintiffs cannot show that the law under these circumstances was clearly established. Plaintiffs compare this matter to *Dyer v. Houston*.[95] There, the Decedent, a pretrial detainee "died after violently bashing his head over 40 times against the interior of a patrol car while being transported to jail."[96] Officers observed the Decedent's "erratic behavior, and physically restrained him." He also bit an officer and was placed in leg restraints. After two hours in a cell, the officers noticed the Decedent's labored breathing and transported him to a local hospital where he eventually died.[97] Further, the autopsy report in *Dyer* confirmed that the cause of death was craniocerebral trauma.[98] However, a forty-five minute interaction with Alberto during which he banged his head three to four times yet was responsive, walking and otherwise appeared uninjured is quite distinct from the facts of *Dyer*. The Fifth Circuit in *Dyer* considered the totality of the circumstances rather than focusing solely on the head strikes. There, officers were aware that Decedent was under the influence of drugs, he

---

[95] *Dyer*, 964 F.3d at 377.
[96] *Id.*
[97] *Id.* at 379.
[98] *Id.* at 379.

was exhibiting erratic behavior, he was rolling and yelling, and he bit an officer all before being placed in a patrol unit.[99] In the unit, Decedent continued his erratic behavior screaming and thrashing and banging his head against the metal cage, side window and back some forty-six times before arriving at the jail.[100] Decedent was then brought into the jail kicking and screaming, and immediately placed in restraints.[101] The Fifth Circuit found that "the Officers had custody of a delusional detainee who was severely harming himself, and yet—despite being aware of the detainee's dire condition—they did nothing to secure medical help."[102] This is quite distinct from the facts here. In sum, the *Dyer* case does not give these Defendants fair warning that their behavior was deliberately indifferent to Alberto's serious medical needs.

Thus, the Court concludes that a reasonable jury could not find Defendants Miguel "Chester" Cervantes and Daniel Garcia acted with deliberate indifference to Alberto's serious medical needs. There is no genuine dispute of material fact as to whether the first or second prong of the qualified immunity standard has been met.

Therefore, the Court **GRANTS** Defendants' motion for summary judgment as to the defense of qualified immunity for Defendants Miguel "Chester" Cervantes [103] and Daniel Garcia.[104]

### 2.  *Hector Lopez III[105] and Joel Garza[106]*

Defendants Hector Lopez III and Joel Garza were working the day shift at the Starr County jail while Mr. Pena was incarcerated there on August 13, 2020.[107] Defendant Lopez was the

---

[99] Id. at 378
[100] *Id*. at 378-79.
[101] *Id*. at 379.
[102] *Id.* at 384.
[103] Dkt. No. 58.
[104] Dkt. No. 60.
[105] Dkt. No. 63.
[106] Dkt. No. 61.
[107] Dkt. No. 63 at 2, ¶ 4.

booking officer and Defendant Garza was the sergeant on duty. The arresting officers did not report Alberto striking his head against the patrol car window to jail staff upon transfer to the institution. However, arresting officer Defendant Cervantes reported in his "Complaint and Affidavit of Probable Cause for Arrest" that at the time of arrest, Alberto's father reported that Alberto "was highly intoxicated and under the influence of drugs" and that he "became rowdy and began causing damage" to their home.[108] Additionally, Defendant Garza admits knowing Alberto was rowdy and Defendant Garza observed Alberto was highly intoxicated.[109] Similarly, Defendant Lopez was aware that Alberto had been rowdy and that he was intoxicated. Thus, while Defendants Lopez and Garza may not have been aware of Alberto striking his head in the patrol car, they each observed that Alberto was intoxicated and, via the complaint, advised that he was under the influence of unidentified drugs, and that he was rowdy as a result of that then unknown concoction.

At 3:34 p.m., within just 18 minutes of arrival at the jail, Alberto struck his head against the cell window and fell to the ground. [110] He was calmed down in his cell but nothing further was done. Because he was so intoxicated when he arrived, he was not booked until an hour later, at 4:29 p.m. Even then, Alberto remained "highly intoxicated."[111] Then at 5:38 p.m., over two hours after he arrived at the jail, Alberto struck his head 14 times against the window in his cell. Defendants Lopez and Garza along with another entered the cell to get Alberto to calm down. Defendant Garza observed that Alberto fell to his knees after banging his head and was concerned that he would hurt himself.[112]  Additionally, Defendant Garza observed Alberto was still visibly intoxicated.[113] Defendant Lopez observed that Alberto was on his knees and appeared dazed.[114]

---

[108] Dkt. No. 66-4 at 6.
[109] Dkt. No. 66-15 at 1-2.
[110] *Id*. at 2.
[111] Dkt. No. 66-14 at 2.
[112] *Id*.
[113] *Id*.
[114] Dkt. No. 66-15 at 2.

Additionally, Defendant Lopez observed red marks and bumps on Alberto's forehead and that Alberto was still "visibly intoxicated."[115] Defendants passed off Alberto's actions as "simply an intoxicated individual exhibiting highly erratic intoxicated-like actions."[116] This aggressiveness continued with five strikes of his fist at 6:27 p.m. and four strikes with his right hand at 6:38 p.m. Defendant Lopez again passed this off as "just another agitated intoxicated prisoner."[117] Finally, after a strike with his left foot and a threat to one of the officers at 6:48 p.m., Alberto was placed in a WRAP[118] restraint device in a sitting position. To do so, the officers had to pepper spray Alberto due to the threats and as he was non-compliant to commands. Defendant Lopez again passed off Alberto's behavior as "just another agitated intoxicated prisoner."[119] Before Defendant Lopez ended his shift, he learned that Alberto was no longer in a sitting position, and he had Alberto repositioned by Defendant Garza and another officer.[120]

The summary judgment declarations of both Defendants Lopez and Garza repeatedly assert that they observed no visible injuries or wounds, that Alberto never lost consciousness, never complained of pain and never requested medical assistance. Yet neither Defendant addresses the fact that from the time of arrival at 3:14 p.m., Alberto, who was known to be under the influence of alcohol and drugs, was agitated, aggressive, engaging in self-harm, non-complaint, and threatening to such an extent that he had to be placed in restraints. Each Defendant also attests that "if someone appeared to obviously need medical treatment for visible or obvious injuries or conditions," it should be provided.[121] Yet, by their own testimony, throughout this period of time,

---

[115] *Id.*
[116] *Id.*
[117] *Id.* at 3.
[118] Dkt. No. 66-14 at 3 (The WRAP is a prisoner/suspect restrain device which essentially restrains a suspect's arms and legs in a cocoon-like jacket, hands cuffed behind; and then prisoner is set up in a low-siting chair with wheels.).
[119] Dkt. No. 66-15 at 3.
[120] *Id.*
[121] Dkt. No. 66-14 at 4; Dkt. No. 66-15 at 14.

Alberto remained highly intoxicated. After well over 3 hours in custody, having observed Alberto's abnormally aggressive behavior and knowing that he was under the influence of an unknown cocktail of drugs and alcohol, neither of these Defendants alerted medical staff to check on Alberto's condition. Clearly, these Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and they "actually drew that inference" as they chose to place Alberto in a WRAP restraint system.[122]

The autopsy confirms what the officers knew from their own observations – that Alberto was highly intoxicated. At the time of death, Alberto had Ethanol (alcohol), Benzoylecgonine (Cocaine Degradation Product), Cocaethylene (Cocaine/Ethanol By-Product), Delta-9 Carboxy THC (Inactive Metabolite, and Delta-9 THC (Active Ingredient of Marijuana) in his system. The autopsy report listed Alberto's cause of death as "Cardiorespiratory Arrest While Under the Influence of Mixed Drugs." To sum up, these Defendants knew that Alberto was under the influence of a mixture of drugs and alcohol, they saw Alberto exhibit bizarre and highly aggressive behavior for an extended period of time, they knew Alberto's bizarre behavior escalated to an extent that he had to be restrained and yet they did not seek medical attention for Alberto. Then Alberto died as a result of exactly what the officers knew and could gather from their observation of him.

Thus, while these Defendants may not have had an obligation to seek medical attention for Alberto due to a head injury, the Court does find that a factual dispute exists as to whether Defendants Lopez and Garza were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that these officers drew that inference. While these Defendants may have taken steps to address Alberto's behavior, they took no steps to address his

---

[122] *Sims v. Griffin*, 35 F.4th 945, 949–50 (5th Cir. 2022)

serious medical needs – a high state of intoxication. Alberto was clearly intoxicated, yet these Defendants ignored that state because Alberto had not suffered a physical injury they could see. On these facts, a reasonable jury may conclude that each of these Defendants was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that each of these Defendants drew that inference. Thus, the Court finds that there is a genuine dispute as to the first prong of the qualified immunity standard as to Defendants Hector Lopez III and Joel Garza

Turning to prong two of the qualified immunity standard, the Court considers whether Alberto's right to receive medical attention under these circumstances was clearly established. To show that a right was clearly established, a plaintiff "must 'identify a case' or 'body of relevant case law' holding that 'an officer acting under similar circumstances . . . violated the [Constitution].'"[123]

Plaintiffs again compare this case to *Dyer* but they also rely on *Thompson v Upshur County, TX.*[124] There, Thompson died after approximately four days in custody at two different jails during which he began suffering from delirium tremens at the second jail such that an ambulance was called to transport him to the hospital.[125] Although warned that injuries and death could result absent hospitalization, Thompson refused medical treatment.[126] He was returned to the first jail where the symptoms of delirium tremens worsened.[127] Although he suffered a head injury which bled, no head gear for protection was used but he was placed in a restrain jacket.[128] Significantly, when the sergeant on duty left for the day, despite being aware of Thompson's history, she

---

[123] *Id.* at 951.
[124] *Thompson v. Upshur Cnty., TX,* 245 F.3d 447 (5th Cir. 2001).
[125] *Id*. at 452-53.
[126] *Id*.
[127] *Id*. at 454.
[128] *Id*.

instructed officers not to request medical care unless Thompson was dying.[129] Thompson subsequently suffered a seizure and died.[130] The Fifth Circuit found the sergeant was not entitled to qualified immunity noting "that all reasonable jailers would have recognized the constitutional obligation not to instruct her subordinates not to disturb her at home or summon an ambulance unless a detainee was on the verge of death.[131]

In contrast to these two cases, the Fifth Circuit found officers were entitled to qualified immunity in *Stapleton v. Lozano*.[132] There, Stapleton was stopped and arrested on suspicion of public intoxication.[133] A search of his vehicle revealed various controlled substances.[134] While being booked he was swaying and unsteady and noted he was not feeling well.[135] Two hours after being booked, he was still swaying and unsteady, he then went to his knees where he remained for the next hour or so.[136] When the cellmate tried to move Stapleton, he was unable to do so.[137] The officer on duty was called, and he called for more help.[138] Around twenty-five minutes later the officer and a first responder entered the cell and found Stapleton unresponsive.[139] He was transferred to the hospital where he died within an hour.[140]

The Fifth Circuit, in addressing the first prong of qualified immunity, found that the plaintiffs had failed as to both the arresting officer and the officer on duty. Although finding in favor of the officers on the first prong, the Court considered the second prong – whether the right

---

[129] *Id.*
[130] *Id.*
[131] *Id.* at 464.
[132] *Stapleton v.* Lozano, 125 F.4d 743 (5th Cir. 2025).
[133] *Id.* at 747.
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.*

to medical care under these circumstances was clearly established. The Fifth Circuit held that the plaintiffs "were required to identify a case in which an officer who did not obtain medical treatment for a detainee exhibiting symptoms consistent with significant intoxication was held to have violated the Constitution."[141] Because the plaintiffs failed "to provide a factually comparable case" they were unable "to overcome the officers' qualified immunity."[142]

Similarly here, Plaintiffs have failed to identify a factually comparable case sufficient to overcome the second prong of qualified immunity. Thus, the motions for summary judgment for Defendants Hector Lopez III[143] and Joel Garza[144] are hereby **GRANTED**.

### 3. *Cesar Juarez Jr.[145] and Ubaldo Suarez[146]*

Defendants Cesar Juarez Jr. and Ubaldo Suarez were working the night shift at Star County jail while Mr. Pena was incarcerated there on August 13, 2020.[147]

Upon beginning their shifts, both Defendants Juarez and Saurez were made aware that Alberto had banged his head against the window of his cell a number of times and that he was in the WRAP system.[148] Within ten minutes of Defendants' arrival, Alberto broke loose from the rolling cart and fell onto the ground, still handcuffed behind his back.[149] He was repositioned but continued to be agitated.[150] Then, in an attempt to calm Alberto down, his cousin, a fellow inmate down the hall, was brought to Alberto's cell at about 8:51.[151] The cousin, Edgar Pena, testified that

---

[141] *Id.* at 753.
[142] *Id.*
[143] Dkt. No. 63.
[144] Dkt. No. 61.
[145] Dkt. No. 62.
[146] Dkt. No. 64.
[147] Dkt. No. 66-20.
[148] Dkt. No. 66-20 at 2.
[149] *Id.*
[150] *Id.*
[151] *Id.*

he heard Alberto screaming and he asked to be brought to Alberto to help calm him down.[152] He observed Alberto to be purple in the face and complaining that he could not breathe.[153] However, Alberto did recognize his cousin and was vocal, even screaming after Edgar left his cell. During the cousin's interaction with Alberto, Defendant Juarez noticed Alberto's "eyes were swollen and his pupils dilated, and his eyes looked out."[154]

The position of these Defendants is very similar to the Defendants in the previous section. The officers here knew that Alberto was intoxicated, and that his behavior had been such that Alberto was in the WRAP system. Defendant Juarez also observed Alberto's swollen eyes and dilated pupils. Construing Edgar's testimony in favor of the non-movants, both Defendants would have heard Alberto complaining that he could not breathe. However, this complaint is contradicted by the fact that Alberto was yelling throughout this period of time. Additionally, these Defendants had very limited interaction with Alberto. While Alberto was not directly observed between 8:51 and 9:01 when he became unresponsive, he was checked at 9:12 and attended to within a minute.

As with the Defendants Cervantes and Garcia, the Court concludes that a reasonable jury could not find Defendants Cesar Juarez Jr. and Ubaldo Saurez acted with deliberate indifference to Alberto's serious medical needs. Thus, there is no genuine dispute of material fact as to whether the first prong of the qualified immunity standard has been met.

Even if the Court found the that the first prong of qualified immunity standard had been met, the Court's assessment as to the second prong is exactly the same as the prior section pertaining to Defendants Lopez and Garza. The *Dyer* case, as well as the predicate case, *Thompson*

---

[152] Dkt. No. 75 at 596.
[153] *Id.*
[154] *Id.*

*v. Upsher County, Texas*[155] did not give Defendants Juarez and Suarez fair warning of a clearly established right to medical treatment under these circumstances.

Thus, the motions for summary judgment for Defendants Cesar Juarez Jr.[156] and Ubaldo Suarez[157] are hereby **GRANTED**.

### 4.   *Evelario Garza*[158]

Defendant Evelario Garza was the sergeant on the night shift at the Starr County Jail the night Alberto was in custody.[159] The analysis applicable to Defendants Saurez and Juarez is the same for Defendant Sergeant Garza on the issue of direct liability. Defendant Sergeant Garza's qualified immunity defense differs from the ones previously addressed to the extent that it is based on a *failure to supervise*.[160] On this issue, Plaintiffs contend that Alberto should have been checked within fifteen minutes of 8:51 p.m., as required by the Texas Commission on Jail Standards when a detainee is in restraints. Had that been done, according to Plaintiffs, Alberto would have been found unresponsive since video shows that time to be 9:01 p.m. Plaintiffs contend that had Alberto been checked timely, he would not have died.

To establish a supervisory liability claim, Plaintiffs must show that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.[161] As support for their claim, Plaintiffs point to the fact that Alberto was not checked until 9:12 p.m. (outside the fifteen minute window). However, one instance of failure to check at a fifteen-minute interval is insufficient to show a failure to supervise

---

[155] *Thompson* 245 F.3d at 447 (5th Cir. 2001).
[156] Dkt. No. 62.
[157] Dkt. No. 64.
[158] Dkt. No. 59.
[159] Dkt. No. 74 at 77.
[160] *Id.* at 12.
[161] *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998).

claim. Plaintiffs provide absolutely no evidence that Defendant Sergeant Garza knew that Alberto had not been checked since 8:51 p.m., nor do Plaintiffs provide any evidence that Defendant Sergeant Garza was deliberately indifferent to Alberto's medical needs. On a failure to supervise claim "[p]roof of deliberate indifference normally requires a plaintiff to show a pattern of violations and that the inadequate training or supervision is "obvious and obviously likely to result in a 'constitutional violation.'"[162] The only case Plaintiffs cite is distinct and insufficient to show a pattern.[163]

Thus, there exists no genuine factual dispute and the motion for summary judgment as to Defendant Evelario Garza is hereby **GRANTED**.[164]

### 5. *Starr County*[165]

Plaintiffs argue that under *Monell*[166] Starr County is liable for Alberto's death. Pursuant to *Monell*, counties are persons within the meaning of Section 1983 and can be held liable for violations of a person's constitutional rights. However, they cannot be held liable on the basis of respondeat superior. "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[167] Plaintiffs here allege two alternative theories to support their claim againt Starr County: (1) pursuant to *Monell,* the episodic acts and omissions of County Jailers and (2) the unconstitutional conditions of confinement at the County Jail.

---

[162] *Brown,* 623 F.3d at 255 (5th Cir. 2010).
[163] Dkt. No. 74 at 78.
[164] Dkt. No. 59.
[165] Dkt. No. 65.
[166] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).
[167] *Est. of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 308 (5th Cir. 2020) (internal citations omitted.).

*a) Episodic Acts and Omissions*

"To establish municipal liability in an episodic-act case, a plaintiff must show '(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.'"[168]

As established in the preceding sections, Plaintiffs have failed to establish, as a matter of law, that the individual officers' actions amounted to deliberate indifference and/or that Alberto's rights were clearly established at the time of his death. As for the second prong of the *Monell* claim, Plaintiffs again argue that the failure to monitor Alberto every fifteen minutes constitutes a policy or custom amounting to deliberate indifference.

Defendants assert that

[e]ven if such a de facto policy exists, Plaintiffs cannot show that any failure to monitor by failing to comply with state administrative standards constituted a violation of any federal law or caused Mr. Pena's death. It is well established that violations of state law are not actionable under § 1983. Additionally, there is no Fifth Circuit precedent governing how often an inmate must be monitored under the circumstance in which Mr. Pena was detained nor do Plaintiffs cite to one.[169]

The Court agrees with Defendants. Plaintiffs fail on both prongs of a *Monell* claim. As detailed in the previous sections, Plaintiffs' claims against the individual Defendants fail to overcome the qualified immunity defense. And as with Defendant Sergeant Garza, Plaintiffs fail to show any pattern and thus fail to show a policy or custom. Thus, the Court finds that Plaintiffs have also failed to establish deliberate indifference for the second prong of a *Monell* claim. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' *Monell* claims against Starr County is hereby **GRANTED.**

---

[168] *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331).

[169] Dkt. No. 65 at 20 (internal citations omitted).

*b) Conditions of Confinement*

A conditions of confinement claim requires Plaintiffs to show "'an intended condition or practice, or show that jail officials' acts are 'sufficiently extended or pervasive . . . to prove an intended condition or practice.'"[170] The Fifth Circuit has held that there is no substantive difference between a *Monell* policies or customs requirement or the conditions of confinement showing and further that the causation element is the same for both claims.[171] Moreover, "[w]hen a plaintiff challenges conditions of confinement, "the proper inquiry is whether those conditions amount to punishment of the detainee."[172] Furthermore, the Plaintiffs "must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights."[173]

For this claim, Plaintiffs point to the alleged failure to monitor and failure to provide medical care.[174] However, Plaintiffs fail to show that either of these failures was the result of a policy or custom. More importantly, for purposes of a conditions of confinement claim, Plaintiffs fail to show that these failures amounted to punishment. The evidence shows that while medical personal were not called, Alberto was attended to throughout his time in the cell, that officers responded to his erratic behavior, that he was monitored at regular intervals and that officers used a restraint not as punishment, but to prevent injury.

Thus, the Court finds that Plaintiffs have failed on both theories of liability against Starr County. For the foregoing reasons Defendant Starr County's Motion for Summary Judgment is hereby **GRANTED.**

---

[170] *Est. of Bonilla by & through Bonilla v. Orange Cnty.*, Texas, 982 F.3d 298, 308 (5th Cir. 2020).
[171] *Id*.
[172] *Id*. (internal citation omitted).
[173] *Id.* (internal citation omitted.)
[174] Dkt. No. 74 at 94-104.

6)    *Wrongful Death and Survival Action Claims*

To recover on a wrongful death claim under Section § 1983, a plaintiff must show: (1) a constitutional violation; and (2) a causal connection between the violation or omission and the death of the decedent.[175]

To recover on a survival statute claim under Section 1983 Plaintiff must show: (1) a constitutional violation; and (2) a causal connection between the violation and the injury to the decedent that the survival statute claim redresses. Section 1983 incorporates both the Texas Wrongful Death Statute and the Texas Survival Statute.[176]

For the same reasons outlined above, the Court **GRANTS** Defendants' motion for summary judgment as to these claims.

### IV. MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND STIPULATION OF DISMISSAL

Plaintiffs filed returns of service of summons for Defendant Javier Gonzalez executed on April 4, 2025[177] and Defendant Erasmos Rios Jr. executed on April 21, 2025.[178] Subsequently, each Defendant filed a motion to dismiss pursuant to Rule 12(b)(5).[179] Plaintiffs have now filed a stipulation of dismissal for both of these Defendants in exchange for acceptance of trial subpoenas.[180]

Under Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs may dismiss a judicial action without a court order by filing a notice of dismissal before the opposing party serves an answer or motion for summary judgment. Such motion to dismiss is without prejudice unless

---

[175] *Montano v. Orange Cty., Texas*, 842 F.3d 865 at 882.
[176] *See Pluet v. Frasier*, 355 F.3d 381 at 383-84 (5th Cir. 2004); *Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205 at 209 (5th Cir. 2016); *Estate of King v. Tex. Dep't of Criminal Justice*, Civil Action No. H-22- 1858, 2023 WL 6370646, at *3 (S.D. Tex. July 13, 2023).
[177] Dkt. No. 84.
[178] Dkt. No. 84-1.
[179] Dkt. Nos. 85 & 86.
[180] Dkt. No. 90.

Plaintiffs state otherwise.[181] Here, Plaintiffs pray to dismiss with prejudice. The Fifth Circuit has

held that Rule 41(a) may be used to dismiss individual defendants.[182] Defendants have not served

an answer or motion for summary judgment in this case. Accordingly, no further action by the

Court is necessary[183] and Plaintiffs have effectively dismissed these Defendants from this case.

All of Plaintiffs' claims against Javier Gonzalez and Erasmos Rios Jr. are hereby

**DISMISSED WITH PREJUDICE**. The Clerk of Court is instructed to terminate the case as to

Defendants Javier Gonzalez and Erasmos Rios.

Further, the motions to dismiss[184] for failure to state a claim filed by the aforementioned

Defendants are hereby **DENIED AS MOOT**.

### V.   DEFENDANTS EMILIO GARZA AND JESUS BARRERA JR.

The Court notes that Defendants have not submitted a motion for summary judgment for

Defendants Emilio Garza and Jesus Barrera Jr. The record shows that summons was issued for

these two Defendants,[185] but there has been no return of service filed. Thus, it is unclear to the

Court whether Plaintiffs intend to proceed against Defendants Emilio Garza and Jesus Barrera Jr.

Pursuant to Rule 4 of the Federal Rules of Civil Procedure the Court hereby gives Plaintiffs notice

that the case against these two Defendants will be dismissed within ten days of this order unless

Plaintiffs show cause for the failure to timely serve these Defendants.

### VI.   CONCLUSION

Based on the foregoing, the Court hereby **DENIES** "Plaintiffs' Motion to Strike Testimony

of Defense Expert Thomas Fowlkes;"[186] **DENIES** "Defendants' Opposed Motion to Exclude or

---

[181] FED. R. CIV. P. 41(a)(1)(B).
[182] *Williams v. Seidenbach*, 958 F.3d 341, 344-345 (5th Cir. 2020).
[183] *See Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 291 (5th Cir. 2016) (quoting *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 973 (5th Cir. 2015) (per curiam)).
[184] Dkt. Nos. 85-86.
[185] Dkt. No. 35.
[186] Dkt. No. 54.

Limit Expert Opinions of Judy Melinek;"[187] **DENIES** "Defendants' Opposed Motion to Exclude or Limit Expert Opinions of Natasha Powers;"[188] and **DENIES** "Defendants' Opposed Motions to Exclude or Limit Expert Opinions of Tim Gravette."[189]

The Court **GRANTS** "Defendant Miguel "Chester" Cervantes's Motion for Summary Judgment" [190] and **DISMISSES** Plaintiffs' claims against **MIGUEL "CHESTER" CERVANTES**; **GRANTS** "Defendant Evelario Garza's Motion for Summary Judgment"[191] and **DISMISSES** Plaintiffs' claims against **EVELARIO GARZA**; **GRANTS** "Defendant Daniel Garcia's Motion for Summary Judgment"[192] and **DISMISSES** Plaintiffs' claims against **DANIEL GARCIA**; **GRANTS** "Defendant Joel Garza's Motion for Summary Judgment" [193] and **DISMISSES** Plaintiffs' claims against **JOEL GARZA**; **GRANTS** "Defendant Cesar Juarez Jr.'s Motion for Summary Judgment"[194] and **DISMISSES** Plaintiffs' claims against Cesar Juarez Jr.; **GRANTS** "Defendant Hector Lopez III's Motion for Summary Judgment"[195] and **DISMISSES** Plaintiffs' claims against Hector Lopez III; **GRANTS** "Defendant Ubaldo Suarez's Motion for Summary Judgment."[196] and **DISMISSES** Plaintiffs' claims against Ubaldo Suarez; **GRANTS** "Defendant Starr County's Motion for Summary Judgment"[197] and **DISMISSES** Plaintiffs' claims against Starr County.

---

[187] Dkt. No. 55.
[188] Dkt. No. 56.
[189] Dkt. No. 57.
[190] Dkt. No. 58.
[191] Dkt. No. 59.
[192] Dkt. No. 60.
[193] Dkt. No. 61.
[194] Dkt. No. 62.
[195] Dkt. No. 63.
[196] Dkt. No. 64.
[197] Dkt. No. 65.

The Court **DENIES AS MOOT** "Defendant Erasmo Rios Jr.'s Motion to Dismiss Pursuant to Rule 12(B)(5);"[198] **DENIES AS MOOT** "Defendant Javier Gonzalez's Motion to Dismiss Pursuant to Rule 12(b)(5);"[199] and **DISMISSES DEFENDANTS JAVIER GONZALEZ AND ERASMOS RIOS** pursuant to Plaintiffs' "Stipulation of Dismissal of Defendant Javier Gonzalez and Erasmos Rios in Exchange for Acceptanc [sic] of Trial Subpoenas Pursuant to Federal Rule of Civil Procedure 41."[200]

Finally, the Court hereby **CANCELS** the parties' final pretrial conference previously set for September 18, 2025 at 9:00 a.m.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 1st of August, 2025.

_____
Micaela Alvarez
Senior United States District Judge

---

[198] Dkt. No. 85.
[199] Dkt. No. 86.
[200] Dkt. No. 90.